Jonathan Jantzen, Attorney General, SBN 016220
Laura Berglan, Deputy Attorney General, SBN 022120
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ  85634
Telephone: (520) 383-3410
jonathan.jantzen@tonation-nsn.gov
laura.berglan@tonation-nsn.gov

Seth P. Waxman (*Pro hac vice*, application pending)
Danielle Spinelli (*Pro hac vice*, application pending)
Kelly P. Dunbar (*Pro hac vice*, application forthcoming)
Sonya L. Lebsack (*Pro hac vice*, application pending)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
kelly.dunbar@wilmerhale.com
sonya.lebsack@wilmerhale.com

*Counsel for Plaintiff Tohono O'odham Nation*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

_____
                                                    )
                                                    )   Case No.  _____
                                                    )
THE TOHONO O'ODHAM NATION,      )
                                                    )
                    Plaintiff,                 )
                                                    )
          vs.                                     )   **COMPLAINT FOR INJUNCTIVE AND**
                                                    )   **DECLARATORY RELIEF**
DOUGLAS DUCEY, Governor of Arizona; )
MARK BRNOVICH, Arizona Attorney   )
General; and DANIEL BERGIN, Director, )
Arizona Department of Gaming, in their )
official capacities,                           )
                                                    )
                    Defendants.             )
                                                    )
                                                    )
_____)

Plaintiff the Tohono O'odham Nation (the "Nation"), a federally recognized Indian tribe, hereby alleges and states:

## INTRODUCTION AND NATURE OF ACTION

1. The Nation brings this action seeking equitable and declaratory relief against Defendants—all state officers sued in their official capacity—for conduct that violates the Supremacy Clause of the U.S. Constitution and the Indian Gaming Regulatory Act ("IGRA").

2. IGRA grants Indian tribes, such as the Nation, the right to engage in Class III, "casino-style" gaming on Indian lands where three statutory conditions are satisfied. Such gaming must be authorized by tribal ordinance; it must be located in a State that permits such gaming; and it must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1). The first two conditions are satisfied here, and neither Defendants nor the State of Arizona (the "State") has ever contended otherwise.

3. With respect to the third statutory condition, the Nation and the State entered into a tribal-state compact governing Class III gaming (the "Compact") in 2002, and the Compact was approved by the U.S. Secretary of the Interior in 2003. Pursuant to the Compact, the Nation plans to open a resort and gaming facility, known as the West Valley Resort, on land in unincorporated Maricopa County. That land became part of the Nation's Indian lands last year, when the Secretary of the Interior accepted it into trust for the Nation.

4. Despite that, the State and its allies have left no stone unturned in an effort to deprive the Nation of its right to engage in Class III gaming at the West Valley Resort. Among other things, Arizona and other tribes with competing gaming interests sued the Nation in this Court, alleging that the Compact prohibited Class III gaming at the West Valley Resort. This Court rejected that claim, holding that that "the Nation's construction of a casino on the Glendale-area land will not violate the Compact" and "is

expressly permitted by [IGRA]." *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 753, 754 (D. Ariz. 2013). That ruling is currently on appeal.

5. Notwithstanding this Court's binding judgment—which the State has not sought to stay or otherwise alter pending appeal—Defendants now seek to throw a new roadblock in the path of the Nation's project. At the behest of the other Defendants, Defendant Bergin, as Director of the Arizona Department of Gaming ("ADG"), has taken the extraordinary position that state law permits ADG to attempt to block Class III gaming at the West Valley Resort by refusing to certify vendors or employees or to approve the facility. Defendants assert that ADG has *state*-law authority to decide that the Nation has engaged in "disqualifying conduct" that "nullif[ies]" the Nation's *federal* right to engage in Class III gaming at the West Valley Resort—a right this Court has already recognized. Specifically, Defendant Bergin has informed the Nation that the State, and therefore ADG, takes the position that the Nation committed "fraud" in the negotiation of the Compact; for that reason, ADG refuses to issue certifications and approvals relating to the West Valley Resort, even though IGRA and the Compact expressly authorize the project.

6. As explained further below, Defendants' allegations of fraud are legally and factually meritless. But the merits of Defendants' allegations are ultimately irrelevant to this suit. Defendants' refusal to issue certifications and approvals for the West Valley Resort based on the purported state-law authority Defendants have articulated is manifestly unlawful for a simple and sufficient reason: The Supremacy Clause of the U.S. Constitution, together with IGRA, precludes Defendants' sweeping view of their state-law authority.

7. Settled principles of preemption foreclose Defendants' position in two ways. *First,* in enacting IGRA, Congress created a federal regulatory regime that occupies the field of Class III gaming regulation. Because IGRA does not permit States to make unilateral decisions regarding Indian tribes' eligibility to engage in gaming, any

state law purporting to grant ADG such authority is preempted.  *Second,* principles of conflict preemption independently compel that result.  Arizona is not free to substitute its judgment for Congress's by placing additional restrictions, beyond those imposed by IGRA, on Indian tribes' federal right to engage in gaming.  Because gaming at the West Valley Resort would satisfy the three conditions for Class III gaming that Congress set out in IGRA, the Nation has a statutory right to open and operate the West Valley Resort that may not be countermanded by state law.

8.     In addition, ADG has recently taken the unprecedented action of singling out the West Valley Resort in a "notice" warning existing vendors and employees against dealing with the Nation.  By doing so, ADG apparently seeks to halt any progress the Nation might make in constructing the facility, hiring employees, or otherwise preparing for gaming at the facility—activities that are lawful under this Court's judgment.  The notice states that employee and vendor certifications are not valid for "the Tohono O'odham Nation's proposed casino" and that vendors or employees providing goods or services to the Nation's West Valley Resort "may be subject to legal and/or regulatory risks."  ADG's issuance of this notice to vendors and employees is also preempted by IGRA for the reasons identified above.

9.     Moreover, even if Defendants had state-law authority to regulate Class *III* gaming in this way (and they do not), IGRA gives States no authority whatsoever to regulate Class *II* gaming on Indian lands, whether through a tribal-state compact or otherwise.  ADG's threat to sanction vendors and employees who deal with the West Valley Resort draws no distinction between Class II and Class III gaming and thus threatens to interfere with the Nation's statutory right to engage in Class II gaming at the West Valley Resort.

10.     The Nation thus brings this suit to obtain prospective injunctive relief from Defendants' conduct, which violates the federal Constitution and laws.

3

**PARTIES**

11.     The Nation is a federally recognized Indian tribe with more than 32,000 members.  The Nation's reservation lands are located in the State of Arizona in Maricopa, Pinal, Pima, and Yuma Counties.  The seat of the Nation's government is in Sells, Arizona.

12.     Defendant Douglas Ducey is the Governor of Arizona.

13.     Defendant Mark Brnovich is the Arizona Attorney General.

14.     Defendant Daniel Bergin is the Director of ADG.

15.     Each defendant is named in his official capacity only.

**JURISDICTION AND VENUE**

16.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1362 (jurisdiction over actions brought by Indian tribes arising under the Constitution, laws, or treaties of the United States).

17.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2), because the events and omissions giving rise to the Nation's claims occurred in Arizona, and the real property involved is located in the State.  Venue is also proper under 28 U.S.C. § 1391(c) because Defendants reside in Arizona.

**GENERAL ALLEGATIONS**

**I.      THE INDIAN GAMING REGULATORY ACT**

18.     In 1987, the Supreme Court held that California could not regulate bingo and poker on an Indian reservation.  *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).  As the Court explained, because "'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States,'" "state laws may be applied to tribal Indians on their reservations" only "if Congress has expressly so provided."  *Id.* at 207.

19.     Congress responded to the Supreme Court's decision one year later, in 1988, by enacting IGRA, 25 U.S.C. §§ 2701-2721.  In doing so, Congress established a comprehensive federal framework to govern gaming on Indian lands.

20.     IGRA's purpose is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  In enacting IGRA, Congress chose not to give States broad authority to regulate gaming on Indian lands.  Rather, the statute recognizes the authority of Indian tribes themselves to conduct and regulate such gaming.  *Id.* § 2710(b), (d).  IGRA also "establish[es] … independent Federal regulatory authority … [and] Federal standards for gaming on Indian lands."  *Id*. § 2702(3).

21.     IGRA carefully defines the respective roles that the federal government, Indian tribes, and States play with respect to gaming on Indian lands.  Those roles depend on the type—or, in IGRA's parlance, the "class"—of gaming at issue.  Class I includes social games with prizes of minimal value.  25 U.S.C. § 2703(6).  Class II generally includes bingo, certain similar games, and certain card games.  *Id.* § 2703(7)(A), (B).  Class III, sometimes described as "casino-style gaming," includes everything else.  *Id.* § 2703(8).

22.     Under IGRA, States have no role to play with respect to Class I or Class II gaming.  Class I gaming is regulated exclusively by tribal governments.  25 U.S.C. § 2710(a)(1).  Class II gaming is regulated by tribes and the National Indian Gaming Commission.  *Id.* § 2710(a)(2), (b)-(c).  Class II gaming "cannot be regulated by the State," *Oneida Tribe of Indians of Wis. v. Wisconsin*, 951 F.2d 757, 759 (7th Cir. 1991), and "may be conducted in Indian country without a tribal-state compact," *Seneca-Cayuga Tribe of Okla. v. NIGC*, 327 F.3d 1019, 1023 (10th Cir. 2003).  *See also Wisconsin v. Ho-Chunk Nation*, 784 F.3d 1076, 1078 (7th Cir. 2015) (tribal-state compact "does not restrict the ability of the [Ho-Chunk] Nation to offer Class II gaming on its tribal lands" "nor could it as a matter of federal law").

5

23.     In contrast, IGRA grants States a strictly limited role with respect to Class III gaming on Indian lands, permitting States to negotiate compacts with tribes regarding the conduct of such gaming.  25 U.S.C. § 2710(d).  Under IGRA, an Indian tribe may engage in Class III gaming on gaming-eligible Indian lands if such gaming is (1) authorized by a tribal gaming ordinance approved by the National Indian Gaming Commission; (2) located in a State that permits such gaming by any person, organization, or entity for any purpose; and (3) conducted in conformance with a tribal-state gaming compact that is in effect.  *Id.* § 2710(d)(1).  When each of those three conditions is satisfied, an Indian tribe has a federal statutory right to engage in Class III gaming.  *See id.* (providing that "Class III gaming activities shall be lawful" only when these three conditions are satisfied and imposing no other conditions).

24.     IGRA closely regulates the process for the formation of Class III gaming compacts.  An Indian tribe may "request" that a State "enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities."  25 U.S.C. § 2710(d)(3)(A).  IGRA specifies the topics that may be addressed in a Class III gaming compact, including "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity"; "remedies for breach of contract"; and "any other subjects that are directly related to the operation of gaming activities."  *Id.* § 2710(d)(3)(C).  Compacts may not include provisions not permitted by IGRA's terms.  *See Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1028-1029 & n.9 (9th Cir. 2010).  Moreover, a tribal-state gaming compact cannot "take effect" unless and until the Secretary of the Interior "approv[es]" it.  25 U.S.C. § 2710(d)(3)(B); *see id.* § 2710(d)(8).

25.     IGRA also specifies where Indian gaming may occur.  IGRA defines "Indian lands" to include, among other things, land within the limits of an Indian reservation or land held in trust by the United States for a tribe's benefit.  25 U.S.C.

§ 2703(4).  Under IGRA, Class III gaming is permitted on such lands acquired before October 17, 1988 (IGRA's effective date), but not generally permitted on lands acquired in trust after that date.  *Id.* § 2719(a).  The general bar on gaming on after-acquired lands is, however, subject to a number of exceptions, including an exception permitting Class III gaming on lands that are "taken into trust as a part of … a settlement of a land claim." *Id.* § 2719(b)(1)(B)(i).

## II.   THE ARIZONA DEPARTMENT OF GAMING

26.    ADG is a state agency created by the Arizona Legislature in 1995 to carry out the State's duties under IGRA.  *See* A.R.S. § 5-604(A).  Its director serves at the pleasure of the governor.  *Id.* § 5-604(B).

27.    ADG is charged, among other things, with issuing "certifications" (essentially, licenses) related to Class III Indian gaming in the State "to ensure that unsuitable individuals or companies are not involved in Indian gaming."  A.R.S. § 5-602(A).  The specific certifications at issue here are described further below.  *See infra* ¶¶ 53-56.

28.    Arizona law specifies that, in issuing certifications under § 5-602 to prospective gaming employees, vendors, and the like, ADG "shall seek to promote the public welfare and public safety and shall seek to prevent corrupt influences from infiltrating Indian gaming."  A.R.S. § 5-602(A).  In addition, ADG is charged with "execut[ing] the duties of this state under the tribal-state compacts in a manner that is consistent with this state's desire to have extensive, thorough and fair regulation of Indian gaming permitted under the tribal-state compacts."  *Id.* § 5-602(C).

## III.   THE TRIBAL-STATE COMPACTS BETWEEN THE NATION AND ARIZONA

29.    Pursuant to IGRA, the Nation and Arizona have entered into two tribal-state compacts, one in 1993 and a second in 2002.

30.    ***The 1993 Compact.***  After IGRA's passage, the Nation and other tribes in Arizona sought to negotiate tribal-state compacts with the State.  Those efforts sparked

7

1   years of litigation and contentious bargaining.  Throughout that period, all sides were

2   represented by experienced counsel.

3       31.   During the course of the compact negotiations, Arizona was aware that the

4   Nation had the right to acquire additional reservation lands.  Specifically, Arizona knew

5   that the Gila Bend Indian Reservation Lands Replacement Act ("LRA"), Pub. L. No. 99-

6   503, 100 Stat. 1798 (1986)—a public federal law passed just a few years earlier to settle

7   the Nation's claims against the United States for the flooding and consequent destruction

8   of the Nation's reservation by a federal dam—entitled the Nation to acquire additional

9   reservation lands in unincorporated Maricopa, Pima, or Pinal Counties.  *See infra* ¶¶ 57-

10  63 (discussing the Nation's land acquisition under the LRA).

11      32.   At compact negotiation meetings with Arizona in July 1992 and May 1993,

12  the Nation's counsel expressly reminded State negotiators of the Nation's rights under the

13  LRA.  In response to a question about "the potential for gaming on noncontiguous land,"

14  the Nation's representatives explained that the LRA authorized the Nation to purchase

15  "up to 9,880 acres of additional trust land" and that "[n]ot all of the land has been

16  purchased yet, so there is a possibility of additional trust land to be acquired."

17      33.   The State also knew that IGRA allowed gaming on certain Indian lands

18  acquired by tribes after IGRA's passage, under IGRA's after-acquired-lands exceptions.

19  *See* 25 U.S.C. § 2719.  Indeed, Arizona's representatives informed tribal representatives

20  multiple times during the negotiations that "[t]hey were concerned that there not be a

21  mechanism by which an Indian tribe could open a casino outside of their contiguous

22  reservation lands."  And Arizona actively sought limitations that would have barred the

23  Nation and other tribes from gaming on after-acquired land, notwithstanding IGRA's

24  exceptions.  Ultimately, however, Arizona dropped these demands, agreeing to compacts

25  that had no such restrictions and that, instead, incorporated IGRA's provisions governing

26  gaming on after-acquired lands.

27

28                                                    8

34.     The Nation's first compact with Arizona, signed in 1993, "authorized" the Nation to conduct Class III gaming on its "Indian Lands" and incorporated IGRA's definition of "Indian Lands."  Exh. A (1993 Compact §§ 2(s), 3).  The 1993 Compact further provided that "[g]aming on lands acquired after the enactment of [IGRA] on October 17, 1988, shall be authorized only in accordance with 25 U.S.C. § 2719," which permits tribes to game on lands taken into trust as part of a settlement of a land claim.  *Id*. (1993 Compact § 3(f)).

35.     The compacts entered into between Arizona and various Arizona tribes during the 1990s authorized each tribe to operate a certain number of facilities and machines based on its population.  The Nation's 1993 compact gave the Nation the right to operate up to four facilities and 1,400 gaming devices.  Exh. A (1993 Compact § 3(c)).  During the term of the 1993 compact, the Nation operated three of the four facilities it was allotted.

36.     ***Proposition 202 and the 2002 Compact.***  Because the 1990s compacts would begin expiring in 2003, Arizona and the 17 member tribes of the Arizona Indian Gaming Association ("AIGA")—including the Nation, the Gila River Indian Community ("GRIC"), and the Salt River Pima-Maricopa Indian Community ("Salt River")—began to discuss new compacts in 1999.  At Arizona's request, the tribes agreed to negotiate a single comprehensive form compact that each tribe would execute separately with Arizona.  Those negotiations lasted from fall 1999 to early 2002.

37.     Although the tribes met with Arizona under the umbrella of AIGA, AIGA played a purely organizational role.  AIGA coordinated the discussions among the tribes and Arizona, but its officers had no authority to speak for or to bind the tribes on any issue.

38.     The parties also all understood that tribal negotiators, including the Nation's negotiators, had no authority to bind their respective tribes on any compacting issue or provision.  Rather—as the tribes informed Arizona many times—the tribal

9

negotiators could only negotiate the best deal they could for their tribes, reduce the agreement to writing, and then present the negotiated compact to their tribal legislatures for approval or disapproval.  The resolution passed by the Nation's Legislative Council authorizing its negotiators to negotiate the compact required that the compact be "submit[ted] to the Legislative Council … for final approval."  Other tribes took the same approach.  The purpose of doing so was to prevent statements made or positions taken by tribal negotiators from being considered binding on a tribe before the tribal legislature reviewed and either approved or disapproved a compact in its entirety.  This need for legislative approval by each tribe meant that, until the negotiators were able to agree on *all* the provisions of a standard form compact, neither Arizona nor the tribes could consider *any* position taken or provision negotiated to be final.

39.     Tribal negotiators participated in hundreds of meetings from 1999 to 2002 to negotiate the new compact terms.  All parties—the tribes and the State—were represented by sophisticated counsel, and they negotiated the terms at arm's length.

40.     One key point in the negotiations was the number of gaming facilities and machines each tribe would be allowed to operate under the new compacts.  At first, Arizona asked all the tribes to forgo the right to build any new gaming facilities.  The tribes rejected that demand.  Arizona then insisted that each tribe relinquish one of the facility rights it had been granted in the 1990s compacts.  That proposal would have limited the Nation to three facilities, even though its 1993 Compact authorized it to operate four.  Nine tribes accepted this proposal, but six others—including the Nation— did not.

41.     As the parties negotiated over the number of facilities and machines the compacts would authorize, their positions were set forth in numerous versions of a "Gaming Device Allocation Table" that were exchanged among the parties.  Ultimately, the parties agreed on the version of the table contained in Section 3 of the 2002 Compact.

Exh. B (Compact § 3(c)(5)).  The table authorized the Nation to operate four facilities and 2,420 devices.  *Id*.

42.    The Compact provides that "at least one of [the Nation's] four" facilities must be "at least fifty (50) miles from the existing Gaming Facilities of the Tribe in the Tucson metropolitan area."  Exh. B (Compact § 3(c)(3)).  Apart from this restriction and a separate provision requiring each tribe's gaming facilities to be at least one and one-half miles apart, the negotiators agreed that, just as in the 1990s compacts, the location of gaming facilities—including facilities on after-acquired lands—would be governed by IGRA.  *Id*. (Compact § 3(j)).

43.    The negotiators specifically considered proposed compact provisions that would have gone further than IGRA in restricting gaming on after-acquired lands.  Each of those proposals was rejected.  Specifically, Steve Hart, a lead negotiator for Arizona, expressed concern about the potential for tribes to put "casinos downtown" and was "adamant" that tribes relinquish their right to game on after-acquired lands.  Salt River objected, telling Hart that "[t]hat was just something we couldn't agree to."  The Navajo Nation, which had the right to acquire additional trust lands pursuant to its land settlements, also objected to the proposal.  Accordingly, the tribes refused to agree to Hart's request.

44.    GRIC's counsel Eric Dahlstrom likewise proposed a ban on gaming on after-acquired lands for the express purpose of eliminating the possibility that a tribe might get land taken into trust in the Phoenix area for gaming purposes.  That proposal was also rejected.

45.    In early 2002, after three years of hard-fought, back-and-forth negotiations, the parties agreed on a framework for a new standard compact.  The framework stated that it was "an outline of the issues discussed, and proposed compromises reached, during the past two years."  The framework did not include any restrictions on gaming on lands acquired after IGRA's enactment.

11

46.     At this point, an obstacle arose:  Operators of horse and dog tracks that wanted to offer competing gaming facilities successfully challenged the Governor's authority under state law to enter into new tribal-state compacts.  A bill to grant the Governor this power failed in the Arizona Legislature.

47.     After the Governor failed in her efforts to obtain authority to enter into a negotiated compact, a coalition of tribes proposed a ballot initiative—Proposition 202—requiring the Governor to enter into a standard form compact with any tribe requesting one, and setting out the complete text of a standard form compact drafted by the coalition of tribes.  *See* A.R.S. § 5-601.02.  In drafting Proposition 202, the tribes drew on the terms they had previously negotiated with Arizona, and no substantive changes were made to the terms governing the location of gaming facilities.

48.     Arizona voters approved Proposition 202 in November 2002.  In the wake of that approval, Arizona and the Nation signed the Compact on December 4, 2002.

49.     As required by IGRA, the Secretary of the Interior approved the Compact on January 24, 2003.  The Compact took effect on February 5, 2003, upon publication in the Federal Register.  *See* 68 Fed. Reg. 5,912.

50.     The Compact incorporates the precise terms set out in Proposition 202 governing the permissible locations for gaming facilities.  These provisions authorize gaming wherever IGRA permits it, *see* Exh. B (Compact §§ 3(a), 3(j), 2(s)), including on after-acquired lands on which gaming is permitted under IGRA, *see id.* (Compact § 3(j)(1) (citing 25 U.S.C. § 2719)).

51.     The Compact unequivocally provides that it "shall not apply to any Class I or Class II Gaming whether conducted within or without [buildings in which Class III gaming is conducted], and shall not confer upon the State any jurisdiction or other authority over such Class I or Class II Gaming conducted by the Nation on Indian Lands."  Exh. B (Compact § 16(a)).

52.     The Compact includes a comprehensive integration clause.  That clause states that the Compact "contains *the entire agreement* of the parties with respect to the matters covered by this Compact and *no other statement, agreement, or promise made by any party, officer, or agent of any party shall be valid or binding*."  Exh. B (Compact § 25 (emphasis added)).  Moreover, the Compact contains no provision reserving any right to either the State or the Nation to rescind or reform the Compact for any reason.

53.     The Compact grants the State a limited role, along with the Nation, in approving certain persons who provide goods or services to the Nation in connection with the operation of Class III gaming.  Specifically, the Compact provides that certain gaming employees, management contractors, and vendors of gaming devices and services shall be certified (i.e., licensed) by ADG.  Exh. B (Compact § 4(b), (c), (d)).

54.     Employees, contractors, and vendors seeking certification must submit applications to ADG.  Exh. B (Compact § 5(a)).  The Compact provides that ADG "shall conduct the necessary background investigation," "shall expedite State Certification Applications," and "[u]pon completion of the necessary background investigation, … shall either issue a State Certification, or deny the Application."  *Id.* (Compact § 5(b)(2)).  The Compact enumerates specified grounds—the only grounds—on which the State may deny certification to a prospective employee, contractor, or vendor.  *Id.* (Compact § 5(f)).

55.     The Compact further requires that, "[w]ithin twenty (20) days of the receipt of a complete Application for State Certification, and upon request of the Nation" or its Gaming Office, "the State Gaming Agency shall issue a temporary certification to [an] Applicant unless the background investigation … discloses that the Applicant has a criminal history, or unless other grounds sufficient to disqualify the Applicant pursuant to" the enumerated list in "subsection (f) of [§ 5] are apparent on the face of the Application." Exh. B (Compact § 5(n)).

56.     In addition, the Compact requires the Nation's Gaming Office to license gaming facilities and gaming facility operators.  *See* Exh. B (Compact § 4(a)).  The

13

1   Compact provides that "[p]rior to the initial commencement of the operation, [ADG] and

2   Tohono O'odham Gaming Office shall verify compliance with this requirement through a

3   joint pre-operation inspection and letter of compliance." *Id.* ADG must send a

4   "compliance letter" or "non-compliance letter" within seven business days of that

5   inspection. *Id.*

### IV.   THE NATION'S ACQUISITION OF THE MARICOPA COUNTY LAND UNDER THE LANDS REPLACEMENT ACT

8   57.    As noted above, the Lands Replacement Act permits the Nation to acquire

9   replacement reservation land in unincorporated Maricopa, Pima, and Pinal Counties. The

10  statute's purpose was to settle the Nation's claims against the United States for the

11  destruction of its Gila Bend Reservation.

12  58.    The Gila Bend Reservation originally encompassed 22,400 acres along the

13  Gila River in Maricopa County, Arizona, where the Nation's ancestors lived for

14  centuries. *See* H.R. Rep. No. 99-851 (1986). In the 1970s and 1980s, a federal dam

15  repeatedly flooded the Gila Bend Reservation, leaving the land unusable. The

16  consequences for the Nation's people at Gila Bend were devastating: They were forced

17  to relocate to a tiny 40-acre parcel incapable of supporting any economic development.

18  The loss of land destroyed their way of life, condemning them to unemployment and

19  poverty.

20  59.    Congress responded to this injustice by enacting the LRA "to provide for

21  the settlement of [the Nation's] claims arising from the operation" of the dam. The

22  LRA's purposes were to "replace[] … [r]eservation land with land suitable for sustained

23  economic use which is not principally farming …, to promote the economic self-

24  sufficiency of the O'odham Indian people at Gila Bend, and to preclude lengthy and

25  costly litigation." H.R. Rep. No. 99-851.

26  60.    The LRA accordingly provided that, in exchange for surrendering title to

27  the flooded lands and releasing "any and all claims of water rights or injuries to land or

28

14

water rights" against the United States, the Nation would receive $30 million and the right to acquire replacement reservation lands.  LRA §§ 4(a), 6(c), 9(a).  The LRA requires the Secretary of the Interior to take such lands into trust for the Nation if the lands meet certain conditions, including that they be located in unincorporated Maricopa, Pima, or Pinal Counties.  LRA § 6(d).  The LRA provides that, once taken into trust, such lands will be "a Federal Indian Reservation for all purposes."  *Id.*

61.     In August 2003—six months after the Compact took effect—the Nation used funds provided under the LRA to purchase replacement land in unincorporated Maricopa County.  It is on this land that the Nation will operate the West Valley Resort, as described further below.

62.     On January 28, 2009, the Nation filed an application asking the Secretary of the Interior to take the Maricopa County land into trust.  In 2010, the Secretary concluded that the LRA required the Secretary to take the land into trust.  DOI Trust Letter (July 23, 2010), *available at* http://www.bia.gov/cs/groups/webteam/documents/text/idc1-027226.pdf.  Arizona, GRIC, and others challenged the Secretary's decision unsuccessfully in this Court.  *See Gila River Indian Cmty. v. United States*, 776 F. Supp. 2d 977 (D. Ariz. 2011).  Following a remand by the Court of Appeals for the Ninth Circuit, *see Gila River Indian Cmty. v. United States*, 729 F.3d 1139 (9th Cir. 2013), the Secretary again determined that the LRA mandated the trust acquisition.  DOI Trust Letter (July 3, 2014), *available at* http://bia.gov/cs/groups/webteam/documents/text/idc1-027180.pdf.

63.     In July 2014, the Secretary, on behalf of the United States, took a portion of the Maricopa County land into trust for the Nation.  That parcel is now part of the Nation's "Indian lands" and pursuant to the LRA is a "Federal Indian Reservation for all purposes."  LRA § 6(d).

15

## V.   THE STATE'S SUIT TO ENJOIN OPERATION OF THE WEST VALLEY RESORT

64.     In 2009, the Nation announced its intention to open a resort and gaming facility on its Maricopa County land—the West Valley Resort.  The Nation's Compact with the State incorporates IGRA's provision allowing gaming on after-acquired lands "taken into trust as part of … a settlement of a land claim," 25 U.S.C. § 2719(b)(1)(B)(i).  Exh. B (Compact § 3(j)(1)).  Because the LRA settled the Nation's claims against the United States for the destruction of its Gila Bend Reservation lands, the Nation's proposal complied fully with IGRA and the Compact.

65.     Nevertheless, the State of Arizona sued the Nation in this Court seeking to enjoin the West Valley Resort project.  GRIC and Salt River, two tribes with competing gaming interests, also filed suit.  The State and its allies alleged that gaming on the Nation's Maricopa County land would violate the Nation's tribal-state compact with Arizona, for two reasons.  *First,* they claimed that the LRA was not a settlement of a land claim under IGRA, and that land acquired under the LRA was thus ineligible for gaming.  *Second,* they claimed that the Compact explicitly or implicitly barred the Nation from gaming in the Phoenix area.

66.     The State also asserted that the Nation had deceived it regarding the Compact.  Specifically, the State alleged that the Nation had represented that under the Compact there would be no new casinos constructed in the Phoenix area.  Based on that allegation, the complaint included claims of promissory estoppel, fraud in the inducement, and material misrepresentation.

67.     This Court rejected all these claims.  *See Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748 (D. Ariz. 2013).  The Court held that "no reasonable reading of the Compact could lead a person to conclude that it prohibited new casinos in the Phoenix area."  *Id.* at 768.  The text contains no such restriction, and "any agreement on an issue of such importance" would have been "carefully included in the Compact" had

1    the parties intended to address it.  *Id.* at 765.  The Court also noted that the Compact

2    includes an integration clause stating that it contains the "'*entire* agreement of the

3    parties,'" superseding any prior agreement or promise.  *Id.* at 771 (emphasis added).

4        68.    The Court separately held that the LRA—whose purpose was "to provide

5    for the settlement of [the Nation's] claims arising from the operation" of a federal dam,

6    *see supra* ¶¶ 57-60—qualified as a "settlement of a land claim" under IGRA.  Land

7    acquired under the LRA, including the land for the West Valley Resort, was thus eligible

8    for gaming under 25 U.S.C. § 2719(b)(1)(B).  *See* 944 F. Supp. 2d at 755-756.

9        69.    Finally, the Court held that the State's remaining claims were barred by the

10   Nation's sovereign immunity because they did not seek to enjoin Class III gaming in

11   violation of the Compact.  *See* 944 F. Supp. 2d at 769-770 (promissory estoppel); 2011

12   WL 2357833, at *12-13 (D. Ariz. June 15, 2011) (fraud in the inducement and material

13   misrepresentation).

14       70.    Although the Court dismissed those claims on sovereign immunity grounds,

15   in the course of adjudicating and rejecting the claims that the Nation had breached its

16   Compact and the duty of good faith and fair dealing, the Court considered *all* the

17   "evidence" regarding the Nation's statements and actions during the Compact's

18   negotiation, which the Nation produced during more than a year of wide-ranging and

19   intensive discovery.  Read as a whole, the Court's analysis of the evidence and the

20   compact claims demonstrates that the State's fraud claims are legally and factually

21   unfounded.  Specifically, the Court's decision supports the conclusion that the State was

22   aware that the Compact meant what it unambiguously said:  The Compact permitted the

23   Nation to game on its Indian lands, without any exception for land it might acquire in the

24   Phoenix area.

25       71.    As noted above, the Court found that "no reasonable reading of the

26   Compact could lead a person to conclude that it prohibited new casinos in the Phoenix

27   area."  944 F. Supp. 2d at 768.  Moreover, the Court noted that "any agreement on an

28

17

issue of such importance" would have been "carefully included in the Compact," not left unwritten.  *Id.* at 765.  And, as the Court also held, the Compact was the complete and exclusive agreement between the parties, superseding any prior agreement or promise. *Id.* at 771.  Read together, those rulings compel the conclusion that the State—a sophisticated party "well-represented" by experienced counsel, *id.* at 765—must have known that the Compact did not prohibit the Nation from conducting gaming in the Phoenix area and that no such agreement existed.

72.     In the prior litigation, the State's principal "evidence" of "fraud" was a brochure distributed by the AIGA before the vote on Proposition 202—well *after* the Compact terms had been finalized—stating that "[u]nder Prop 202, there will be no additional facilities authorized in Phoenix."  The Court considered that evidence in determining whether the State's view of the Compact should be enforced, and it concluded that AIGA's statements about Proposition 202 could not be attributed to the Nation and did *not* "reflect[] the Nation's view."  944 F. Supp. 2d at 766.

73.     The Court's prior decision also establishes why the State could not have "reasonably relied" on such a statement as a basis for entering into the Compact.  As the Court explained, the Compact does *not* bar the Nation from gaming in Phoenix; no reasonable person could have understood it to do so; had there been such an understanding, it would have been included in the Compact; and the Compact says it supersedes any prior promises or agreements.  On the record developed in the prior litigation, it is not possible for a reasonable finder of fact to conclude that the Nation fraudulently induced the State to enter into the gaming compacts by somehow deceiving the State into misunderstanding the plain terms of the Compact.

74.     Based on those holdings, this Court's judgment was that "the Nation's construction of a casino on the Glendale-area land will not violate the Compact" and "is expressly permitted by the federal statute that authorizes Indian gaming."  944 F. Supp.

2d at 753, 754.  That holding belies Defendants' allegations of fraud, though, for the reasons discussed below, the merits of those allegations are irrelevant to this suit.

## VI.   DEFENDANTS' RENEWED EXTRAJUDICIAL EFFORTS TO BLOCK THE WEST VALLEY RESORT

75.     After this Court's final judgment, on February 2, 2015, Defendant Bergin wrote to the Nation, expressing "concern[] that the proposed gaming facility is not authorized, and, as a consequence, that ADG would not have the authority to participate in any certification or approval processes relating to the opening or operation of the casino."  Exh. C (Letter from Daniel H. Bergin to Ned Norris (Feb. 2, 2015)).  The Nation responded by letter, explaining that, under IGRA and the Compact, the Nation has legal authority to proceed with opening the West Valley Resort and that this Court's judgment upholding that authority was binding on ADG.  Exh. D (Letter from Seth P. Waxman to Daniel H. Bergin (Feb. 13, 2015)).

76.     In response, ADG recognized that its initial concern was unfounded and assured the Nation that it would abide by the Court's decision, stating that it "intends to proceed in the normal course of its business with various regulatory requirements imposed by IGRA and the Compact, including those concerning TON's Glendale casino, unless applicable laws change or a court orders otherwise."  Exh. E (Letter from Roger L. Banan to Seth P. Waxman (Feb. 19, 2015)).

77.     Less than two months later, on April 10, 2015, ADG abruptly changed its position.  By letter, Defendant Bergin informed the Nation that, "based upon" the "advice" of "Governor Ducey," ADG had concluded that it "lacks statutory authority to approve TON's Glendale casino notwithstanding" this Court's decision.  Exh. F (Letter from Daniel H. Bergin to Ned Norris, Jr. (Apr. 10, 2015) ("April 10 Letter")).  The letter asserted that state law requires ADG to refuse to provide certifications and approvals for "gaming at a casino under the Compact if," in ADG's unilateral view, "credible facts indicate that such gaming is not permitted and is inconsistent with thorough, extensive

and fair regulation." *Id.* at 2 (citing A.R.S. § 5-602(C)).  The letter explained that the State's litigating position that the Nation engaged in fraud was also its view "as an agency of the State." *Id.* at 1.  The letter concluded that supposed "evidence" of fraudulent inducement by the Nation—which the letter did not describe—"nullif[ies] any right that [the Nation] would otherwise have under the compact to build the Glendale casino." *Id.*

78.  This newly minted position was apparently the product of political pressure by Governor Ducey and Attorney General Brnovich.  ADG's April 10 letter attached a letter from the Office of the Arizona Attorney General and a letter from Defendant Ducey.  Citing A.R.S. § 5-602, the Attorney General's letter advised ADG that, "[i]n determining whether to certify the proposed casino, [ADG] is vested with the statutory discretion to determine whether the application is at odds with the public welfare and safety and/or is consistent with the thorough and fair regulation of gaming in Arizona." Exh. F at 6 (Letter from Maria Syms to Daniel H. Bergin (Apr. 2, 2015)).

79.  Defendant Ducey's letter of April 8 "reaffirm[ed] the State of Arizona's position" that the Nation's West Valley Resort "is the product of fraud, fraudulent concealment, and misrepresentation."  Exh. F at 7 (Letter from Douglas A. Ducey to Daniel H. Bergin (Apr. 8, 2015)).  That letter requested that, if Director Bergin agreed with Governor Ducey that evidence of fraudulent inducement would "be grounds for the denial of the regulatory approvals necessary to operate the proposed casino, … [he] communicate those grounds to the [Nation] at the earliest appropriate date." *Id.* at 8.

80.  The Nation promptly responded to ADG by letter of April 15.  Among other things, the Nation explained that "[a]ny state law that gave ADG the unilateral authority to impose additional conditions on the exercise of rights conferred by the express terms of a tribal-state compact—a compact that implements the requirements of federal law and was approved by the U.S. Secretary of the Interior—would … be preempted by operation of the Supremacy Clause of the U.S. Constitution."  Exh. G at 2

1   (Letter from Seth P. Waxman to Daniel H. Bergin (Apr. 15, 2015)).  The Nation also

2   explained that "the State's allegation that it was somehow defrauded into executing the

3   compact is baseless, as [this Court's] decision itself makes clear."  *Id.* at 3.

4         81.    In response, on April 17, 2015, the Director reaffirmed that ADG will not

5   recognize the Nation's rights under federal law.  Exh. H (Letter from Daniel H. Bergin to

6   Seth P. Waxman (Apr. 17, 2015) ("April 17 Letter")).  The Director claimed that state

7   law (specifically A.R.S. §§ 5-602(A), (C)) "bind[s]" ADG and forecloses ADG from

8   "permit[ting] gaming" "*regardless of whether such gaming would otherwise be permitted*

9   *by a valid tribal-state compact*."  *Id.* at 1 (emphasis added).  In the letter, ADG asserted

10  that it has a state-law duty to decide for itself whether the Nation has engaged in

11  "disqualifying conduct" and, on that basis, ADG may deny the Nation its federal right to

12  engage in Class III gaming at the West Valley Resort.  *Id.* at 1, 3.  The Nation then sent

13  another letter, explaining why these positions were contrary to ADG's obligations under

14  the law.  Exh. I (Letter from Seth P. Waxman to Daniel H. Bergin (Apr. 24, 2015)).

15        82.    At bottom, Defendant Bergin, at the behest of the other Defendants, has

16  adopted the legal position that *state* law gives ADG the authority to deny the Nation

17  regulatory certifications and approvals based on its unilateral view that the Nation has

18  engaged in conduct "disqualifying" the Nation from exercising its rights under *federal*

19  law.  Exh. H at 3 (April 17 Letter) ("ADG will not issue any certification or approval

20  relating to the opening or operation of the" West Valley Resort).

21        83.    On June 4, 2015, ADG, in a letter sent by legal counsel "retained to

22  represent [ADG] with respect to matters concerning" the West Valley Resort, reiterated

23  "ADG's decision that pursuant to A.R.S. § 5-602, [ADG] will not provide the necessary

24  authorizations, certifications, and licenses" for the facility.  Exh. J (Letter from Patrick

25  Irvine to Seth P. Waxman (June 4, 2015)).

26        84.    Defendants have taken steps to implement the new position that ADG has

27  state-law authority to nullify the Nation's right to engage in Class III gaming at the West

28                                          21

Valley Resort.  In so doing, Defendants have also threatened to compromise the Nation's ability to engage in Class *II* gaming—which ADG has no authority to regulate—at the facility.

86.     On May 26, 2015, ADG notified the Nation that it "recently added an important notice" to the applications for vendor and employee certifications, and ADG provided copies of the notices to the Nation.  Exh. K (Letter from Michael McGee to Jerry Derrick (May 26, 2015)).

86.     The "Vendor Notice" enclosed in the May 26 letter states that the "application for State Certification" will now include the following additional language:

> Please be advised this application for certification is valid only for authorized Arizona gaming facilities.  Providing goods or services to any location considered by the State to be unauthorized, or in pending litigation with the State concerning whether it is authorized, would be outside the approval granted through State Certification.  Vendors providing goods or services to unauthorized facilities may be subject to legal and/or regulatory risks.

Exh. K (Vendor Notice); *see also id*. (Class A/B Vendor Application) (same); *id*. (Class D Vendor Application) (same).  ADG has now included the same language in a pop-up box on its website.  https://gaming.az.gov/certifications/vendor-certification.

87.     The "Employee Notice" enclosed in the May 26 letter states that the "application for State Certification" will now include the following additional language:

> Please be advised this application for certification is valid only for authorized Arizona gaming facilities.  Employees of any location considered by the State to be unauthorized, or in pending litigation with the State concerning whether it is authorized, would be outside the approval granted through State Certification.  Employees of unauthorized facilities may be subject to legal and/or regulatory risks.

Exh. K (Employee Notice).

88.     These notices—which ADG sent to "all existing certified vendors" and employees "applying for state certification"—also make clear that the new provisions are specifically aimed at the West Valley Resort.  The notices state that the "Tohono O'odham Nation is moving forward with construction of a proposed West Valley casino" and that the "proposed casino has been and continues to be subject to legal challenges by the State of Arizona."  Exh. K (Vendor and Employee Notices).  The notices further state that, "based upon fraud and misrepresentation committed" by the Nation, "the Arizona Department of Gaming has determined that the proposed West Valley casino is not authorized."  *Id.*

89.     Neither notice acknowledges that this Court has held that the West Valley Resort is authorized under IGRA and will not violate the Compact.  In addition, neither notice draws any distinction between Class II or Class III gaming, even though IGRA gives States no role with respect to Class II gaming.

90.     On June 9, 2015, ADG provided the Nation with new forms that the Nation's gaming office must use to certify employees.  The new forms require employees to initial the following language:  "Please be advised this application for certification is valid only for authorized Arizona gaming facilities.  Employees of any location considered by the State to be unauthorized, or in pending litigation with the State concerning whether it is authorized, would be outside the approval granted through State Certification.  Employees of unauthorized facilities may be subject to legal and/or regulatory risks."  Exh. L (required employee applications).

91.     ADG informed the Nation that it must begin using these forms by July 3, 2015.  Exh. L at 1.

92.     These efforts by Defendants have the purpose and effect of impeding the Nation's ability to engage in Class III gaming at the West Valley Resort.  They have materially impaired the Nation's ability to open the West Valley Resort in a timely

1    manner as a Class III gaming facility—which federal law entitles the Nation to do—

2    causing the Nation and its members substantial and irreparable injury.

3         93.   Because ADG's communications with vendors and employees do not

4    distinguish between Class II and Class III gaming, they also threaten to interfere with the

5    Nation's uncontested federal right to engage in Class II gaming at the West Valley

6    Resort, by chilling vendors' and employees' willingness to provide goods and services

7    related to Class II gaming.

8

9                              **COUNT ONE:**

10   **FEDERAL PREEMPTION OF DEFENDANTS' OBSTRUCTION OF
     LAWFUL CLASS III GAMING**

11        94.   The Nation incorporates by reference the allegations of the preceding

12   paragraphs.

13        95.   Under the Supremacy Clause, "the Laws of the United States" are "the

14   supreme Law of the Land … any Thing in the Constitution or Laws of any State to the

15   Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Defendants' refusal to perform

16   regulatory approvals and certifications relating to Class III gaming at the West Valley

17   Resort—based on Defendants' position that state law gives ADG the authority to

18   determine that the Nation has engaged in "disqualifying conduct" and on that basis deny

19   the Nation its rights under IGRA—violates the Supremacy Clause.

20        96.   Congress enacted IGRA "to provide a statutory basis for the operation of

21   gaming by Indian tribes as a means of promoting tribal economic development, self-

22   sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  IGRA establishes a

23   "framework for regulating gaming activity on Indian lands."  *Michigan v. Bay Mills*

24   *Indian Cmty.*, 134 S. Ct. 2024, 2028 (2014).  That statutory framework is comprehensive

25   and is supplemented by comprehensive regulations.  *See, e.g.*, 25 C.F.R. pt. 291 (Class III

26   Gaming Procedures).  Indeed, Congress "intended to expressly preempt the field in the

27

28
                                        24

governance of gaming activities on Indian lands."  S. Rep. No. 100-446, at 6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3706.

97.     IGRA recognizes the principle that "tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity."  25 U.S.C. § 2701(5); *see also Cabazon Band of Mission Indians*, 480 U.S. at 207.  IGRA implements that principle in different ways depending on the class of gaming activity at issue.

98.     An Indian tribe has a right to engage in Class III gaming on gaming-eligible Indian lands if three conditions are satisfied.  Such gaming "shall be lawful" only if it is (1) "authorized" by an appropriate tribal ordinance or resolution approved by the National Indian Gaming Commission; (2) "located in a State that permits such gaming for any purpose by any person, organization, or entity"; and (3) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and State … that is in effect."  25 U.S.C. § 2710(d)(1).

99.     Class III gaming at the West Valley facility would satisfy each of the three conditions set forth by Congress in 25 U.S.C. § 2710(d)(1):

        a.   Class III gaming at the West Valley Resort is authorized by a tribal ordinance approved by the National Indian Gaming Commission;

        b.   Class III gaming at the West Valley Resort would be in a State that permits such gaming; and

        c.   Class III gaming at the West Valley Resort would be "conducted in conformance" with the Compact, as this Court has already held.

100.    For those reasons, the Nation has a federal statutory right to engage in Class III gaming at the West Valley Resort.  *See Tohono O'odham Nation*, 954 F. Supp. 2d at 754 (Class III "gaming" at the West Valley Resort "is expressly permitted by [IGRA]").

101.    Defendants nonetheless maintain that ADG has state-law authority to impose additional conditions on the exercise of the Nation's rights under IGRA. Defendants take the position that ADG has the authority under state law to determine whether the Nation has engaged in "disqualifying conduct" outside the requirements of IGRA and the Compact and, on that basis, refuse to issue regulatory certifications and approvals relating to Class III gaming at the West Valley Resort.  Exh. H (April 17 Letter); *see* A.R.S. § 5-602(A) (providing for ADG certification of contractors, financiers, and employees).  The Supremacy Clause and IGRA foreclose Defendants' position in two ways.

102.    ***Field Preemption.***  Defendants' position that ADG has state-law authority to decide that the Nation has engaged in "disqualifying conduct" and that Defendants may seek to bar the Nation from engaging in gaming that IGRA otherwise permits is wrong because IGRA occupies the field of gaming regulation on Indian lands.

103.    Congress has plenary authority over Indian affairs.  Exercising that plenary authority, in enacting IGRA, Congress intended to "preempt the field in the governance of gaming activities on Indian lands."  S. Rep. No. 100-446, at 6.  That preemptive intent is manifest from IGRA's text, structure, and purpose.  *See Tamiami Partners v. Miccosukee Tribe of Indians*, 63 F.3d 1030, 1033 (11th Cir. 1995) ("The occupation of this field by federal law is evidenced by the broad reach of [IGRA's] regulatory and enforcement provisions and is underscored by the comprehensive regulations promulgated under the statute."); *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996) ("Examination of the text and structure of IGRA, its legislative history, and its jurisdictional framework … indicates that Congress intended it completely preempt state law.").

104.    Where, as here, "Congress occupies an entire field … state regulation is impermissible."  *Arizona v. United States*, 132 S. Ct. 2492, 2502 (2012).  Field preemption is complete and total:  It "foreclose[s] any state regulation in the area, even if

1    it is parallel to federal standards."  *Id.*; *see id.* ("States may not enter, in any respect, an

2    area that the Federal Government has reserved for itself.").

3         105.    Under IGRA's comprehensive federal scheme, "Congress left states with

4    no regulatory role over gaming except as expressly authorized by IGRA" and "the only

5    method by which a state can apply its general civil laws to gaming is through a tribal-

6    state compact."  *Dorsey & Whitney*, 88 F.3d at 546; *see also United Keetoowah Band of*

7    *Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1177 (10th Cir. 1991) ("[T]he very

8    structure of the IGRA permits assertion of state civil or criminal jurisdiction over Indian

9    gaming *only* when a tribal-state compact has been reached to regulate class III gaming.

10   The statute appears to leave no other direct role for … State gaming enforcement.")

11   (internal citations omitted).  IGRA and the Compact nowhere authorize the State to deny

12   the Nation the right to engage in Class III gaming if the State decides that the Nation has

13   engaged in "disqualifying conduct" (during compact negotiation or otherwise).  Thus,

14   any authority the Arizona Legislature has purportedly delegated to ADG to do so is

15   "void."  *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819) (it is the

16   "unavoidable consequence of that supremacy which the constitution has declared" that

17   States have "no power" to enact laws interfering with the "operations of the constitutional

18   laws enacted by [C]ongress"; such a state law "is unconstitutional and void").

19        106.    ***Conflict Preemption.***  Even if IGRA did not occupy the field of Indian

20   gaming and in that way displace state authority, Defendants' assertion of state-law

21   authority to regulate Class III gaming by imposing requirements not set out in IGRA or

22   the Compact violates principles of conflict preemption.  "The ordinary principles of

23   preemption include the well-settled proposition that a state law is preempted where it

24   'stands as an obstacle to the accomplishment and execution of the full purposes and

25   objectives of Congress.'"  *Arizona*, 132 S. Ct. at 2505.  Defendants' position would

26   frustrate the purposes and objectives of IGRA in a direct and palpable way.

27

28
                                              27

107.    IGRA gives Indian tribes a statutory right to engage in Class III gaming on Indian lands when three conditions are satisfied.  *See* 25 U.S.C. § 2710(d)(1) ("Class III gaming activities *shall be lawful* on Indian lands" if three conditions are satisfied) (emphasis added); *see also Tohono O'odham Nation*, 954 F. Supp. 2d at 754 (Class III "gaming" at the West Valley Resort "is expressly permitted by [IGRA]").

108.    IGRA also carefully circumscribes the authority it grants to States to regulate gaming on Indian lands.  Defendants' position that, under *state* law, ADG may impose additional, and special, conditions on the exercise of Class III gaming rights— conditions not found in IGRA or the Compact—countermands that federal scheme by "depriv[ing]" the Nation of a right "given [to] it" by federal law.  *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 155 (1982); *see also Arizona*, 132 S. Ct. at 2506.  Put differently, as the Supreme Court has made clear, "Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted."  *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33 (1996).

109.    Where, as here, the avowed purpose and the inevitable effect of Defendants' action under state law is to nullify the exercise of a federal statutory right, conflict preemption is particularly apparent.  If Arizona were free to impose additional requirements on Class III gaming beyond "the clear procedure[s] Congress established" in IGRA, that would create a "general license for state law to override" IGRA.  *Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013).  That outcome would directly conflict with IGRA and with the Supremacy Clause.  *See id.* at 1955 (state law "directly conflicts" with federal law where it "nullifies [an] insured's [federal] statutory right to designate a beneficiary") (Thomas, J., concurring in judgment).  Arizona's position would also create intolerable conflict with federal law because it would leave States free to upset the delicate balance among federal, tribal, and state interests that Congress struck in IGRA.

110.    Nor is there anything inequitable about this result.  As explained above, the State's allegations of fraud are meritless.  But IGRA includes protections to ensure that gaming compacts are both reasonable and fair, including permitting States and tribes to bargain for remedies for breach of contract and to determine to what extent they will waive their sovereign immunity with respect to claims relating to a compact.  25 U.S.C. § 2710(d)(3)(C)(v).  Absent a compact provision to the contrary, both tribes *and* States would be immune from suit after a compact is in effect to rescind that compact based on a theory of fraudulent inducement.

111.    Here, the Compact contains no such provision.  To the contrary, it expressly *disclaims* reliance on any purported statement or promise not expressly set forth in the Compact:  "This Compact contains the entire agreement of the parties with respect to the matter covered by this Compact and *no other statement, agreement, or promise made by any party, officer, or agent of any party shall be valid or binding*."  *Id.* (Compact § 25 (emphasis added)).  The inclusion of that integration clause reflects the bedrock principle that parties' rights and obligations should be governed by written agreements, not unwritten promises based on pre-contractual statements not embodied in a final agreement.  As this Court has explained:  "Written agreements matter.  Parties who reach an accord, particularly on a matter as important and complicated as tribal gaming, carefully document their agreement in writing.  They do so to fix the precise terms of their contract, identify their respective obligations, and avoid later controversy about the nature and scope of their bargain.  When disputes do arise, the written document usually constitutes the best evidence of the parties' agreement. … [P]arties to complicated contracts hire lawyers to ensure that their written agreements are clear, comprehensive, and binding.  Indeed, final contracts often declare that they are complete, that no other agreements have been reached by the parties, and that no unwritten promises will be enforced."  *Tohono O'odham Nation*, 944 F. Supp. 2d at 753.

29

112.   At the end of the day, Defendants simply wish to unwind the clear terms of the Compact.  As this Court has held, the Compact contains no restriction on gaming by the Nation in the Phoenix area, and no reasonable person could believe otherwise.  What is more, in a straightforward integration clause, the Compact disclaims the theory Defendants now advance:  that the State was induced to enter into the Compact by representations not contained in the Compact.  The State may now be dissatisfied with the Compact, but the Supremacy Clause does not permit state officials to nullify the Nation's rights under federal law.

113.   For those reasons, the Nation is entitled to declaratory and injunctive relief to remedy Defendants' threatened and ongoing violations of the federal Constitution and laws.  Absent such relief, the Nation will continue to suffer irreparable harm from its inability to exercise rights secured to it by federal law.

**COUNT TWO:**

**FEDERAL PREEMPTION OF STATE REGULATION OF CLASS II GAMING**

114.   The Nation incorporates by reference the allegations of the preceding paragraphs.

115.   Under IGRA, Class II gaming is regulated exclusively by tribes and the National Indian Gaming Commission.  *See* 25 U.S.C. § 2710(a)(2), (b)-(c).  Class II gaming "cannot be regulated by the State," *Oneida Tribe of Indians of Wis.*, 951 F.2d at 759, and "may be conducted in Indian country without a tribal-state compact," *Seneca-Cayuga Tribe of Okla*, 327 F.3d at 1023.  *See also* Ariz. Op. Att'y Gen. No. I97-010 (Aug. 8, 1997) ("Tribes may conduct Class II gaming on Indian lands without a gaming compact or State regulation.").

116.   The Compact itself expressly disclaims that anything in it "appl[ies] to any Class I or Class II Gaming whether conducted within or without [Class III gaming facilities authorized by the Compact]" and provides that it "shall not confer upon the

1   State any jurisdiction or any authority over such Class I or Class II Gaming conducted by

2   the Nation on Indian Lands." Exh. B (Compact § 16(a)).

3       117.   The Nation satisfies each of the statutory conditions under IGRA necessary

4   to permit it to engage in Class II gaming at the West Valley Resort. *See* 25 U.S.C.

5   § 2710(b). The Nation would engage in Class II gaming at the West Valley Resort if

6   Defendants were successful in their efforts to block Class III gaming at the facility.

7       118.   Defendants' recent notices and letters to vendors and employees of the

8   Nation threaten to interfere with Class II gaming at the West Valley Resort. Those

9   notices and letters threaten legal and regulatory action against vendors or employees who

10  provide services to the West Valley Resort without clarifying that the State has no

11  authority to regulate Class II gaming. Defendants' communications threaten to chill

12  vendors' and employees' willingness to provide goods and services relating to lawful

13  Class II gaming at the West Valley Resort.

14      119.   Any assertion of state-law authority to regulate Class II gaming is

15  preempted in two ways.

16      120.   First, it is preempted on field-preemption grounds because IGRA occupies

17  the field with respect to regulation of gaming on Indian lands.

18      121.   Second, it is preempted on conflict-preemption grounds. IGRA gives tribes

19  a right to engage in Class II gaming when two conditions are met. 25 U.S.C.

20  § 2710(b)(1). States may not impose additional conditions on the exercise of that federal

21  right. In addition, IGRA makes clear that *only* tribes and the federal government may

22  regulate Class II gaming; States have no authority over it. 25 U.S.C. § 2710(a)-(b).

23      122.   Any attempt by a State to regulate Class II gaming is therefore "void."

24  *McCulloch*, 17 U.S. (4 Wheat.) at 436.

25      123.   Likewise, any attempt by a State to impose regulatory sanctions on an

26  employee or vendor holding a certification relating to Class III gaming because the

27

28

31

1  employee or vendor provided goods or services in support of lawful Class II gaming is
2  preempted by federal law.

3      124.   For those reasons, the Nation is entitled to declaratory and injunctive relief
4  to remedy Defendants' threatened and ongoing violations of the federal Constitution and
5  laws.  Absent such relief, the Nation will continue to suffer irreparable harm from its
6  inability to exercise rights secured to it by federal law.

### PRAYER FOR RELIEF

8      WHEREFORE, the Nation prays that this Court:

9      1.   Declare that Defendants' assertion of state-law authority to refuse to
10          perform regulatory approvals for Class III gaming, or otherwise obstruct
11          Class III gaming, at the West Valley Resort is preempted by IGRA;

12     2.   Declare that Defendants have no authority to regulate or otherwise obstruct
13          Class II gaming at the West Valley Resort;

14     3.   Declare that Defendants have no authority to impose regulatory sanctions
15          on an employee or vendor holding a certification relating to Class III
16          gaming because the employee or vendor provided goods or services in
17          support of lawful Class II gaming;

18     4.   Grant preliminary and permanent injunctive relief barring Defendants from
19          relying on state law to refuse to perform regulatory approvals for Class III
20          gaming, or otherwise to obstruct Class III gaming, at the West Valley
21          Resort;

22     5.   Grant preliminary and permanent injunctive relief barring Defendants from
23          interfering with the Nation's relationships with vendors and employees
24          based on the provision of goods or services for Class III or Class II gaming
25          at the West Valley Resort; barring Defendants from refusing to certify,
26          revoking the certification of, or otherwise threatening or sanctioning
27          vendors, employees, or others based on the provision of goods or services

for Class III or Class II gaming at the West Valley Resort; and barring Defendants from taking any other actions to obstruct the Nation from conducting Class III and Class II gaming at the West Valley Resort.

6.     Award the Nation its costs and reasonable attorney's fees as appropriate; and

7.     Grant such further relief as this Court deems just and proper.

Dated:  June 22, 2015

Respectfully submitted,

/s/  Laura Berglan
Jonathan Jantzen,
   Attorney General, SBN 016220
Laura Berglan,
   Deputy Attorney General, SBN 022120
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ  85634
Telephone: (520) 383-3410
jonathan.jantzen@tonation-nsn.gov
laura.berglan@tonation-nsn.gov

Seth P. Waxman (*Pro hac vice*, application pending)
Danielle Spinelli (*Pro hac vice*, application pending)
Kelly P. Dunbar (*Pro hac vice*, application forthcoming)
Sonya Lebsack (*Pro hac vice*, application pending)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
kelly.dunbar@wilmerhale.com
sonya.lebsack@wilmerhale.com

*Counsel for Plaintiff*
*Tohono O'odham Nation*

34