FENNEMORE CRAIG
PATRICK IRVINE (006534)
PIrvine@fclaw.com
DOUGLAS C. NORTHUP (013987)
DNorthup@fclaw.com
CARRIE PIXLER RYERSON (028072)
CRyerson@fclaw.com
2394 East Camelback Road, Suite 600
Phoenix, AZ  85016-3429
Tel.:  602.916.5406
Fax:  602.916.5606

GIBSON, DUNN & CRUTCHER LLP
MATTHEW D. MCGILL (*pro hac vice*)
MMcGill@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Tel.:  202.955.8500
Fax:  202.467.0539

MATTHEW A. HOFFMAN (*pro hac vice*)
MHoffman@gibsondunn.com
TIMOTHY W. LOOSE (*pro hac vice*)
TLoose@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.:  213.229.7000
Fax:  213.229.7520

Attorneys for Defendant Daniel Bergin, Director,
Arizona Department of Gaming

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| THE TOHONO O'ODHAM NATION,<br><br>Plaintiff,<br><br>v.<br><br>DOUGLAS DUCEY, Governor of Arizona; MARK BRNOVICH, Arizona Attorney General; and DANIEL BERGIN, Director, Arizona Department of Gaming, in their official capacities,<br><br>Defendants. | CASE NO. 2:15-cv-01135-DGC<br><br>**DEFENDANT DANIEL BERGIN'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) & 12(b)(6)**<br><br>**ORAL ARGUMENT REQUESTED** |

Defendant Daniel Bergin, in his official capacity as Director of the Arizona Department of Gaming ("ADG"), respectfully moves for an order dismissing Plaintiff Tohono O'odham Nation's ("the Nation") complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

The Nation asks this Court to compel the State of Arizona through its officials (collectively referred to here as "the State") to issue licenses that would allow the Nation to proceed with its plans to open a Class III gaming facility in Glendale. That request is fatally flawed and should be dismissed with prejudice for several independent reasons:

At the threshold, the Court lacks subject matter jurisdiction. The Eleventh Amendment to the United States Constitution bars the entirety of the Nation's suit. The Nation does not and cannot allege that the State has waived its Eleventh Amendment immunity, and under the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the detailed remedial scheme of the Indian Gaming Regulatory Act ("IGRA") renders the *Ex parte Young* doctrine inapplicable.

Moreover, there is no live Article III controversy between the State and the Nation over the regulation of Class II gaming that could warrant adjudication of the Nation's second claim for relief. The State has never asserted authority to regulate the Nation's Class II gaming activities, nor has it threatened any adverse action against the Nation or its gaming vendors with respect to Class II gaming. The Nation's unease that the State's communications to State-regulated gaming vendors do not "clarif[y] that the State has no authority to regulate Class II gaming" (D.E. 1, ¶ 118) falls far short of establishing the "actual controversy" the Declaratory Judgment Act requires.

Beyond the jurisdictional defects, the Nation's complaint fails to state a claim on which relief can be granted. Neither the Supremacy Clause nor IGRA grants the Nation a private right of action to compel state officials to issue regulatory approvals. Even if IGRA conferred such a right of action—and it does not—the Nation's preemption arguments fail on their own terms. IGRA simply does not preempt the State's police-power authority to grant

or withhold regulatory approvals in connection with Class III gaming. Far from it, IGRA was enacted specifically to ensure that States *retained* regulatory authority over Class III gaming occurring within their borders. It is not the State's actions that conflict with IGRA's policies—it is the Nation's lawsuit.

Finally, under no circumstance could IGRA—or any other federal law—permissibly be construed to require a State to issue regulatory approvals for Class III gaming. The anti-commandeering doctrine of the Tenth Amendment forbids legislation requiring States to govern according to Congress's instructions. If federal law cannot require state officials to perform background checks on handgun purchasers (*see Printz v. United States*, 521 U.S. 898 (1997)), it cannot require state officials to issue regulatory approvals to tribal casinos.

None of these defects can be cured by amendment, because each of them represents a fundamental failing at the core of the Nation's attempt to compel the State to grant its regulatory imprimatur to the Nation's new casino in Glendale. The Nation's complaint therefore should be dismissed with prejudice. If the Nation believes its rights under its tribal-State compact have been violated, it should file a claim for breach of the compact and face the State's defenses, including that the Nation procured that compact by fraud.

## II. SUMMARY OF FACTUAL ALLEGATIONS

### A. Background

In 2002, after years of negotiations between the State and the Arizona Indian Gaming Association ("AIGA")—which included the Nation and most of the gaming tribes in the State—the parties agreed on the form and substance of a new compact to govern future gaming activities by tribes wishing to engage in them. *See Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 754 (D. Ariz. 2013) (*TON I*). Because the Governor of Arizona was not authorized to approve the compact under then-existing Arizona law, a coalition of tribes proposed a ballot initiative, Proposition 202, which set forth the terms of the compact and required the Governor of Arizona to execute the compact on behalf of the State upon the voters' approval of the initiative. *Id*. During the course of the compact negotiations and during the ballot initiative process, the Nation and AIGA, of which the Nation was a part,

repeatedly represented—through both affirmative statements and purposeful omissions—that no casino in the greater Phoenix metropolitan area would be built under Proposition 202. *Id*. at 762; *see also TON I*, No. 11-00296, D.E. 119, ¶¶ 41, 49, 89–92, 111, 124, 140, 141, 169, 182, 186 (plaintiffs' statement of undisputed facts outlining representations and omissions relating to the Phoenix geographic restriction). Proposition 202 passed, and, as required by the terms of that Proposition, the Governor signed the compact. *TON I*, 944 F. Supp. 2d at 762−63; *see also TON I*, No. 11-00296, D.E. 119, ¶¶ 195–96.

Turning its back on its representations to the voters and government of Arizona, in 2009, the Nation announced its intention to open the "West Valley Resort" casino in the city of Glendale. The State and other affected tribes sued the Nation for violating the compact, as well as on claims of promissory estoppel, fraud in the inducement, and material misrepresentation. *See TON I*, No. 11-00296, D.E. 1 (filed Feb. 14, 2011). On cross-motions for summary judgment, this Court found no violation of the compact, but did not reach the merits of plaintiffs' claims for promissory estoppel, fraud in the inducement, and material misrepresentation, holding that those claims were barred by the Nation's sovereign immunity. It did note, however, that plaintiffs' evidence "would appear to support a claim for promissory estoppel" based on the representations the Nation made about the compact and the State's evident reliance on those representations in not insisting on more specific geographic restrictions in the compact itself. *TON I*, 944 F. Supp. 2d at 768−69.

The State timely appealed this Court's ruling to the Ninth Circuit (*see Arizona v. Tohono O'odham Nation*, No. 13-16517 (9th Cir.)), but the Nation decided to proceed with construction of the casino project even though its legal status remains subject to challenge.

On February 2, 2015, ADG wrote to the Nation to express its concern that, in view of the pending appeal and the fraudulent manner in which the Nation developed the casino project, the casino could not be authorized and therefore would not be able to obtain state approvals for the vendors, employees, and casino facilities. D.E. 1-4 at 1–2. The Nation responded that the casino had been authorized by the Court in *TON I* and that it had no intention of halting construction. *Id*. at 4–6.

On April 10, 2015, ADG again wrote to the Nation, notifying it that pursuant to A.R.S. §§ 5-602(A) and (C), ADG could not approve the casino because doing so would be inconsistent with its mandate to ensure that the gaming in question is "permitted" and consistent with "extensive, thorough and fair regulation." D.E. 1-5 at 3. ADG noted that the Court did not order the State to issue the necessary approvals in *TON I*, and that, based on its review of the relevant evidence, it believed there was "credible and largely unrefuted evidence that TON engaged in deceptive behavior and made significant misrepresentations during the compact negotiation process and the run-up to Proposition 202." *Id*. at 3–4. As such, ADG concluded it would exceed its statutory authority if it were to proceed with certifying and approving the casino as a Class III gaming facility. Further correspondence followed. D.E. 1-5 at 10–25.

**B.    The Nation's Current Lawsuit**

The Nation filed this lawsuit on June 22, 2015. Count One of the Nation's complaint alleges that ADG's communication that it would "refuse to issue regulatory certifications and approvals relating to Class III gaming at the West Valley Resort" violates IGRA and the Supremacy Clause. D.E. 1, ¶ 101.

Count Two of the Nation's complaint alleges that certain of ADG's communications to the regulated community "threaten legal and regulatory action against vendors or employees who provide services to the West Valley Resort without clarifying that the State has no authority to regulate Class II gaming," and that such statements violate IGRA and the Supremacy Clause. D.E. 1, ¶ 118. The Nation requests declaratory and injunctive relief prohibiting the State, *inter alia*, from "refus[ing] to perform regulatory approvals for Class III gaming" or "refusing to certify … vendors, employees, or others based on the provision of goods or services for Class III or Class II gaming at the West Valley Resort." D.E. 1 at 32–33.

### III.    LEGAL STANDARD

A complaint must be dismissed pursuant to Rule 12(b)(1) when the Court "lack[s] … subject-matter jurisdiction" over the claims. Fed. R. Civ. P. 12(b)(1); *Seminole Tribe*, 517

U.S. at 76 (granting State's motion to dismiss in IGRA suit for lack of subject matter jurisdiction). In resolving a motion to dismiss under Rule 12(b)(1), the Court need not "presume the truthfulness of the plaintiff['s] allegations" and "may look beyond the complaint" to affidavits or other matters of public record without converting the motion into one for summary judgment. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

Under Rule 12(b)(6), a complaint must be dismissed where the plaintiff fails to state a cognizable claim under the statutes at issue, or requests relief under a statute that can provide it no remedy. *See, e.g., Cement Masons Health & Welfare Trust Fund for N. Cal. v. Stone*, 197 F.3d 1003, 1007–08 (9th Cir. 1999) (dismissing claims that were not cognizable under ERISA or where ERISA provided no remedy); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009–10 (9th Cir. 2007) (dismissing claims under statute dealing with injuries caused by nuclear plants where statute was "exclusive means" of redressing certain injuries and requested relief was not cognizable under it).

### IV.   ARGUMENT

**A.   The Court Lacks Subject Matter Jurisdiction Over The Nation's Claims.**

**1.   The State's Eleventh Amendment Immunity Bars The Nation's Lawsuit.**

The State of Arizona may not be sued in federal court, either directly or through its officials, unless it has waived its Eleventh Amendment immunity, or Congress validly has abrogated its immunity. *See Scott v. State*, No. CV-09-1882-PHX-JAT (Lead), 2010 WL 2228513, at *1 (D. Ariz. June 1, 2010) (citing *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999)). The Nation, as the party asserting federal jurisdiction, bears the burden of establishing that the State is not immune. *See Horejs v. United States*, No. 02-35288, 2002 WL 1769274, at *1 (D. Ariz. Sept. 20, 2002) (citing *Baker v. United States*, 817 F.2d 560, 562 (9th Cir. 1987)). The Nation's complaint does not allege that the State has waived its Eleventh Amendment immunity, and as the Supreme Court has held, IGRA does not abrogate the State's constitutional immunity from suit in federal court. *See Seminole Tribe*, 517 U.S. at 72; *see also Hein v. Capitan Grande*

*Band of Diegueno Mission Indians*, 201 F.3d 1256, 1260 n.7 (9th Cir. 2000) (IGRA "does not permit a suit against a state unless the state waives its sovereign immunity").

To the extent the Nation seeks to base jurisdiction on the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), that also is foreclosed by Supreme Court precedent. As the Court explained, while the *Ex parte Young* doctrine generally permits "jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of federal law,'" the doctrine is "inapplicable" to suits claiming violations of rights conferred by IGRA. *Seminole Tribe*, 517 U.S. at 73, 74 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)). IGRA's "detailed remedial scheme for the enforcement against a State of a statutorily created right" demonstrates that Congress did not permit other means of enforcing IGRA's mandates. *Id*. at 74. Thus in *Seminole Tribe*, the Court concluded that the tribe's suit against the governor of Florida was "barred by the Eleventh Amendment and must be dismissed for a lack of jurisdiction." 517 U.S. at 76. The same is true here.

### 2.     There Is No Live Controversy Over Class II Gaming.

In order to obtain a declaratory judgment or other prospective relief, the Nation must demonstrate that there is a "substantial controversy, between parties having adverse legal interests, of *sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citing *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)) (emphasis added). The Nation's allegations that "ADG's threat to sanction vendors and employees … draws no distinction between Class II and Class III gaming" (D.E. 1, ¶ 9) and that ADG's "threaten[ing] legal and regulatory action against vendor or employees … without clarifying that the State has no authority to regulate Class II gaming" (*id*., ¶ 118) do not cross this threshold.

There is no genuine dispute between the State and the Nation concerning the Nation's ability to engage in Class II gaming. The State has never claimed to have the authority to regulate Class II gaming. Indeed, Section 16 of the compact expressly states that it "*shall not apply to any Class I or Class II Gaming* whether conducted within or without the Gaming

Facilities." D.E. 1-3 at 33 (emphasis added). Against this background, there is not even a "general threat of enforcement" against the Nation for engaging in Class II gaming activities, much less the threat with "sufficient immediacy and reality" necessary to satisfy the "actual controversy" requirement of the Declaratory Judgment Act, 28 U.S.C. § 2201. *Rincon Band of Mission Indians v. San Diego Cnty.*, 495 F.2d 1, 6 (9th Cir. 1974); *see also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1096 (9th Cir. 2003) (finding no standing where plaintiff did not face a "credible threat of prosecution" because the regulations at issue would not have applied to plaintiff's conduct).

The Nation nevertheless claims harm from certain ADG notices to state-regulated gaming vendors and employees that remind those vendors and employees that their State certifications apply only in gaming facilities authorized by the State, and further notifies them that the West Valley casino is not such a State-authorized facility. *See* D.E. 1-6 at 5–6. The Nation complains that because these notices do not themselves "clarify[] that the State has no authority to regulate Class II gaming," they "threaten to chill vendors' and employees' willingness to provide goods and services relating to lawful Class II gaming at the West Valley Resort." D.E. 1, ¶ 118.

But the Nation's complaint alleges no facts whatsoever to substantiate the alleged "chill" ADG's notices supposedly have placed on "vendors' and employees' willingness to provide goods and services relating to lawful Class II gaming." A conclusory allegation of a "threat" of a "chill" based on a hypothetical set of facts cannot satisfy Article III's requirement that there be an "actual controversy." At most, the Nation is alleging a "general threat of enforcement" from ADG that the Ninth Circuit has found to be insufficient to satisfy Article III's requirements. *Rincon Band*, 495 F.2d at 6.

In reality, the Nation's second claim for relief seeks an advisory opinion that, if it operated the West Valley casino as a Class II-only facility, then IGRA would require ADG to treat the West Valley casino as an authorized gaming facility *under State law* such that *State-regulated* vendors and employees could not be sanctioned *under State law* for providing goods and services to that facility. That contention is flawed on the merits, but this Court

should decline that invitation as a matter of federal subject matter jurisdiction—both because the Nation is not alleging a concrete and particularized injury resulting from ADG's notices and also because it is not clear at this time whether the Nation intends to open the West Valley casino as a Class II-only facility, or something else.[1]

Count 2 of the Nation's complaint should be dismissed under Rule 12(b)(1).

**B.   The Nation's Complaint Fails To State A Claim On Which Relief Could Be Granted.**

    **1.   Neither The Supremacy Clause Nor IGRA Authorizes The Nation's Lawsuit.**

The Nation purports to bring this suit against the State "for conduct that violates the Supremacy Clause of the U.S. Constitution and the Indian Gaming Regulatory Act." D.E. 1, ¶ 1. Even if the State had waived its sovereign immunity (and it has not), neither the Supremacy Clause nor IGRA provides the Nation with a right of action for the relief it seeks here.

The Supreme Court recently made clear that the Constitution's "Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action" for suits seeking injunctive or declaratory relief against state officers. *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1383 (2015) (internal quotation marks and citation omitted). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* For its federal causes of action, the Nation cannot look to the Supremacy Clause; its causes of action must be found in IGRA.

But IGRA does not grant Indian tribes a right of action to seek relief from alleged "obstruction of lawful class III gaming" by a State, or alleged "state regulation of class II

---

[1] The complaint does not allege that the Nation intends to open West Valley casino as a Class II-only facility; indeed, the Nation has suggested publicly that it may attempt to operate the West Valley casino as a Class III facility even without the State certification required by the tribal-State compact. Howard Fischer, *Tohono O'odham Vow To Defend Glendale Casino Rights*, ARIZ. DAILY STAR (Apr. 22, 2015), http://tucson.com/news/business/tohono-o-odham-vow-to-defend-glendale-casino-rights/article_a6a6c297-744d-5552-88bd-fa8580357800.html.

gaming." D.E. 1, ¶¶ 94–113 (Count One), 114–124 (Count Two). As the Ninth Circuit has explained, IGRA does not create a "general private right of action." *Hein*, 201 F.3d at 1260. IGRA provides a private right of action *only* if the claim falls into one of three categories: (i) "a[] cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact"; (ii) "a[] cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact … that is in effect"; or (iii) "a[] cause of action initiated by the Secretary [of the Bureau of Indian Affairs] to enforce the [Act's post-mediation procedures]." 25 U.S.C. § 2710(d)(7)(A)(i)–(iii). The Nation's lawsuit does not fit within any of the congressionally-authorized causes of action. Because there is no right of action for the claims or relief pled in the Nation's complaint, the Nation's complaint must be dismissed.[2]

### 2. IGRA Does Not Preempt The State's Authority To Withhold Regulatory Approvals In Connection With Class III Gaming.

The primary count of the Nation's complaint fails for the additional reason that IGRA does not displace the State's authority to withhold regulatory approvals or to decide whether to issue vendor or employee certifications to non-tribal members in connection with Class III gaming. The "purpose of Congress" "is the ultimate touchstone of preemption analysis." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). In IGRA, Congress created a cooperative federalism regime in which the federal government, States, and tribes share regulatory authority. An intention to preempt State authority over Class III gaming cannot be inferred from that design.

---

[2] Under some circumstances, the Ninth Circuit has permitted tribes to bring breach-of-compact claims in federal court on the theory that the compacts are "a creation of federal law," and thus present a federal question. *See Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997); *see also Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 968 (9th Cir. 2008). But the Nation pointedly avoids asserting any breach of the tribal-State compact, doubtless to avoid the State's defenses to such an action, which would include the claims of fraud and promissory estoppel that the Nation, by tactically deploying its sovereign immunity, thus far has evaded.

### a. IGRA Does Not Preempt The Field Of Regulation Of Class III Gaming.

The Nation claims that IGRA "left states with no regulatory role over gaming." D.E. 1, ¶ 105. But, as the Ninth Circuit has recognized, "IGRA is an example of 'cooperative federalism'" that "giv[es] each [sovereign] a role in the regulatory scheme." *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1096 (9th Cir. 2003) (citation omitted). Indeed, IGRA was enacted specifically to *undo* the Supreme Court's "ouster" of States' "regulatory authority over gaming on Indian lands" in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), and to ensure that States would continue to have a "measure of authority over gaming on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014); *see also Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1554 (10th Cir. 1997) ("While preservation of tribal sovereignty was clearly of great concern to Congress, respect for state interests relating to class III gaming was also of great concern."). And that is why the Ninth Circuit **rejected** the argument—now pressed by the Nation here—that "in passing IGRA, Congress made it clear that the statute expressly preempts the entire field of Indian Gaming." *Confederated Tribes of Siletz Indians of Or. v. Oregon*, 143 F.3d 481, 486 n.7 (9th Cir. 1998). That decision is controlling and dispositive of the Nation's field preemption contention.[3]

### b. The State's Decision, Under The Terms Of A Tribal-State Compact, To Withhold Regulatory Approvals For Class III Gaming Does Not Conflict With IGRA's Objectives Or Purpose.

The Nation's conflict preemption theories fare no better. Congress's purpose in enacting IGRA was three-fold: First, to "provide a statutory basis for the operation of gaming by Indian tribes"; second, to "provide a statutory basis for the regulation of gaming by an

---

[3] The Nation's complaint cites a snippet from the Senate report on IGRA stating that the legislation was intended to "preempt the field in the governance of gaming activities on Indian lands." D.E. 1, ¶ 96 (citing S. Rep. 100-446 at 6). But as the same report explains (on the same page), under a "tribal-State compact," there may be "State jurisdiction and the application of state laws to activities conducted on Indian land." S. Rep. 100-446 at 6. Thus, Indian gaming may be regulated only pursuant to IGRA, but IGRA permits the exercise of State jurisdiction under tribal-State compacts.

Indian tribe adequate to shield it from organized crime and other corrupting influences," as well as to "assure that gaming is conducted fairly and honestly by both the operator and the players"; and third, to establish "independent Federal regulatory authority for gaming on Indian lands," along with "Federal standards," to "protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702.  To the extent that IGRA is intended to provide a "statutory basis" for Indian tribes to engage in Class III gaming, it does so only when such gaming is conducted in accordance with a valid tribal-State compact. *Id.* § 2710(d).

The compact in this case requires that "[p]rior to the initial commencement of the [Class III gaming ] operation," the State must issue a "letter of compliance" to the "Gaming Facility Operator" (D.E. 1-3 at 1–2)—which includes "the Nation, an enterprise owned by the Nation, or such other entity of the Nation … as the wholly-owned Tribal entity having full authority and responsibility for the operation and management of Class III Gaming Activities" (D.E. 1-2 at 13–14).  If the State "determines that the Gaming Facility Operator and Gaming Facility do not comport with the terms of this Compact, a non-compliance letter shall be sent." D.E. 1-3 at 2.  Section 5(b) of the compact likewise grants authority to the State to deny a vendor or employee application provided the State submits a "statement setting forth the grounds for denial" to the Nation "together with all documentation relied upon by the State Gaming Agency to the extent allowed by State law." D.E. 1-3 at 4. Section 5(f) then sets forth a non-exclusive list of determinations the State "may" make in order to "revoke, suspend or deny" a State Certification. D.E. 1-3 at 5.  In this way, the State's compact with the Nation requires the State, through Director Bergin, to exercise state-law regulatory authority over Class III gaming activities on tribal lands.

Here, Director Bergin has advised the Nation of his view that he would exceed the authority granted to him under Arizona law if he were to issue various regulatory approvals to an unauthorized casino born of an elaborate fraud upon Arizona's government and voters. D.E. 1-5 at 3–4; *see also* A.R.S. § 5-602(C).  Exercising the regulatory authority granted to the State under the compact hardly conflicts with IGRA; it is precisely the role for the State that IGRA envisions. *See Bay Mills Indian Cmty.*, 134 S. Ct. at 2034.

11

The Nation's real complaint is that it does not believe Director Bergin's actions are permitted under the compact. *See* D.E. 1, ¶ 54 (claiming the compact "enumerates specified grounds—the only grounds—on which the State may deny certification to a prospective employee, contractor, or vendor"); *id.*, ¶ 105 ("[t]he Compact nowhere authorize[s] the State to deny the Nation the right to engage in Class III gaming"). But that dispute is about the terms of the compact, not the requirements of IGRA. Although the State and the Nation may have a dispute about their rights and obligations under the compact, there should be no dispute that IGRA allows States to regulate Class III gaming on Indian lands in accordance with a tribal-State compact. Such regulation is precisely what IGRA was enacted to permit and thus does not conflict with that statute's purposes or objectives.

**C.     The Nation Cannot Use IGRA To Compel The State To Issue Certifications.**

The Nation's interpretation of IGRA is flawed for yet another reason:  Under it, IGRA would commandeer the State's and its officers' authority to issue certifications relating to the West Valley casino. Because the U.S. Constitution's Tenth Amendment prohibits a reading of IGRA that would effectively allow the federal government to force the State to certify Indian casinos, employees, and vendors, it too requires dismissal of the Nation's claims.

Ordinarily, when federal law preempts state law, it "*displace[s]* state law" in that area and replaces it with a federal standard or requirement. *See Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 (9th Cir. 2006) (emphasis added). Here, however, a federal order barring the State from "refusing to certify" the Nation, employees, and vendors (D.E. 1 at 32), would not replace Arizona law with any federal directive. Instead, federal law simply would require the *Arizona* officials to use their own powers under *Arizona* law to issue *Arizona* certifications. That type of "preemption" would involve a "prescription for state and local governing bodies to use their … power in a specified way" (*Petersburg Cellular P'ship v. Bd. of Sup'rs of Nottoway Cnty.*, 205 F.3d 688, 702 (4th Cir. 2000)), and would violate the Tenth Amendment's prohibition on commandeering of the regulatory authority of the States. The Tenth Amendment simply does not permit the federal government to command a State to

"govern according to Congress' instructions" in such a way. *New York v. United States*, 505 U.S. 144, 162 (1992).

As the Supreme Court has said, "[i]t is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority" (*Printz*, 521 U.S. at 928), and the federal government may not "directly … compel the States to require or prohibit" the licensing of individuals or entities. *New York*, 505 U.S. at 166; *Bd. of Natural Resources of the State of Wash. v. Brown*, 992 F.2d 937, 947 (9th Cir. 1993) (concluding that provisions in a federal law directing, among other things, that "the Governor of each State to which [the Act] applies … *shall* … issue regulations to carry out the purposes of this section" violated the Tenth Amendment). Just as the Tenth Amendment precludes the federal government from directing a State to issue regulations (*see Brown*, 992 F.2d at 947), so, too, does it preclude the federal government from requiring a State to issue regulatory approvals for Class III gaming activities.

The Tenth Amendment prohibits such commandeering of state authority in part because a federal takeover of a State's regulatory authority necessarily diminishes the accountability of the State government to its citizens. *New York*, 505 U.S. at 168. That concern is palpable here. Arizona citizens understandably will blame State officials, not Congress, if State officials issue regulatory approvals to the Nation's casino in contravention of State law and policy. Under the Tenth Amendment, if the federal government wants to dictate that outcome, it must take ownership of the regulatory function and do it itself. It cannot command a State to do its bidding. Since that is the sum and substance of the relief the Nation seeks—a federal order commanding the State to issue a state-law regulatory approval—the Nation's complaint must be dismissed.

\\\
\\\
\\\
\\\
\\\

## V. CONCLUSION

For the foregoing reasons, each of the Nation's claims for relief should be dismissed with prejudice.

DATED: July 31, 2015

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

FENNEMORE CRAIG

By: /s/ Matthew D. McGill
      Matthew D. McGill

*Attorneys for Defendant Daniel Bergin, Director, Arizona Department of Gaming*

# CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2015, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Seth P. Waxman
Danielle Spinelli
Kelly P. Dunbar
Sonya L. Lebsack
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Ave. NW
Washington, DC  20006
Email:  seth.waxman@wilmerhale.com
Email:  danielle.spinelli@wilmerhale.com
Email:  kelly.dunbar@wilmerhale.com
Email:  sonya.lebsack@wilmerhale.com
*Attorneys for Plaintiff*
*The Tohono O'odham Nation*

Jonathan Landis Jantzen
Laura Lynn Berglan
Tohono O'odham Nation
Office of the Attorney General
P.O. Box 830
Sells, AZ  85634
Email:  jonathan.jantzen@tonation-nsn.gov
Email:  laura.berglan@tonation-nsn.gov
*Attorneys for Plaintiff*
*The Tohono O'odham Nation*

Heidi McNeil Staudenmaier
Brett W. Johnson
Sara J. Agne
Thomas Clees
Snell & Wilmer LLP
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ  85004-2202
Email:  hstaudenmaier@swlaw.com
Email:  bwjohnson@swlaw.com
Email:  sagne@swlaw.com
Email:  tclees@swlaw.com
*Attorneys for Defendant*
*Governor Douglas A. Ducey*

Thomas K. Chenal
Karen J. Hartman-Tellez
Office of the Arizona Attorney General
1275 W. Washington Street
Phoenix, AZ  85007
Email:  thomas.chenal@azag.gov
Email:  karen.hartman@azag.gov
*Attorneys for Defendant*
*Attorney General Mark Brnovich*

/s/ *Matthew D. McGill*
Matthew D. McGill