Jonathan Jantzen, Attorney General, SBN 016220
Laura Berglan, Deputy Attorney General, SBN 022120
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ  85634
(520) 383-3410
jonathan.jantzen@tonation-nsn.gov
laura.berglan@tonation-nsn.gov

Seth P. Waxman (*Pro hac vice*)
Danielle Spinelli (*Pro hac vice*)
Kelly P. Dunbar (*Pro hac vice*)
Sonya L. Lebsack (*Pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
kelly.dunbar@wilmerhale.com
sonya.lebsack@wilmerhale.com

*Counsel for Plaintiff Tohono O'odham Nation*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

THE TOHONO O'ODHAM NATION,

                Plaintiff,

     v.

DOUGLAS DUCEY, Governor of Arizona;
MARK BRNOVICH, Arizona Attorney General;
and DANIEL BERGIN, Director, Arizona
Department of Gaming, in their official
capacities,

                Defendants.

Case No. 2:15-cv-01135-PHX-DGC

**THE TOHONO O'ODHAM NATION'S OPPOSITION TO DEFENDANT BERGIN'S MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

1

**TABLE OF CONTENTS**

2
Page

TABLE OF AUTHORITIES ..................................................................................... ii

BACKGROUND ................................................................................................... 1

STANDARD OF REVIEW ..................................................................................... 3

ARGUMENT ....................................................................................................... 3

I.    THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THE NATION'S
      CLAIMS ..................................................................................................... 3

      A.    *Ex Parte Young* Permits The Nation's Suit ...................................... 4

      B.    There Is A Live, Ongoing Controversy Over Class II Gaming ............ 8

II.   THE NATION HAS STATED PREEMPTION CLAIMS ........................................ 9

      A.    The Nation's Suit Properly Invokes This Court's Equitable Authority
            To Enjoin Preempted State Action .................................................. 10

      B.    The Nation Has Stated Preemption Claims ...................................... 11

            1.    Field Preemption ................................................................... 11

            2.    Conflict Preemption .............................................................. 13

III.  DEFENDANT'S "COMMANDEERING" ARGUMENT IS MERITLESS ................ 16

CONCLUSION ................................................................................................... 17

CERTIFICATE OF SERVICE

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alliance Labs, LLC v. Stratus Pharmaceuticals, Inc.*,
    2013 WL 273309 (D. Ariz. Jan. 24, 2013) ............................................................. 3

*Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748 (D. Ariz. 2013),
    *appeal docketed*, No. 13-16517 (9th Cir.) ..................................... 1, 11, 13, 14

*Arizona v. United States*, 132 S. Ct. 2492 (2012) .................................................. 12

*Armstrong v. Exceptional Child Care Center*,
    135 S. Ct. 1378 (2015) ............................................................................ 5, 6, 7, 10

*Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084 (E.D. Cal. 2002) ........................ 7

*Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996) .................... 14

*Bond v. United States*, 134 S. Ct. 2077 (2014) ........................................................ 7

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) ................... 14

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ....................... 14

*Confederated Tribes of Siletz Indians of Oregon v. Oregon*,
    143 F.3d 481 (9th Cir. 1998) ........................................................................ 12, 13

*Edelman v. Jordan*, 415 U.S. 651 (1974) ................................................................ 4

*Fidelity Federal Savings & Loan Association v. De la Cuesta*,
    458 U.S. 141 (1982) ........................................................................................... 14

*Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954) .... 14

*Friends of Amador County v. Salazar*, 2010 WL 4069473
    (E.D. Cal. Oct. 18, 2010) ..................................................................................... 7

*Gaming Corporation of America v. Dorsey & Whitney*, 88 F.3d 536
    (8th Cir. 1996) ................................................................................................... 12

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ............................................................... 17

*Green v. Mansour*, 474 U.S. 64 (1985) ................................................................... 4

*Hein v. Capitan Grande Band of Diegueno Mission Indians*,
201 F.3d 1256 (9th Cir. 2000) ...................................................................7, 11

*Hillman v. Maretta*, 133 S. Ct. 1943 (2013) ................................................13, 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................................3

*Mukarugwiza v. JPMorgan Chase Bank NA*,
2015 WL 3960889 (D. Ariz. June 30, 2015) .........................................................3

*NCAA v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013) .....................16, 17

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).....................9

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996)............................4, 5, 6, 7

*Shaw v. Delta Airlines, Inc.*, 463 U.S. 85 (1985) ...................................................10

*Sycuan Band of Mission Indians v. Roache*, 788 F. Supp. 1498
(S.D. Cal. 1992) ...................................................................................................14

*Tamiami Partners v. Miccosukee Tribe of Indians*,
63 F.3d 1030 (11th Cir. 1995) ............................................................................12

*Tohono O'odham Nation v. City of Glendale*,
2011 WL 2650205 (D. Ariz. June 30, 2011) .........................................................9

*United Keetoowah Band of Cherokee Indians v. Oklahoma*,
927 F.2d 1170 (10th Cir. 1991) ..........................................................................12

*United States v. Lara*, 541 U.S. 193 (2004) ..........................................................11

*United States v. Virginia*, 518 U.S. 515 (1996) ....................................................17

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ................................12

*Verizon Maryland, Inc. v. Public Service Commission*,
535 U.S. 635 (2002)...........................................................................................4, 5

*Virginia Office for Protection & Advocacy v. Stewart*,
131 S. Ct. 1632 (2011)...........................................................................................4

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) ..........................................................3

*Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004)................................................3

iii

*Ex parte Young*, 209 U.S. 123 (1908)................................................................*passim*

**CONSTITUTIONAL PROVISIONS, STATUTES, RULES, REGULATIONS, AND LEGISLATIVE MATERIALS**

25 U.S.C. § 1331.....................................................................................................10

Ariz. Rev. Statute
   § 5-602 ...............................................................................2, 12, 15, 17

Fed. R. Civ. P.
   12(b)..................................................................................................8
   12(b)(1) ..............................................................................................3
   12(b)(6) ..............................................................................................3

Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503,
   100 Stat. 1798 (1986) ...........................................................................9

Indian Gaming Regulatory Act, 25 U.S.C.
   § 2702(1)............................................................................................11
   § 2710(b)...................................................................................5, 7, 11
   § 2710(d)(1) .........................................................................5, 7, 11, 14
   § 2710(d)(1)(C)...................................................................................14
   § 2710(d)(3) ...............................................................................5, 6, 12
   § 2710(d)(7) ........................................................................................6
   § 2710(d)(7)(A)(i)................................................................................5

S. Rep. No. 100-446 (1988) .............................................................................11, 13

Plaintiff the Tohono O'odham Nation (the "Nation") opposes the Motion to Dismiss ("Motion" or "Mot.") (Doc. 50) filed by Daniel Bergin, who is sued in his official capacity as Director of the Arizona Department of Gaming ("ADG"). As explained below, the Court has jurisdiction over this suit, and the Nation has stated a claim that Defendant Bergin's actions are preempted by federal law. Defendant's Motion should be denied.

## BACKGROUND

As this Court is aware, in 2009, the Nation announced its intention to open a resort and gaming facility, the West Valley Resort ("WVR"), on its Maricopa County land. The Secretary of the Interior has since taken part of that land into trust, and that land is thus now the Nation's "Indian lands." Compl. ¶¶ 57-63 (Doc. 1).

Arizona, along with two tribes with competing gaming operations, sued to block the Nation from building the WVR. No. 2:11-cv-00296-DGC. This Court rejected plaintiffs' claims, holding that "the Nation's construction of a casino on the Glendale-area land will not violate [its tribal-state gaming] Compact" with Arizona and that such gaming "is expressly permitted by [the Indian Gaming Regulatory Act]." *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 753, 754 (D. Ariz. 2013), *appeal docketed*, No. 13-16517 (9th Cir.); *see* Compl. ¶¶ 64-74.

Following this Court's decision, ADG acknowledged that it was bound by the Court's final judgment and stated that it would comply "with federal law [and] the requirements of the … Compact." Compl. Exh. E (Letter from Roger L. Banan to Seth P. Waxman, at 1 (Feb. 19, 2015)) (Doc. 1-4). Indeed, ADG assured the Nation that it would "proceed in the normal course of its business with various regulatory requirements imposed by IGRA and the Compact, including those concerning TON's Glendale casino, unless applicable laws change or a court orders otherwise." *Id*.

Although no applicable law changed and no court ordered otherwise, ADG changed its mind less than two months later, at the direction of the other Defendants. *See* Compl. ¶¶ 77-79. Defendant Bergin took the novel position that ADG has the authority under state law to determine that the Nation has engaged in "disqualifying conduct" barring the Nation

from engaging in gaming at the WVR, even if the Compact and IGRA would otherwise permit it.  Compl. ¶ 81 (quoting Compl. Exh. H (Letter from Daniel Bergin to Seth Waxman (Apr. 17, 2015) ("Bergin April 17 Letter")) (Doc. 1-5)).  Based on this purported authority, Defendant Bergin asserted that "evidence" of "fraud" by the Nation "nullif[ies] any right [the Nation] would otherwise have under the compact to build the Glendale casino." *Id.* ¶ 77 (quoting Compl. Exh. F (Letter from Daniel Bergin to Chairman Norris (Apr. 10, 2015)) (Doc. 1-5)).

Defendant Bergin thus asserted that *state* law gave him the authority to block the Nation from exercising its rights under federal law.  Specifically, he claimed that A.R.S. § 5-602 forecloses ADG from "permit[ting] gaming" at the WVR, "*regardless of whether such gaming would otherwise be permitted by a valid tribal-state compact*."  Compl. ¶ 81 (quoting Compl. Exh. H, Bergin April 17 Letter).  In a final letter to the Nation, counsel for Defendant Bergin confirmed that, "pursuant to A.R.S. § 5-602, [ADG] will not provide the necessary authorizations, certifications, and licenses" in connection with the WVR.  Compl. Exh. J (Letter from Patrick Irvine to Seth P. Waxman, at 3 (June 4, 2015)) (Doc. 1-5).

In late May and early June, ADG took further steps to "nulli[fy]" the Nation's right to engage in Class III gaming at the WVR.  In doing so, Defendants also endangered the Nation's ability to engage in Class II gaming—which IGRA does not permit States to regulate at all.  Specifically, ADG took the unprecedented step of notifying existing and prospective vendors and employees that the WVR is not an "authorized" facility and that they may be "subject to legal and/or regulatory risks" for providing goods or services to the WVR.  *See* Compl. ¶¶ 84-91.  Defendants' communications have drawn no distinction between Class II and Class III gaming.

The Nation brought this suit in June 2015 to enforce its federal rights, filing a complaint and a motion for a preliminary injunction.  The Nation's Complaint raises two claims:  first, ADG's claimed state-law authority to block the Nation from exercising its federal right to engage in Class III gaming at the WVR, based on the Nation's purported "disqualifying conduct," is preempted by federal law.  Second, ADG's notifications to

vendors and employees—notifications that do not distinguish between Class II and Class III gaming—are impermissibly interfering with the Nation's ability to deal with vendors and employees of its choice for Class II operations; such interference is also preempted.

Defendant Bergin has now moved to dismiss the Complaint.  *See* Mot. 5-13.

## STANDARD OF REVIEW

Where a Rule 12(b)(1) motion argues that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction," the Court must treat the allegations of the complaint as true.  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004); *see also White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  Where, on the other hand, a Rule 12(b)(1) motion contests the accuracy of jurisdictional allegations, a court "may look beyond the complaint to matters of public record."  *White*, 227 F.3d at 1242.  Such "factual jurisdictional dismissals are exceptional and only warranted where the alleged claim under the constitution or federal statutes appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous."  *Alliance Labs, LLC v. Stratus Pharm., Inc.*, 2013 WL 273309, at *2 (D. Ariz. Jan. 24, 2013).

With respect to a "motion to dismiss under Rule 12(b)(6), all allegations of material fact are assumed to be true and construed in the light most favorable to the non-moving party."  *Mukarugwiza v. JPMorgan Chase Bank NA*, 2015 WL 3960889, at *2 (D. Ariz. June 30, 2015).  Allegations must also be plausible, meaning that "the complaint must permit the court to infer more than the mere possibility of misconduct."  *Id.*  Moreover, "'general allegations embrace those specific facts that are necessary to support the claim.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

## ARGUMENT

### I.   THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THE NATION'S CLAIMS

As a threshold matter, Defendant argues that this Court has no jurisdiction to hear the Nation's claims.  *See* Mot. 5-6.  According to Defendant, (1) *Ex parte Young*—the venerable doctrine permitting federal courts to enjoin state officials who are violating federal law—

3

does not apply to the Nation's claims, and (2) there is no live controversy over ADG's efforts to interfere with Class II operations at the WVR.  Defendant is wrong on each point.

### A.     *Ex Parte Young* Permits The Nation's Suit

*Ex parte Young*, 209 U.S. 123 (1908), is a "watershed case," *Edelman v. Jordan*, 415 U.S. 651, 664 (1974), that established a vital exception to the principle that States are ordinarily immune from suit in federal court.  *Cf.* Mot. 5 ("[t]he State of Arizona may not be sued in federal court" absent abrogation or waiver of immunity).  Under the doctrine of *Ex parte Young*, state officials can be sued in their official capacities when a plaintiff seeks prospective injunctive relief to remedy ongoing violations of federal law.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996) ("[W]e often have found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of federal law.'").

*Ex parte Young* reflects "an important limit on the sovereign-immunity principle" and has "existed alongside [the Court's] sovereign-immunity jurisprudence for more than a century, accepted as necessary to 'permit the federal courts to vindicate federal rights.'" *Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011).  In particular, "*Ex parte Young* gives life to the Supremacy Clause.  Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green v. Mansour*, 474 U.S. 64, 68 (1985); *see Edelman*, 415 U.S. at 664 (*Ex parte Young* has permitted various constitutional provisions "to serve as a sword, rather than merely as a shield, for those whom they were designed to protect").

Whether *Ex parte Young* applies at the pleading stage is a "straightforward inquiry": "In determining whether … *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only" decide that a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Serv. Comm'n*, 535 U.S. 635, 645 (2002).

The Nation's suit readily satisfies the elements of an *Ex parte Young* action.  The Nation has sued Defendant Bergin and other involved state officials in their official

capacities.  *See* Compl. ¶¶ 1, 15.  The Nation seeks prospective equitable relief barring those state officials from continuing to violate federal law—namely, an injunction forbidding Defendants from relying on purported state-law authority to frustrate the Nation's exercise of rights secured to it by IGRA and the Supremacy Clause.  *See id.* ¶ 10, Prayer for Relief; *see also* 25 U.S.C. § 2710(d)(1) ("Class III gaming activities shall be lawful on Indian lands" if three conditions are satisfied); *id.* § 2710(b) (similar for Class II gaming activities).  The Nation's suit thus satisfies the "'straightforward inquiry'" governing whether claims may proceed under *Ex parte Young*.  *Verizon*, 535 U.S. at 645.

Indeed, *Ex parte Young* has long been used as a vehicle for federal preemption claims, the only type of claim the Nation has brought here.  "[A]s [the Supreme Court] ha[s] long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."  *Armstrong v. Exceptional Child Care Ctr.*, 135 S. Ct. 1378, 1384 (2015) (citing *Ex parte Young*); *see Verizon*, 535 U.S. at 645 ("Verizon sought injunctive and declaratory relief, alleging that the Commission's order requiring payment of reciprocal compensation was pre-empted by the 1996 Act and an FCC ruling.  The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies our 'straightforward inquiry'" into the applicability of *Ex parte Young*).

Against the weight of this authority, Defendant contends, in a single brief paragraph, that the Supreme Court held in *Seminole Tribe* that *Ex parte Young* is "inapplicable" to any suit involving "rights conferred by IGRA."  Mot. 6.  But *Seminole Tribe* held no such thing.  It addressed one particular right conferred by IGRA and concluded that because IGRA provided an elaborate remedial scheme (offering a limited form of relief) to vindicate that right, Congress did not intend that *Ex parte Young* be used as a substitute remedy.  Specifically, *Seminole Tribe* held that a State's "duty to negotiate" compacts in good faith under 25 U.S.C. § 2710(d)(3) could not be enforced through *Ex parte Young* because Congress had fashioned a specific and calibrated statutory remedy to enforce that duty.  *Seminole Tribe*, 517 U.S. at 73-76; *see also* 25 U.S.C. § 2710(d)(7)(A)(i) (tribe may sue for

failure to enter into compact negotiations or for failing to conduct negotiations in good faith). That holding is unexceptional: Where Congress has provided a specific statutory remedy to enforce a statutory right, courts may infer an "'intent to foreclose' equitable relief" under *Ex parte Young*. *Armstrong*, 135 S. Ct. at 1385. But that limitation has no application here, because IGRA provides no remedy for conduct by state officials that wrongfully denies an Indian tribe the right to engage in Class III or Class II gaming on Indian land.

Indeed, *Seminole Tribe*'s analysis forecloses Defendant's position that *Ex parte Young* is categorically inapplicable to IGRA. The Court first reaffirmed the basic principle that, "[w]here Congress has created a remedial scheme for the enforcement of a *particular* federal right, [courts] have … refused to supplement that scheme with one created by the judiciary." 517 U.S. at 74 (emphasis added); *see Armstrong*, 135 S. Ct. at 1385. That principle was dispositive in *Seminole Tribe* because IGRA supplied a specific remedy for the specific wrong at issue. As the Court explained, "Congress intended" the duty to negotiate in good faith (set forth in § 2710(d)(3)) "to be enforced against the State in an action brought under § 2710(d)(7)," which provided a "carefully crafted and intricate remedial scheme" to enforce that duty. 517 U.S. at 73-74.[1] If that same duty "could be enforced in a suit under *Ex parte Young*," the Court reasoned, the remedy IGRA provided "would have been superfluous; it is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more complete and more immediate relief would be available under *Ex parte Young*." *Id.* at 75. In short, *Seminole Tribe* teaches that a court should identify the "particular federal right" at issue and determine whether a statute prescribes a specific remedy to vindicate that right. If so, that indicates that Congress may have intended the statutory remedy to be exclusive. If not, however, *Ex parte Young* remains available.

---

[1] The remedial scheme at issue in *Seminole Tribe* is complex and highly specific: A tribe may sue a State for failure to negotiate in good faith; the court may order the State to conclude a compact with the tribe within 60 days; if a compact is not concluded within 60 days, the court can order mediation; the mediator considers compacts submitted by both sides and chooses one; and if the State does not agree to the mediator's compact, the Secretary of the Interior may prescribe procedures under which the tribe may engage in Class III gaming without a compact. 25 U.S.C. § 2710(d)(7).

6

1      Here, there is no evidence of a congressional "'intent to foreclose'" *Ex parte Young*

2  suits to enjoin actions by a state official that interfere with an Indian tribe's right to engage in

3  Class III gaming (25 U.S.C. § 2710(d)(1)) or Class II gaming (25 U.S.C. § 2710(b)).

4  *Armstrong*, 135 S. Ct. at 1385.  In contrast to the good-faith negotiation provision at issue in

5  *Seminole Tribe*, IGRA supplies no remedy—much less a comprehensive or intricate one—

6  for such conduct by state officials.  Two courts in this Circuit have thus permitted *Ex parte*

7  *Young* claims where state officials were alleged to have obstructed a tribe's Class III gaming

8  rights under § 2710(d)(1).  *See Friends of Amador Cnty. v. Salazar*, 2010 WL 4069473, at

9  *3-4 (E.D. Cal. Oct. 18, 2010) ("The *Seminole Tribe* exception to *Ex parte Young* is

10  inapplicable here.  Unlike the provisions at issue in *Seminole Tribe*, Congress did not create

11  a detailed remedial scheme to enforce § 2710(d)(1), the section that permits class III gaming

12  by tribes."), *aff'd*, 554 F. App'x 562 (9th Cir. 2014); *Artichoke Joe's v. Norton*, 216 F. Supp.

13  2d 1084, 1109-1110 & n.34 (E.D. Cal. 2002) ("Congress did not create a detailed remedial

14  scheme to enforce section 2710(d)(1), which permits class III gaming on certain conditions,

15  unlike the provisions of IGRA which the Court held could not be enforced by an *Ex parte*

16  *Young* action in *Seminole Tribe*."), *aff'd*, 353 F.3d 712 (9th Cir. 2003).[2]  As those courts

17  held, because IGRA does not establish any remedial scheme to protect the gaming rights at

18  issue here, there is no reason to believe Congress intended to foreclose *Ex parte Young*'s

19  well-established mechanism for enforcing the supremacy of federal law.[3]

20

21      [2] In enacting IGRA, Congress was well aware of the long-standing principle that "if
an individual claims federal law immunizes him from state regulation, the court may issue an
22  injunction upon finding the state regulatory actions preempted."  *Armstrong*, 135 S. Ct. at
1384; *see, e.g.*, *Bond v. United States*, 134 S. Ct. 2077, 2088 (2014) (Congress is aware of,
23  and legislates against, background principles of law).  Had Congress wished to preclude such
preemption suits, it would have said so affirmatively or provided an alternative remedy.
24

25      [3] *Hein v. Capitan Grande Band of Diegueno Mission Indians*, 201 F.3d 1256 (9th Cir.
2000), is also inapposite.  As Defendant describes it, *Hein* held that "*IGRA* 'does not permit
26  a suit against a state unless the state waives its sovereign immunity.'"  Mot. 5-6 (emphasis
added).  The decision actually says that "*section 2710(d)(7)* does not permit a suit against a
27  state unless the state waives its sovereign immunity," *Hein*, 201 F.3d at 1260 n.7 (emphasis
added), merely restating the specific holding of *Seminole Tribe*.
28

**B.      There Is A Live, Ongoing Controversy Over Class II Gaming**

Defendant contends that "[t]here is no genuine dispute between the State and the Nation concerning the Nation's ability to engage in Class II gaming" because the "State has never claimed to have authority to regulate Class II gaming." Mot. 6.  According to Defendant, the Nation's allegations that vendors and employees have been chilled from working with the Nation on the WVR, even as a Class II facility, are "conclusory" and do not establish an "actual controversy." *Id.* at 7.  Again, Defendant is wrong.

ADG's actions have successfully intimidated vendors from dealing with the WVR as a Class III facility.  Accordingly, the Nation has been working toward opening a Class II facility.  Francisco Decl. ¶ 21, at 7-8 (Doc. 3).  As the Complaint alleges, however, Defendants' conduct has compromised and will continue to compromise vendors' and employees' willingness to work with the WVR, even as a Class II facility.  *See* Compl. ¶¶ 9, 84-93, 114-124.  This is not "[a] conclusory allegation of a 'threat' of a 'chill' based on a hypothetical set of facts." Mot. 7.  The allegation is plausible—indeed, the allegation that threatened sanctions would affect prospective vendors and employees is a matter of common sense—and well-supported.  ADG has raised the specter of sanctions against employees and vendors who work at, or provide goods and services to, any gaming facility "considered by the State to be unauthorized." Compl. Exh. K (ADG Employee & Vendor Notices) (Doc. 1-6).  ADG has also warned vendors and employees that "the Arizona Department of Gaming has determined that the proposed West Valley casino is not authorized." *Id.* To date, those notices have drawn no distinction between Class III and Class II gaming and, as written, may naturally be read to encompass all categories of gaming at the "West Valley casino."  The injuries to the Nation from those notices are real and they are ongoing, and at this stage the Nation's allegations are more than sufficient to state a claim.[4]

---

[4] Although Rule 12(b) does not require the Nation to identify vendors or employees by name in the Complaint, the preliminary injunction discovery authorized by the Court, in connection with the Nation's declarations, demonstrates concretely that ADG's notices are causing harm to the Nation by interfering with vendor relationships, even with respect to Class II operations. *E.g.*, Francisco Decl. ¶¶ 17-21, at 5-8.  The Nation easily would be able

1    Defendant's position that there is no genuine Class II dispute is also flatly

2    contradicted by his motion to dismiss.  In one breath, Defendant asserts that "the State has

3    never claimed to have the authority to regulate Class II gaming."  Mot. 6.  In the next,

4    Defendant reserves the right to treat the WVR, even as a Class II facility, as unauthorized

5    "*under State law*" and to "sanction[]" vendors and employees "*under State law*" for

6    associating with Class II gaming at the WVR.  *Id.* at 7.  That statement underscores what is

7    at stake:  Defendant continues to claim the authority under state law to punish vendors or

8    employees who work with or at the WVR as a Class *II* facility.

9    To the extent Defendant is arguing that "sanction[ing]" vendors and employees

10   "under State law" for participating in Class II gaming is not "regulat[ing]" Class II gaming,

11   that argument is specious.  In similar preemption contexts, the Supreme Court has

12   recognized that preempted "state regulation" includes conduct that "can be" or is "designed

13   to be" a "method of governing conduct and controlling policy" contrary to federal law.  *San*

14   *Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246-247 (1959).  Here, ADG's threats

15   to sanction vendors and employees who work with the WVR as a Class II facility plainly

16   burden the Nation's right to engage in Class II gaming activities that Congress has approved

17   under IGRA, and any assertion of such state-law authority is thus preempted.  *See, e.g.*,

18   *Tohono O'odham Nation v. City of Glendale*, 2011 WL 2650205, at *11 (D. Ariz. June 30,

19   2011) (H.B. 2534 is preempted because it burdens the "exercise[]" of "rights under [the

20   Lands Replacement Act]").  This dispute is genuine and it is ripe for resolution now.

21   **II.    THE NATION HAS STATED PREEMPTION CLAIMS**

22   On the merits, Defendant fares no better.  The assertion that ADG has state-law

23   regulatory authority to exercise what amounts to a freestanding veto of gaming on Indian

24   lands that IGRA otherwise permits contravenes IGRA's purpose and structure and is

25

26

27   ─────────────────────────────────────────────

28   to amend its complaint to include specific allegations based on that evidence if the Court
     were to find the Nation's allegations of harm insufficient.

therefore preempted under ordinary principles of field and conflict preemption.  *See* Prelim.

Inj. Mot. 9-13 (Doc. 3).  Defendant's contrary arguments are undeveloped and unpersuasive.

### A.    The Nation's Suit Properly Invokes This Court's Equitable Authority To Enjoin Preempted State Action

Defendants' lead argument—that the Nation lacks a "right of action"—is easily

dispatched.  Mot. 9.  The Nation is not invoking a "right of action" under either the

Supremacy Clause or IGRA.  Instead, the Nation's claims rest on federal courts' inherent

equitable power to "issue an injunction upon finding … state regulatory actions preempted."

*Armstrong*, 135 S. Ct. at 1384 (citing *Ex parte Young*).

As the Supreme Court recently explained in *Armstrong*, "[t]he ability to sue to enjoin

unconstitutional actions by state … officers is the creation of courts of equity, and reflects a

long history of judicial review of illegal executive action, tracing back to England."  135 S.

Ct. at 1384.  *Armstrong* makes clear that this "judge-made remedy," reflected in *Ex parte

Young* and related cases, is distinct from "an implied right of action contained in the

Supremacy Clause," but nonetheless permits injured parties to seek injunctive relief where

"federal law immunizes [the party] from state regulation."  *Id.*; *see also id.* at 1391

(Sotomayor, J., dissenting) ("[The Court has] long entertained suits in which a party seeks

prospective equitable protection from an injurious and preempted state law without regard to

whether the federal statute at issue itself provided a right to bring an action." (collecting

authority)); *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96 n.14 (1985) ("It is beyond dispute

that federal courts have jurisdiction over suits to enjoin state officials from interfering with

federal rights.  A plaintiff who seeks injunctive relief from state regulation, on the ground

that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy

Clause of the Constitution, must prevail, thus presents a federal question which the federal

courts have jurisdiction under 28 U.S.C. § 1331 to resolve.  This Court … frequently has

10

1   resolved pre-emption disputes in a similar jurisdictional posture" (internal citations

2   omitted)).  It is that well-established equitable authority the Nation invokes here.[5]

3          **B.     The Nation Has Stated Preemption Claims**

4          IGRA gives the Nation a right to engage in Class III or Class II gaming on its Indian

5   lands if certain statutory conditions are satisfied, as they are here.  *See* 25 U.S.C.

6   § 2710(d)(1) (Class III); *id.* § 2710(b) (Class II).  Indeed, this Court has already held that

7   Class III gaming at the WVR is permitted by IGRA and the Compact.  *Tohono O'odham*

8   *Nation*, 944 F. Supp. 2d at 754.  State laws and regulations that obstruct the Nation from

9   exercising those federal rights are preempted, on field- and conflict-preemption grounds.

10  The Nation has thus stated a claim that Defendant's position—that ADG has state-law

11  authority to bar the Nation from conducting otherwise lawful gaming at the WVR based on

12  the Nation's purportedly "disqualifying conduct"—is preempted.  *See* Prelim. Inj. Mot. 9-14.

13         **1.     Field Preemption**

14         IGRA creates a comprehensive scheme for regulating on-reservation gaming,

15  carefully balancing the roles of the federal government, tribes, and States.  *See* Prelim. Inj.

16  Mot. at 9-10.  Exercising its plenary authority to legislate with respect to Indian tribes,

17  *United States v. Lara*, 541 U.S. 193, 200 (2004), Congress enacted IGRA to "to provide a

18  statutory basis for the operation of gaming by Indian tribes."  25 U.S.C. § 2702(1).  In doing

19  so, Congress "intended to expressly preempt the field in the governance of gaming activities

20  on Indian lands."  S. Rep. No. 100-446, at 6 (1988).

21

22

23         [5] Defendant's reliance on *Hein* for the proposition that IGRA does not create a right
    of action is misplaced for the same reason.  *Hein* did not involve claims under *Ex parte*
24  *Young*; rather, plaintiffs argued that "they may bring a direct action under IGRA because that
    statute authorized private suits to enforce its provisions."  *Hein*, 201 F.3d at 1260.  The Ninth
25  Circuit held that IGRA did not create a right of action for the wrong alleged.  *Id*.  *Hein* is
    beside the point here because the Nation does not invoke a right of action, express or
26  implied, under IGRA; instead, it relies on federal courts' well-established equitable power to
    enjoin preempted state regulation, recognized by *Ex parte Young* and reaffirmed in
27  *Armstrong.*
28

1    IGRA's "pervasive" federal regulatory scheme thus occupies the field of on-

2    reservation Indian gaming and leaves no room for state regulation outside IGRA's confines.

3    *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013), *cert. denied*, 134 S. Ct.

4    1876 (2014); *see Arizona v. United States*, 132 S. Ct. 2492, 2500-2502 (2012).  Congress's

5    preemptive intent is manifest from IGRA's text, structure, and purpose, as many courts have

6    recognized.  *See, e.g.*, *Tamiami Partners v. Miccosukee Tribe of Indians*, 63 F.3d 1030, 1033

7    (11th Cir. 1995); *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir.

8    1996).  The regulation of on-reservation gaming is thus "an area that States may not enter,"

9    *Arizona*, 132 S. Ct. at 2502, except where IGRA expressly assigns the State a regulatory role.

10    Defendant's response to this point is to mischaracterize the Nation's position.  The

11    Nation does not argue "that IGRA 'left states with no regulatory role over gaming.'"  Mot.

12    10 (quoting Compl. ¶ 105).  Rather, the Nation argues that IGRA "left states with no

13    regulatory role over gaming *except as expressly authorized by IGRA*."  Compl. ¶ 105

14    (emphasis added).  IGRA may well be "an example of 'cooperative federalism'" in some

15    respects (Mot. 10), but it does not give States unchecked authority to apply their own laws to

16    on-reservation gaming.  Instead, "the only method by which a state can apply its general civil

17    laws to gaming is through a tribal-state compact" whose negotiation and terms are governed

18    and restricted by IGRA.  *Dorsey & Whitney*, 88 F.3d at 546; *see United Keetoowah Band of*

19    *Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1177 (10th Cir. 1991) ("IGRA permits …

20    state civil or criminal jurisdiction over Indian gaming *only* when a tribal-state compact has

21    been reached to regulate class III gaming."); 25 U.S.C. § 2710(d)(3) (regulating compacts).

22    Here, ADG has asserted state-law authority independent of the Compact to regulate

23    Class III gaming.  *See, e.g.*, Compl. Exh. H (Bergin April 17 Letter, at 1 (claiming that

24    A.R.S. § 5-602 authorizes ADG to bar gaming at the WVR "regardless of whether such

25    gaming would be otherwise be permitted by a valid tribal-state compact")).  That purported

26    state-law regulatory authority is preempted.

27    Defendant also suggests that IGRA is not field-preemptive based on *Confederated*

28    *Tribes of Siletz Indians of Oregon v. Oregon*, 143 F.3d 481 (9th Cir. 1998).  Defendant

12

misreads *Confederated Tribes*.  There, the question was whether IGRA preempted a state public records law that required public disclosure of a state police report about an Indian casino.  *Id.* at 484.  The court held that the public records law—which was "unrelated to Indian gaming"—was not preempted because it was "unclear" how the law "interfered [with] or [was] incompatible with IGRA," because the law did not "usurp tribal control over gaming," and because the law did not "threaten to undercut federal authority over Indian gaming."  *Id.* at 487.  In a footnote, the court rejected a field-preemption contention, reasoning that "the application of Oregon law … ha[d] no effect on the determination 'of which gaming activities are allowed.'"  *Id.* at 486 n.7 (quoting S. Rep. No. 100-446, at 6 (1988)).  Here, by contrast, Defendants have asserted sweeping state-law authority tantamount to a veto over the Nation's right to engage in "gaming activities" on its Indian lands.  That strikes at the core of the field comprehensively governed by IGRA.[6]

## 2.      Conflict Preemption

Defendant's asserted state-law authority to "nullify" the Nation's right to game at the WVR is also preempted under conflict preemption principles.  "State law is pre-empted 'to the extent of any conflict with a federal statute.'"  *Hillman v. Maretta*, 133 S. Ct. 1943, 1949-1950 (2013).  As this Court has held, "the Nation's construction of a casino on the Glendale-area land" "is expressly permitted by [IGRA]" under the settlement-of-a-land-claim provision.  *Tohono O'odham Nation*, 944 F. Supp. 2d at 753-754.  The Court has also

---

[6]   Defendant's discussion (Mot. 10 n.3) of IGRA's Senate Report is puzzling.  The Report states that IGRA "is intended to expressly preempt the field in the governance of gaming activities on Indian lands.  Consequently, Federal courts should not balance competing Federal, State, and tribal interests to determine the extent to which various gaming activities are allowed."  S. Rep. No. 100-446, at 6.  Defendant points out that the Report contemplates some state regulation pursuant to compacts—but that is obvious from the text of IGRA and does nothing to support ADG's claim that it can nullify the Nation's right to game "*regardless of whether such gaming would otherwise be permitted by a valid tribal-state compact*."  Compl. ¶ 81 (quoting Compl. Exh. H, Bergin April 17 Letter).  Indeed, the passage Defendant quotes establishes that IGRA does not "contemplate the extension of State jurisdiction or the application of State laws for any other purpose" beyond the limited role IGRA expressly grants the States.  S. Rep. No. 100-446, at 6.

1    held that Class III gaming at the WVR would be "in conformance with [the] Tribal-State

2    compact," 25 U.S.C. § 2710(d)(1)(C).  *Id.* at 748.  And there is no dispute that such gaming

3    satisfies the other two conditions set forth in § 2710(d)(1):  It is authorized by an approved

4    tribal ordinance, and Arizona permits Class III gaming.  The Nation thus has a right under

5    IGRA to game at the WVR.

6          Defendant contends that he has the authority under state law to deprive the Nation of

7    that right because the Nation's alleged conduct "disqualif[ies]" it from exercising its rights

8    under IGRA.  But where state law would deprive a party of a right given to it by federal law,

9    the state law conflicts with federal law and is preempted.  *Fidelity Fed. Sav. & Loan Ass'n v.*

10   *De la Cuesta*, 458 U.S. 141, 154-155 (1982); *Barnett Bank of Marion Cnty.*, *N.A. v. Nelson*,

11   517 U.S. 25, 33 (1996); Prelim. Inj. Mot. 12-13.  Because gaming at the WVR "is expressly

12   permitted by [IGRA]," *Tohono O'odham Nation*, 944 F. Supp. 2d at 753-754, state laws

13   restricting that right "must give way to the contrary federal policy."  *Franklin Nat'l Bank of*

14   *Franklin Square v. New York*, 347 U.S. 373, 377-379 (1954).  Indeed, IGRA could not

15   function as Congress intended if States could impose requirements beyond those imposed by

16   the statute.  *See Hillman*, 133 S. Ct. at 1953 (permitting states to impose additional

17   restrictions on federal statutory scheme would amount to "a general license for state law to

18   override" the federal statute).  Defendants' position would leave States free to upset the

19   delicate balance among federal, tribal, and state interests that Congress struck in IGRA.  *See*

20   *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989) (state law that

21   upset federal balance was preempted); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S.

22   341, 348 (2001) (similar); *Sycuan Band of Mission Indians v. Roache*, 788 F. Supp. 1498,

23   1504 (S.D. Cal. 1992), *aff'd*, 38 F.3d 402 (9th Cir. 1994) (applying this principle in the

24   IGRA preemption context).

25         Defendant disputes none of this in his opposition.  Instead, he apparently takes the

26   position that his actions with respect to Class III gaming are authorized under the Compact.

27   Mot. 11; *see id.* at 12 ("The Nation's real complaint is that it does not believe Director

28

                                                14

1  Bergin's actions are permitted under the compact."); *id.* (this is "a dispute about the terms of

2  the compact").[7]  This is a surprising about-face.

3          To date, ADG's letters to the Nation have been clear that ADG's position that the

4  WVR is "not authorized" is based on ADG's interpretation of its statutory authority under

5  state law, independent of the Compact.  This Court has already held that the Compact

6  permits the Nation to game at the WVR.  Presumably for that reason, ADG's theory is now

7  that *state law* is "binding on ADG" and requires it to deny certifications and approvals

8  connected to the WVR "regardless of whether such gaming would otherwise be permitted by

9  a valid tribal-state compact."  Compl. Ex. H, Bergin April 17 Letter, at 1; *see also id.*

10  ("[R]egardless of how issues of … compact interpretation are ultimately resolved, ADG is

11  not authorized to permit gaming inconsistent with [state] statutory mandates."); *id.* at 3

12  ("[P]roviding regulatory approvals to the proposed Glendale casino would violate [state

13  statutory] mandates.").  In ADG's most recent letter to the Nation, Defendant's counsel made

14  clear that "*pursuant to A.R.S. § 5-602*, [ADG] will not provide the necessary authorizations,

15  certifications, and licenses."  Compl. Exh. J (June 4, 2015 Letter, at 3) (emphasis added).

16  None of ADG's letters to the Nation references the Compact provisions cited in the motion

17  to dismiss.  Instead, Defendant's position has been unambiguous:  Under state law

18  (specifically, A.R.S. § 5-602), ADG may decide that the Nation has engaged in disqualifying

19  conduct that nullifies the Nation's federal rights.  For that reason, the Nation's request for

20  relief is targeted at that assertion of *state-law* authority.  Defendant's after-the-fact attempt to

21  recharacterize his position and the Nation's suit should be rejected.[8]

22  _____

23          [7] The Nation says "apparently" because other parts of Defendant's motion to dismiss
    acknowledge (correctly) that ADG's position has been that it cannot "approve the casino
24  because doing so would be inconsistent with" and "exceed its [state-law] statutory
    authority."  Mot. 4.  That recitation confirms that the dispute is about ADG's state-law
25  authority, not the Compact.  Indeed, in a separate footnote, Defendants admits that the
    Nation has not "assert[ed] any breach of the tribal-State compact."  *Id.* at 9 n.2.
26

27          [8] Although the Nation's complaint is not based on the Compact, Defendant's
    description of the Compact is decidedly wrong.  The Compact gives ADG a significant, but
28  largely administrative, role in overseeing tribal casinos, and does not confer any power to

III.  **DEFENDANT'S "COMMANDEERING" ARGUMENT IS MERITLESS**

Finally, Defendant argues that "the Nation's interpretation of IGRA … would commandeer the State's and its officers' authority to issue certifications relating to the West Valley casino." Mot. 12.  This argument mischaracterizes the relief the Nation seeks.

The Nation does not seek to "force the State to certify" anyone.  Mot. 12; *see id.* at 1 (asserting that the Nation seeks to "compel" ADG "to issue licenses").  As the Complaint makes clear, the Nation seeks a prohibitory injunction barring Defendants from refusing to issue certifications or denying regulatory approvals on grounds preempted by federal law— that is, the claimed state-law authority to decide that the Nation has engaged in conduct "disqualifying" it from exercising its federal rights.  *See* Compl., Prayer for Relief. Prohibiting state officials from basing decisions on impermissible considerations is common and does not "commandeer" those officials.  *See, e.g., NCAA v. Governor of New Jersey*, 730

---

nullify the Nation's core rights under IGRA.  For example, the Compact provides that ADG shall certify certain gaming employees, contractors, and vendors.  Compl. Exh. B (Compact § 4(b), (c), (d)) (Doc. 1-2).  Section 5 sets forth the procedure for obtaining such state certifications, providing that ADG "shall conduct the necessary background investigation," "shall expedite State Certification Applications," and "[u]pon completion of the necessary background investigation, … shall either issue a State Certification, or deny the Application."  *Id.*  Section 5(f) then lays out the grounds on which ADG may deny or revoke a certification, including past felony convictions, links to organized crime, fraud, or other disqualifying conduct.  *Id.*  The Compact nowhere gives ADG the right to certify the Nation itself as fit or unfit for gaming activities or to penalize vendors and employees who deal with the Nation on the ground that the Nation has purportedly engaged in "disqualifying conduct."

Separately, § 4(a) of the Compact provides that "[t]he Gaming Facility Operator, and all Gaming Facilities authorized by this Compact, shall be licensed by the Tohono O'odham Gaming Office."  This includes "the licensing of each Principal, Primary Management Official and Key Employee."  *Id.*  "Prior to the initial commencement of the operation, [ADG] and Tohono O'odham Gaming Office, shall verify compliance with this requirement through a joint pre-operation inspection and letter of compliance."  *Id.*  After that inspection, "[i]f [ADG] determines that the Gaming Facility Operator and Gaming Facility do not comport with the terms of this Compact a non-compliance letter shall be sent … that shall set forth the matters of non-compliance upon which the [ADG] bases its decision."  *Id.*  That provision also does not give ADG a right to issue a non-compliance letter concluding that a casino is "not authorized" or that the Nation is insufficiently trustworthy to be permitted to exercise its federal rights.

1  F.3d 208, 232 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2886 (2014) (explaining the
2  "importance of the affirmative/negative command distinction" in applying commandeering
3  principles and noting that many federal statutes prohibit state conduct). Similarly, a judicial
4  order that state officials may not base decisions on certain prohibited grounds does not
5  commandeer those state officials. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515 (1996)
6  (Virginia Military Institute may not exclude applicants based on sex; no discussion of
7  commandeering); *Gratz v. Bollinger*, 539 U.S. 244 (2003) (University of Michigan may not
8  use race-based point allocation in admissions process; no discussion of commandeering).
9      It is ADG's position that, based on A.R.S. § 5-602, ADG "will not provide the
10  necessary authorizations, certifications, and licenses" for the WVR. Compl. Exh. J (June 4,
11  2015 Letter, at 3). The Nation seeks equitable relief from this Court making clear that
12  Defendants may not refuse to issue those authorizations, certifications, and licenses based on
13  the state-law authority Defendants claim under A.R.S. § 5-602 to decide that the Nation has
14  engaged in conduct "disqualifying" it from exercising its federal rights and to penalize those
15  who deal with the Nation based on the Nation's "disqualifying" conduct. Such relief would
16  *not* compel Defendants to issue any specific authorization, certification, or license if there is
17  a valid basis for refusing to issue it. *See, e.g.*, Compl. Exh. B (Compact § 5(f) (state
18  certification may be denied to an applicant who has ties to organized crime)) (Doc. 1-2).
19      In short, the relief the Nation seeks would simply bar Defendants from relying on
20  putative state-law authority that is preempted by IGRA. It would not "commandeer" anyone.

**CONCLUSION**

22  Defendant's motion to dismiss should be denied.

17

Dated:  August 14, 2015

Respectfully submitted,


/s/      Danielle Spinelli
Jonathan Jantzen,
   Attorney General, SBN 016220
Laura Berglan,
   Deputy Attorney General, SBN 022120
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ  85634
Telephone: (520) 383-3410
jonathan.jantzen@tonation-nsn.gov
laura.berglan@tonation-nsn.gov


Seth P. Waxman (*Pro hac vice*)
Danielle Spinelli (*Pro hac vice*)
Kelly P. Dunbar (*Pro hac vice*)
Sonya L. Lebsack (*Pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
kelly.dunbar@wilmerhale.com
sonya.lebsack@wilmerhale.com


*Counsel for Plaintiff Tohono O'odham Nation*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of August, 2015, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, which will send a notice of filing to all counsel of record.


/s/  Danielle Spinelli
DANIELLE SPINELLI