**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tohono O'odham Nation, | No. CV-15-01135-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Douglas A. Ducey, et al., | |
| Defendants. | |

Plaintiff Tohono O'odham Nation (the "Nation") is currently constructing a major casino on land purchased in 2003 near Glendale, Arizona. In May 2013, this Court ruled that the 2002 Gaming Compact between the State of Arizona and the Nation did not prohibit construction of another casino in the Phoenix metropolitan area, and the Nation elected to begin construction of the casino even though that ruling is on appeal. As construction has progressed, the State and its officials have refused to certify vendors and employees to work at the casino. In response, the Nation brings this action for declaratory and injunctive relief to prohibit the State from continuing to bar the casino's progress. Before the Court is the Nation's motion for preliminary injunction (Doc. 3), Defendants Douglas Ducey and Mark Brnovich's joint motion to dismiss (Doc. 49), and Defendant Daniel Bergin's motion to dismiss (Doc. 50). The Court heard oral argument on September 10, 2015. For the reasons set forth below, the Court will deny the Nation's motion for preliminary injunction, grant Ducey and Brnovich's motion to dismiss, and grant Bergin's motion to dismiss in part.

I.     **Background.**

  A.     **The Indian Gaming Regulatory Act.**

In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Supreme Court held that states could not regulate gaming on Indian lands.  In response, Congress passed the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, which granted "states some role in the regulation of Indian gaming."  *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003).  "'IGRA is an example of "cooperative federalism" in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme.'"  *Id.* (quoting *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002)).

IGRA divides gaming into three classes: Class I, which includes social games with prizes of minimum value and traditional forms of Indian gaming; Class II, which includes bingo and certain card games; and Class III, which includes all gaming that falls outside of Classes I and II, typically referred to as "casino-style" gaming.  25 U.S.C. §§ 2703(7)(A), (7)(B), (8).  Under IGRA, "Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes[.]"  *Id.* § 2710(a)(1).  Class II gaming is also "within the jurisdiction of the Indian tribes," but subject to some federal regulation.  *Id.* § 2710(a)(2).  Class III gaming is permitted if it is authorized by a tribal ordinance, conducted in a state that permits such gaming, and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State[.]"  *Id.* § 2710(d)(1).

  B.     **Arizona Department of Gaming.**

To carry out the state regulation allowed by IGRA, Arizona created the Arizona Department of Gaming ("ADG").  *See* A.R.S. § 5-604(A).  ADG is managed by a governor-appointed director, Defendant Daniel Bergin.  ADG is tasked with "certify[ing], as provided in tribal-state compacts, prospective gaming employees, facility support employees, tribal gaming office employees, financiers, management contractors, providers of gaming services and manufacturers and distributors of gaming devices to

ensure that unsuitable individuals or companies are not involved in [gaming]." *Id.* § 5-602(A).  ADG is also charged with promoting "the public welfare and public safety" and seeking "to prevent corrupt influences from infiltrating Indian gaming." *Id.*

## C. The Compact.

On January 24, 2003, the Secretary of the Interior approved a tribal-state compact between the Nation and Arizona (the "Compact").  Doc. 1, ¶ 49.  The Compact permits the Nation to operate four gaming facilities and provides that it does not apply to Class I or Class II gaming.  *Id.*, ¶¶ 41, 51.  The Compact requires prospective gaming employees, contractors, and vendors to obtain certification from ADG.  Specifically, it provides that ADG "shall conduct the necessary background investigation to ensure the Applicant is qualified for State Certification."  Doc. 1-3 at 4.[1]  Once a background check is completed, ADG must either issue the certification or deny the application and provide the grounds for denial.  *Id.*  ADG may deny certifications on several grounds, including prior felony convictions, providing false statements, or previous violations of gaming laws.  *Id.* at 5.

After the Compact was executed, the Nation purchased unincorporated land in Glendale, Arizona, located just west of Phoenix.  Several years later, in 2009, the Nation announced plans to use the land for a Class III gaming facility to be known as the West Valley Resort.  Doc. 1, ¶ 64.  The State of Arizona filed suit in this Court, arguing that gaming on the Glendale land was not authorized by IGRA and violated the Compact's ban on additional casinos in the Phoenix area.  The State also asserted that the Nation committed fraud by agreeing with the State and the voters that there would be no more casinos in the Phoenix area, while secretly planning to acquire land and open the West Valley Resort.  *See Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748 (D. Ariz. 2013).  The Court held that the Nation's construction of a casino on the Glendale land would not violate any provision of the Compact and was permitted by IGRA.  *Id.* at 754.  The Court also found the State's claims of fraud and promissory estoppel barred by the

---

[1] Citations to pages in the Court's docket are to page numbers placed at the top of each page by the Court's CM/ECF system, not to the original page numbers at the bottom of each page.

Nation's sovereign immunity.  *Id.* at 769.  The decision was appealed to the Ninth Circuit and remains pending.

### D.      The Present Dispute.

The Nation began construction of the West Valley Resort in December 2014.  The building currently under construction will serve as an interim facility until construction of the entire resort takes place in the future.  Doc. 62-2 at 240.  On February 2, 2015, Defendant Bergin expressed concern to the Nation that the casino was "not authorized, and, as a consequence, . . . ADG would not have the authority to participate in any certification or approval processes relating to the opening or operation of the casino."  Doc. 1, ¶ 75.  On April 10, 2015, Bergin informed the Nation that "ADG lacks statutory authority to approve [the Nation's] Glendale casino notwithstanding [the Court's earlier decision]."  Doc. 1-5 at 2.  Bergin expressed a belief that the Nation committed fraud during the formation of the Compact and that the fraud "nullif[ied] any right that [the Nation] would otherwise have under the compact to build the Glendale casino."  *Id.*  He referenced A.R.S. § 5-602(C), which "requires ADG to execute the State's duties under tribal-state compacts 'in a manner that is consistent with this state's desire to have *extensive, thorough and fair regulation* of Indian gaming *permitted* under the tribal-state compacts.'"  *Id.* at 3 (quoting § 5-602(C) (emphasis in Bergin letter)).  Bergin stated that "the record created in [the prior litigation] includes credible and largely unrefuted evidence that [the Nation] engaged in deceptive behavior and made significant misrepresentations during the compact negotiations[.]"  *Id.* at 3-4.  He concluded that ADG would "exceed its authority if it were to proceed with any certification or approval processes relating to the opening or operation" of the casino, and noted that the casino does not qualify as "Indian gaming permitted under the Tribal-State compact."  *Id.*

In May 2015, ADG issued a new notice for its certification applications, which stated the following:

> Please be advised this application for certification is valid only for authorized Arizona gaming facilities.  Providing goods or services to any

- 4 -

location considered by the State to be unauthorized, or in pending litigation with the State concerning whether it is authorized, would be outside the approval granted through State Certification.  Vendors providing goods or services to unauthorized facilities may be subject to legal and/or regulatory risks.

Doc. 1, ¶ 86.  The notice also stated that "based upon the fraud and misrepresentation committed" by the Nation, "[ADG] has determined that the proposed West Valley casino is not authorized."  *Id.*, ¶ 88.  The notice does not distinguish between Class II and Class III gaming.  *Id.*, ¶ 89.  ADG requires the Nation to use these forms for prospective vendors and employees of the casino.  *Id.*, ¶ 90-91.

On June 22, 2015, the Nation filed this action against Arizona Governor Douglas Ducey, Arizona Attorney General Mark Brnovich, and ADG Director Daniel Bergin.  It alleges that Ducey and Brnovich directed Bergin to deny certifications for the West Valley Resort and that Defendants have violated the Supremacy Clause because IGRA preempts state regulation of gaming on Indian lands.  It further alleges that Defendants are violating IGRA by illegally regulating Class II gaming, specifically because the notice appears to apply to any gaming that may take place at the West Valley Resort.  The Nation asks the Court to enjoin Defendants from refusing to grant the Class III certifications and from regulating Class II gaming.  The Court will address the merits of Defendants' motions to dismiss before turning to the Nation's motion for preliminary injunction.

## II.   Motions to Dismiss.

Defendants Ducey and Brnovich argue that the Nation's claims should be dismissed for several reasons: (1) sovereign immunity bars suit against them in their official capacities, (2) the Nation's claims are a disguised and improper mandamus action, (3) the Nation's claims are non-justiciable, and (4) the Nation fails to state a claim for relief.  Defendant Bergin argues that the claims should be dismissed for similar reasons: (1) sovereign immunity bars the Nation's claims against him because IGRA provides an alternative enforcement mechanism, (2) the Nation's claim regarding Class II

gaming is not ripe, (3) the Nation's complaint fails to state a claim for relief, and (4) the Nation's requested relief would violate the Tenth Amendment. Because courts generally treat sovereign immunity as a threshold issue, the Court will address it first. *See Confederated Tribes & Bands of the Yakama Indian Nation v. Locke*, 176 F.3d 467, 469 (9th Cir. 1999).

### A.      Sovereign Immunity.

The Eleventh Amendment bars federal court lawsuits against a state "by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. This bar applies to suits against states by federally-recognized Indian tribes. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996); *see also Blatchford v. Native Village of Noatak*, 501 U.S. 775, 782 (1991). State agencies such as ADG fall within the protection of the Eleventh Amendment. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

There are several exceptions to the protection of sovereign immunity, one of which is at issue in this case. The Supreme Court held in *Ex parte Young*, 209 U.S. 123 (1908), that state officials can, in some circumstances, be sued to enjoin violations of federal law. This exception to sovereign immunity applies when lawsuits are brought against state officers in their official capacities for an injunction prohibiting future violations of federal law. Such "official-capacity actions for prospective relief are not treated as actions against the State" for purposes of the Eleventh Amendment. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989) (internal quotations omitted). This is because "state officers have no authority to violate the Constitution and laws of the United States," and an injunction against such violations therefore does not infringe any legitimate state power. Erwin Chemerinsky, *Federal Jurisdiction*, § 7.5 (6th ed. 2012).

The *Ex parte Young* exception has two limitations that are relevant here. First, it does not apply to all state officers. The officer named in the suit "must have some connection with the enforcement of the act" to be enjoined. 209 U.S. at 157. The

connection between the officer and the act "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1167 (D. Ariz. 2001).   Second, "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe*, 517 U.S. at 74.  Permitting suit under *Ex parte Young* in such a circumstance might render the congressionally-created remedial scheme superfluous.  *Id.* at 75.

Defendants' invoke both of these limitations.   The Nation seeks to enjoin Defendants from denying certifications in violation of IGRA and the Supremacy Clause. Defendants Ducey and Brnovich argue that they lack the necessary connection to the granting of such certifications.  Defendant Bergin argues that he cannot be sued because IGRA includes a comprehensive enforcement mechanism.  The Court will address these arguments separately.

### 1.   Connection to Enforcement of the Act.

*Ex parte Young*'s required connection between the defendant and a challenged law can be established when the law specifically grants the defendant enforcement authority. *See, e.g.*, *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013).  Here, the statute cited by ADG for denying certifications – A.R.S. § 5-602 – charges ADG with issuing certifications in connection with gaming on Indian lands.   Specifically, the director of ADG is granted authority to determine whether prospective vendors and employees meet the requirements for certification.  *See* A.R.S. §§ 5-602(A), (G), (J).  The Nation does not argue that § 5-602 grants the governor or the attorney general authority to issue or deny certificates.[2]

---

[2] The Nation does note that A.R.S. § 5-602.1 authorizes Brnovich to collect "civil

The Nation instead asserts that "Ducey and Brnovich intervened in the normal course of ADG's business, directed ADG to take steps to block the [casino], and caused ADG to adopt" the position of refusing certifications for potential employees and vendors.  Doc. 60 at 11.  Specifically, the Nation notes that Ducey and Brnovich wrote letters to Bergin essentially directing him to adopt the State's view that the West Valley Resort was procured by fraud.

Courts have recognized that the connection required by *Ex parte Young* may be established when state officials send letters to the plaintiff threatening enforcement of the challenged law.  *See, e.g.*, *Culinary Workers Union v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999) ("The attorney general's acts of sending the letter to the union, threatening either to enforce the statute on behalf of the Banking Commissioner or to refer the matter to a local prosecutor, and defending her authority and power to do so during much of the proceedings before the district court, establishes, in our opinion, an ample 'connection with the enforcement' of the challenged statute."); *Norton*, 216 F. Supp. 2d at 1106 ("The history of letters written by the Attorney General and the Director to the plaintiffs and other California card clubs, as well as their interaction with local law enforcement officials adequately satisfies the causation requirement."), *aff'd* 353 F.3d 712 (9th Cir. 2003).  The Nation argues that the letters sent by Ducey and Brnovich to ADG similarly make the necessary connection for the *Ex parte Young* exception to apply.

When Bergin wrote to the Nation on April 10, 2015, to explain that ADG would not grant certifications for those working at the West Valley Resort, he attached letters from Ducey and Brnovich.  The letter from Brnovich, dated April 2, 2015, reiterated Arizona's belief that "the Nation committed fraudulent misrepresentation and concealment[.]"  Doc. 1-5 at 5.  Brnovich noted that ADG "remains statutorily charged with a broad regulatory mission to protect the public, ensure compliance with the Tribal-

---

penalties" imposed on employees and vendors by ADG.  Doc. 60 at 14 n.7.  But the Nation argues only that this authority "further intertwines" Brnovich with ADG's decision.  *Id.*  The Court does not find this authority sufficient to satisfy *Ex parte Young* because the Nation challenges denial of certificates, not imposition of civil penalties.

State Gaming Compacts and to regulate the gaming industry." *Id.*   Citing § 5-602, Brnovich wrote that "[i]n determining whether to certify the proposed casino, [ADG] is vested with the statutory discretion to determine whether the application is at odds with the public welfare and safety and/or is consistent with the thorough and fair regulation of gaming in Arizona." *Id.* at 6.  Brnovich stated:

> [ADG] is bound to the conclusion that the Nation did commit actionable malfeasance in its pursuit of a new casino near Glendale.  Thus, [ADG] should consider this in its certification deliberations.   [ADG] may ultimately deny the certification if it determines that the Nation has not met its obligations with respect to the regulatory structure set forth in the Arizona Tribal-State Gaming Compact.

*Id.*

The letter from Ducey, dated April 8, 2015, also asserted that the casino is "contrary to the public interest and . . . the product of fraud, fraudulent concealment, and misrepresentation." *Id.* at 7.  Ducey "urged" ADG to consider this in its deliberations regarding certifications. *Id.*  Ducey further stated that "if in the course of your duties you agree with me that the evidence referred to above would, without more, be grounds for denial of the regulatory approvals necessary to operate the proposed casino, then I ask that you communicate those grounds" to the Nation. *Id.* at 8.

There can be little doubt that these letters influenced ADG's decision.  Bergin attached the letters to his letter to the Nation and explained:  "Based upon this advice and further consideration I have concluded that ADG lacks statutory authority to approve [the casino operations]." *Id.* at 2.  His decision, at least in part, was based on the advice from Ducey and Brnovich.

The Court cannot conclude, however, that this advice establishes the connection required by *Ex parte Young*.  State executive officers routinely influence decisions of the state's executive branch – which is virtually always the branch whose actions are challenged in cases raising the *Ex parte Young* exception – and yet courts consistently hold that "general supervisory power over the persons responsible for enforcing the

challenged provision will not subject an official to suit." *Coal. to Defend Affirmative Action*, 674 F.3d at 1134; *Eu*, 979 F.2d at 704. Were the law otherwise, the exception would always apply. Governors who influence state executive branch policies (which virtually all governors do) would always be subject to suit under *Ex parte Young*. The exception would become the rule.

True, Defendants Ducey and Brnovich did more in this case than simply possess the power to influence; they actually influenced the ADG decision. But their actions do not rise to the level of those that have been found sufficient for *Ex parte Young* to apply. In each case cited by the Nation, the state official took some actual enforcement action toward the plaintiff. In *Del Papa*, 200 F.3d at 619, the attorney general repeatedly sent letters to the plaintiff threatening to refer the matter to the local prosecutor. The letters also set forth the attorney general's authority to take enforcement action. *Id.* In *Norton*, 216 F. Supp. 2d at 1106, the attorney general wrote several letters to the plaintiff and brought the matter before local law enforcement. In *Gay Lesbian Bisexual Alliance v. Evans*, 843 F. Supp. 1424, 1426 (M.D. Ala. 1993), the attorney general not only provided an advisory opinion on enforcement of the challenged law, he also was "responsible for enforcement of" the law. And this was not mere general enforcement authority, but authority to enforce the law "specifically against the [plaintiff alliance]." *Id.* Finally, in *Kitchen v. Herbert*, 755 F.3d 1193, 1202-03 (10th Cir. 2014), which focused more on standing than Eleventh Amendment immunity, state law made the attorney general responsible for filing charges against any clerk or other state official who issued a license for same-sex marriages in the state, and the governor had the authority to "order the Attorney General to assist in such prosecution." The defendants' "actual exercise of supervisory power *and* their authority to compel compliance from county clerks and other officials provide[d] the requisite nexus between them and [the challenged state law]." *Id.* at 1204 (emphasis added).

Similar facts are missing here. Ducey and Brnovich have not written directly to the Nation or otherwise directly threatened enforcement of the law against the Nation.

1    And the Nation cites no state law that gives Ducey or Brnovich authority to deny

2    certificates.  In the absence of such a "fairly direct" connection to § 5-602, the Court

3    concludes that the *Ex parte Young* exception does not apply.  *Coal. to Defend Affirmative*

4    *Action*, 674 F.3d at 1134; *see also Locke*, 176 F.3d at 468 (holding that *Ex parte Young*

5    exception does not apply to governor when state lottery statutes do not contain "any

6    indication that the governor has the responsibility of operating the state lottery or

7    determining where its tickets will be sold").  The Court accordingly will grant the motion

8    to dismiss Defendants Ducey and Brnovich.[3]

9                          **2.    Comprehensive Enforcement Mechanism.**

10         Citing the Supreme Court's decision in *Seminole Tribe*, Defendant Bergin argues

11   that the claims should be dismissed because IGRA provides a comprehensive

12   enforcement mechanism.   The Nation responds that IGRA does not provide a

13   comprehensive enforcement scheme for violations of § 2710(d)(1), the provision that

14   regulates Class III gaming.  The Nation argues that *Seminole Tribe*'s holding applies only

15   to § 2710(d)(3) of IGRA, which prescribes the state's duty to negotiate a tribal-state

16   compact in good faith and provides for a specific and detailed statutory remedy should

17   the state breach that duty.  *See* 25 U.S.C. § 2710(d)(7).  The Nation argues that no

18   comparable remedy exists for § 2710(d)(1).  The Court agrees.

19         In *Seminole Tribe*, the plaintiff brought suit against Florida and its governor for

20   failure to negotiate a gaming compact in good faith as required by § 2710(d)(3) of IGRA.

21   517 U.S. at 51-52.  The Supreme Court found that *Ex parte Young* did not permit the suit

22   against the governor because "Congress passed § 2710(d)(3) in conjunction with the

23   carefully crafted and intricate remedial scheme set forth in § 2710(d)(7)."  *Id.* at 73-74.

24   Under that scheme, "where the court finds that the State has failed to negotiate in good

25   faith, the only remedy prescribed is an order directing the State and the Indian tribe to

26   conclude a compact within 60 days."  *Id.* at 74.  If a compact is not reached within that

27   _____

28         [3] Because Defendants Ducey and Brnovich cannot be sued under *Ex parte Young*,
     the Court will not address their other arguments.

time, the parties must engage an independent mediator to assist in concluding a compact. If that fails, the Secretary of the Interior is charged with regulating Class III gaming on the Indian land. *Id.* at 74-75. The Court characterized this remedial scheme not only as "carefully crafted and intricate," *id.* at 73-74, but also as creating a "quite modest set of sanctions" against the states for breach of the negotiation duty, *id.* at 75.

The Supreme Court held that permitting suit under *Ex parte Young* would run afoul of this intricate and moderated scheme, frustrating the intent of Congress. Allowing such a suit would render entirely superfluous the detailed procedures crafted by Congress in § 2710(d)(7). *Id.* It would also permit sanctions far greater than those allowed by the statute. *Id.* at 75-76 ("Congress chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young*[.]"). *Seminole Tribe* thus held that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Id.* at 74.

Defendant Bergin argues that the same result should obtain here. He points to § 2710(d)(3)(C) as the IGRA remedy available to the Nation in this case and argues that it is comparable to the remedial provisions that precluded the use of *Ex parte Young* in *Seminole Tribe*. But § 2710(d)(3)(C) contains nothing like the detailed remedial scheme considered in *Seminole Tribe*. It provides only that a tribal-state compact "may include provisions relating to . . . remedies for breach of contract." 25 U.S.C. § 2710(d)(3)(C). It contains no detailed procedures that must be followed; it does not limit available remedies in any way; and it makes the inclusion of breach of contract provisions entirely optional, stating only that they "may" be included in a compact.

The Court cannot conclude that allowing suit under *Ex parte Young* would run afoul of any congressional intent discerned from this provision. Allowing suit would not render § 2710(d)(3)(C) superfluous. If the parties elected not to include in their compact a remedy for breach of the compact – as § 2710(d)(3)(C) allows – application of *Ex parte*

*Young* would not frustrate any alternative remedial scheme.  And if the parties chose to include a breach remedy in their compact, they presumably could also decide to make it exclusive, in which event a court might elect to require that the partiers use their agreed-upon dispute resolution method.  Nor would a suit under *Ex parte Young* expose a state official to any greater liability than Congress intended – § 2710(d)(3)(C) places no limitations on the breach remedies that can be included in a compact.

In summary, the circumstances underlying the Supreme Court's decision in *Seminole Tribe* simply are not present here, and the Court finds that it does not apply.  Other courts have reached similar conclusions.  *See Friends of Amador Cty. v. Salazar*, No. CIV. 2:10-348 WBS KJM, 2010 WL 4069473, at *4 (E.D. Cal. Oct. 18, 2010); *Norton*, 216 F. Supp. 2d at 1109 n.34.

## B.    Ripeness.

Defendant Bergin argues that there is no live controversy over Class II gaming.  This issue, sometimes referred to as "ripeness," has two components: "constitutional ripeness and prudential ripeness."  *In re Coleman*, 560 F.3d 1000, 1004 (9th Cir. 2009).  "The constitutional component is a jurisdictional prerequisite."  *United States v. Antelope*, 395 F.3d 1128, 1132 (9th Cir. 2005).  Constitutional ripeness depends on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *United States v. Braren*, 338 F.3d 971, 975 (9th Cir. 2003) (internal quotations omitted).  "Where a dispute hangs on future contingencies that may or may not occur, it may be too impermissibly speculative to present a justiciable controversy."  *In re Coleman*, 560 F.3d at 1005 (internal quotation marks and citations omitted).

Prudential ripeness considers "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration."  *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010).  Issues are fit for judicial decision when they are "purely legal, and will not be clarified by further factual development."  *Thomas v. Union*

*Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985).  In addition, "[o]ne does not have to await the consummation of the threatened injury to obtain preventative relief.  If the injury is certainly impending, that is enough."  *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923).

Count two alleges that "Defendants' recent notice and letters to vendors and employees of the Nation threaten to interfere with Class II gaming at the West Valley Resort."  Doc. 1, ¶ 118.  The Nation claims that the notice and letters "threaten legal and regulatory action against vendors or employees who provide services to the West Valley Resort without clarifying that the State has no authority to regulate Class II gaming."  *Id.* Because the notice sent by the State does not differentiate between Class II and Class III gaming, the Nation asserts, the notice threatens to "chill vendors' and employees' willingness to provide goods and services relating to lawful Class II gaming at the West Valley Resort."  *Id.*  In essence, the Nation complains about the ambiguous nature of the notice and seeks an order declaring that the State cannot sanction employees, vendors, or contractors who provide services to a Class II facility.  During oral argument, counsel for the Nation stated that the Nation has decided to open the West Valley Resort as a Class II facility in December 2015 and convert it to a Class III facility at a later date.

The State readily concedes that it has no authority to regulate Class II gaming at the West Valley Resort.  Bergin made this concession in his briefs and at oral argument, and asserts that ADG has responded to inquiries from potential vendors by stating that it does not regulate Class II gaming.  The Compact and IGRA also make clear that the State has no authority to regulate Class II gaming.  *See* Doc. 1-1 at 23; 25 U.S.C. § 2710(a)(2).

The Nation argues, nonetheless, that ADG's actions have chilled its ability to complete and open the West Valley Resort as a Class II facility.  Elizabeth Francisco, the Chief Operating Officer of the Nation's Gaming Enterprise, testified during her deposition that the ADG notice has resulted in "five of the slot gamers" saying, "at some point," that "they could not do business with us[.]"  Doc. 62-2 at 18.  She also testified that at least one vendor "is requesting that they be indemnified" as a result of the notice

(Doc. 73-2 at 14), and that potential employees were "concerned" with the notice and possible sanctions (*id.* at 11).  Jerry Derrick testified on behalf of the Nation that he spoke with at least one employee who expressed "concern" about the notice.  Doc. 73-4 at 3. He also stated that the Nation has "concerns as far as whether we can effectively recruit well-qualified applicants," and that an inability to certify employees for both Class II and Class III gaming could undermine employee flexibility.  *Id.* at 4-5.

When the factual record is considered as a whole, the evidence shows that count two is not ripe.  When asked whether any vendors have indicated that they will not do business with the West Valley Resort as a Class II facility, Francisco unequivocally answered "No."  Doc. 62-2 at 21.  She further confirmed that ADG's notice and letters have not delayed the opening of the facility in December 2015.  *Id.* at 23.  With respect to the five vendors who "at some point" stated they could not work with the Nation because of the ADG notice, she clarified that four are now in negotiations with the Nation to provide Class II services and the fifth has not yet made a decision.  *Id.* at 25.  With respect to employee hiring, Francisco stated that she did not personally speak with any employees or know how many expressed a concern, nor could she testify as to whether the Nation has incurred any extra costs as a result of such concerns.  *Id.* at 129.

The Court cannot conclude that the imprecise "concerns" identified by the Nation are sufficient to establish that count two is constitutionally ripe for judicial review.  When ADG wrote its initial letters and issued its notice, the Nation was planning to open a Class III facility.  That was the only kind of facility the Nation had announced.  Thus, in context, the letters and notice were limited to Class III operations.  Later letters from Bergin's counsel to counsel for the Nation confirm that "the State does not regulate Class II gaming."  *See* Doc. 71 at 2.  And as noted, ADG has made clear in this litigation that it has no authority to regulate Class II gaming.  The Court therefore cannot conclude that Bergin has taken steps to suggest that ADG can or will attempt to regulate the West Valley Resort as a Class II gaming facility.

Moreover, the Nation has conceded that the ADG notice and letters have not

delayed the opening of the West Valley Resort or increased its cost.  And there is no evidence that any vendor has finally refused to work at the Class II facility because of the notice.  The fact that one vendor is seeking additional contractual protections and that another is still contemplating its decision is not enough to create a live Class II controversy, particularly where the Nation has informed vendors that it is "clear[] [that] the state has no jurisdiction over class II" and that the West Valley Resort will be opening on schedule as a Class II facility.  Doc. 62-2 at 233.  Finally, when ADG has received inquiries from prospective vendors and employees regarding the notice, it has responded that the State does not regulate Class II gaming.  Doc. 71.  The record contains no evidence that ADG has threatened to sanction those who work at the Class II facility.

Given this record, the Court cannot conclude "that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Braren*, 338 F.3d at 975. Count two will be dismissed as constitutionally unripe.

### C.    Failure to State a Claim.

Defendant Bergin argues that the Nation fails to state a claim because neither the Supremacy Clause nor IGRA provides a private cause of action for the conduct complained about in this case.  He also asserts the Nation cannot state a claim for preemption.  The Court will address the first argument here, and will address the preemption argument in the next section.

The Supremacy Clause "creates a rule of decision: Courts 'shall' regard the 'Constitution' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the Land.'  They must not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015).  The Supremacy Clause is not, however, "the source of any federal rights, and certainly does not create a cause of action."  *Id.* (internal quotation marks and citations omitted).  The clause "is silent regarding who may enforce federal laws in courts, and under what circumstances they may do so."  *Id.*  For this reason, the Nation states that it does not seek to assert a

private right of action under the Supremacy Clause.  Doc. 59 at 15.

The Nation also disavows any private right of action found in IGRA.  *Id.*  This too is wise, as the Ninth Circuit has noted that "where IGRA creates a private cause of action, it does so explicitly."  *Hein v. Capitan Grande Band of Diegueno Mission Indians*, 201 F.3d 1256, 1260 (9th Cir. 2000).  In the absence of an express cause of action in IGRA, "plaintiffs could not sue for every violation of IGRA by direct action under the statute." *Id.* (citing *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Florida*, 63 F.3d 1030, 1049 (11th Cir. 1995)).  IGRA creates no private right of action for the claim asserted by the Nation in this case.

Lacking a private right of action under the Supremacy Clause and IGRA, the Nation argues that its claims "rest on federal courts' inherent equitable power to 'issue an injunction upon finding . . . state regulatory actions preempted.'"  Doc. 59 at 15 (quoting *Armstrong*, 135 S. Ct. at 1384).  Invoking this equitable right of action, the Supreme Court has recognized that "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulated is pre-empted by a federal statute, which, by virtue of the Supremacy Clause of the Constitution, must prevail, . . . presents a federal question which the federal courts have jurisdiction[.]"  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

The "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  *Armstrong*, 135 S. Ct. at 1385. "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."  *Id.* (internal quotation marks and citation omitted). Thus, to determine whether equitable relief is available in connection with a federal statutory scheme, courts look to "Congress's 'intent to foreclose' equitable relief."  *Id.* (quoting *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002)).

Defendant Bergin argues that Congress, in enacting IGRA, intended to foreclose equitable relief.  IGRA creates three specific causes of action, and the Ninth Circuit has held that private rights of action under IGRA are limited to these three.  *Hein*, 201 F.3d

1260.  But the Court cannot conclude that Congress's passage of IGRA also reveals an intent to exclude all other types of actions, including equitable actions.

Defendants rely heavily on the Supreme Court's recent decision in *Armstrong*. 135 S. Ct. at 1385.  The plaintiffs in *Armstrong* brought suit against a state agency and its administrator seeking an injunction to force the agency to increase Medicaid reimbursement rates.  *Id.* at 1382.  After the Court held that there was no private right of action under the Supremacy Clause or under the Medicaid Act itself, *id.* at 1384, 1387, the plaintiffs claimed that their action could proceed in equity, *id.* at 1385.  The Court rejected this argument because "[t]wo aspects of [the Medicaid Act] establish Congress's 'intent to foreclose' equitable relief."  *Id.* (quoting *Verizon*, 535 U.S. at 647).  First, Congress had created a remedy for the very wrong about which the plaintiffs were complaining – the state's failure to comply with Medicaid's requirements.  *Id.*  Second, Congress had entrusted that remedy to the executive branch, not the courts.  *Id.*  The "sheer complexity associated with enforcing [the statute], coupled with the express provision of an administrative remedy," showed that Congress intended to preclude an action in equity.  *Id.* at 1385.

IGRA provides no comparable remedy for allegedly preempted state efforts to regulate Indian gaming.  Bergin argues that § 2710(d)(3)(C) – which allows compacts to include remedies for their breach – is comparable to the remedy addressed in *Armstrong*. But that clearly is not the case.  Permitting the parties to agree upon remedies for breach of the compact is not the same as specifically entrusting the remedy to an executive branch agency and prescribing complex procedures for the dispute's resolution.  And, as noted above, § 2710(d)(3)(C) is optional, leaving parties free to include no remedy for breach, in which event court action may be the only available alternative, or to agree that breaches of the compact will be resolved in court.  Such a flexible provision does not evince a congressional intent to keep disputes out of court.

*Armstrong* also relied on the fact that the statutory provision the plaintiff sought to enforce – § 30A – was unusually complex and contained standards that reasonably could

be applied only with the expertise of the executive branch agency.  The same is not true here.  Courts are well suited to deciding equitable claims.

For these reasons, the Court is not convinced that Congress intended to foreclose an equitable cause of action asserting preemption.  The Supreme Court recognized the existence of such a cause of action in *Armstrong*, and Bergin has cited no IGRA provision that shows a congressional intent to foreclose it.

**III.    The Nation's Motion for Preliminary Injunction.**

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  A preliminary injunction may be granted if the moving party "establishes [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Id.* at 20.  The moving party has the burden to prove each element.  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).[4]

**A.    Likelihood of Success on the Merits.**

Count one of the Nation's complaint asserts that ADG's attempted regulation of the West Valley Resort is preempted by IGRA.  Doc. 1 at 25-31.  In its preliminary injunction motion, the Nation argues that it is likely to succeed on this claim.  As the Court noted at oral argument, however, the parties' positions on this claim have evolved during the course of this dispute.

The Nation initially asked the Court to enjoin Defendants from refusing to certify vendors and employees at the West Valley Resort and from "taking any other action to obstruct the Nation from conducting Class III gaming at the [resort]."  Doc. 3 at 26.  In other words, the Nation sought a complete bar on ADG interference with their planned

---

[4] The Nation could not establish a likelihood of success on the merits of count two because it is not ripe for judicial review.  In addition, the Court could not conclude (for reasons explained in the ripeness discussion above) that the Nation is likely to prevail on its claim that the State is attempting to exercise Class II regulatory authority over vendors and employees at the West Valley Resort.

Class III operation.  As the Nation confirmed at oral argument, it has narrowed this request.  The Nation now asks the Court only to enjoin Defendants from attempting to regulate the West Valley Resort on any basis not permitted by the Compact.  The Nation does not seek an injunction against regulation permitted by the Compact.  *See* Doc. 59 at 21.[5]

Defendant Bergin's position also has evolved.  Bergin originally asserted in a letter to the Nation that ADG could regulate Class III gaming under § 5-602 "regardless of whether such gaming would otherwise be permitted by a valid tribal-state compact." Doc. 1-5 at 14.  In other words, Bergin asserted that ADG's regulatory authority was not limited to the authority granted in the Compact.  Bergin has narrowed his position, asserting now that ADG is simply regulating the West Valley Resort under the authority of the Compact.  *See* Docs. 50 at 12, 68 at 8-9.

Thus, the parties seem to have reached an unacknowledged agreement on the nature of a state's regulatory authority over Indian gaming: a state may regulate tribal gaming in accordance with the regulatory authority reserved to it in the tribal-state compact, and state efforts to regulate outside of that authority are not valid.  The Court is likely to agree with this view.  As noted above, IGRA was passed in part to grant states some regulatory role with respect to Indian gaming.  That role is found in the compact negotiated between the tribe and the state.  Indeed, IGRA allows the parties to agree on fairly extensive state regulation of tribal gaming.  The compact may include provisions on "the application of the criminal and civil laws and regulations of the . . . State that are directly related to and necessary for" the regulation of the gaming, "the allocation of criminal and civil jurisdiction between the State and the Indian tribe," and assessments

---

[5] In much of its complaint and preliminary injunction motion, the Nation argues that this Court has already held that operation of the West Valley Resort complies with the Compact.  As the Court explained at oral argument, however, its previous orders held that the Compact did not prohibit a casino in the location of the West Valley Resort, but made no decision on whether the operation of that casino would otherwise comply with the Compact.  Nor did the Court hold, as the Nation argues, that the State's allegations of fraud and promissory estoppel lack merit.  The Court held only that the claims asserting fraud and promissory estoppel were blocked by the Nation's sovereign immunity.

the state can make to "defray the costs of regulating" the gaming.   25 U.S.C. § 2710(d)(3)(C)(i)-(iii).   IGRA then allows tribal gaming to occur if it is authorized by a tribal ordinance, located in a state that permits such gaming, and "conducted in conformance" with the compact.   *Id.* § 2710(d)(1)(A)-(C).   Because IGRA was passed against a legal background that allowed no state regulation of tribal gaming, it is reasonable to conclude that state regulation outside the compact is not permitted.   Other courts have reached this conclusion.   As the Eighth Circuit explained, "Congress thus left states with no regulatory role over gaming except as expressly authorized by IGRA, and under it, the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact."   *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 546 (8th Cir. 1996).[6]

This conclusion on the scope of state regulatory authority, although now accepted by the parties, does not enable the Court to decide who will prevail in this case or, for present purposes, that the Nation is likely to prevail on count one.   Whether ADG can withhold certifications on the basis of the Nation's alleged fraud depends on whether the State is granted that authority by the Compact, and that is an issue to which the parties have devoted very little attention.   The Nation does not assert a claim in its complaint that the State has breached the Compact.   The complaint asserts generally that the Compact does not authorize ADG's action (*e.g.*, Doc. 1, ¶¶ 105, 108), but the Nation does not address the terms of the Compact in any detail in the complaint or the preliminary injunction briefing.   Likewise, Defendant Bergin asserts generally that his actions are authorized by the Compact and makes reference to a few general Compact provisions (Docs. 50 at 12; 68 at 6-7, 9), but he provides no detailed explanation of the Compact

___

[6] Given the evolution of the parties' positions, the Court cannot agree with Bergin's argument that any relief obtained by the Nation would violate the Tenth Amendment by forcing the State to certify Indian casinos.   Doc. 50 at 13-14.   The Nation has made clear that it does not seek an injunction that requires the State to issue certifications, only an injunction that prohibits the State from denying certifications on a preempted ground.   And in light of Bergin's agreement that the State may regulate Indian gaming only in accordance with the Compact, any attempt to exercise regulatory authority outside of the Compact would be invalid without running afoul of the Tenth Amendment.

provisions he relies upon or how they authorize his denial of certifications.  Given this state of the record, the Court cannot conclude that the Nation likely will prevail on its argument that ADG's actions are preempted because they are not authorized by the Compact.

When the Court raised this issue at oral argument, the Nation complained that ADG has not identified the Compact provisions under which it is acting.  But the Nation bears the burden of showing it is entitled to injunctive relief, and has provided no analysis of the Compact which shows that ADG's actions fall outside its provisions.

Moreover, given the scant attention paid by the parties to the terms of the Compact, the Court is not comfortable venturing into the document and deciding on its own whether ADG's action is or is not authorized.  This is particularly true given the Court's previous conclusion that the Compact is governed by Arizona's liberal parol evidence rule, *Tohono O'odham Nation*, 944 F. Supp. 2d at 759-60, and the fact that the parties have not addressed whether any parol evidence bears on interpretation of the Compact with respect to the State's regulatory authority.

The situation is further complicated by the dispute resolution provisions of the Compact.  The Nation's position could be viewed as an allegation that the State has breached the Compact by attempting regulation the Compact does not authorize.  Section 15 of the Compact provides, however, that breach of compact disputes between the Nation and the State are to be resolved through arbitration.  *See* Doc. 1-1 at 60-61 ("if the Nation or the State believes that the other party has failed to comply with the requirements of the foregoing Sections and appendices, or if any dispute arises as to the proper interpretation thereof, the procedures set forth in this Section shall apply").  It is not clear, therefore, that the Nation's claim could be asserted in this Court.

Because the parties have not addressed whether the Compact authorizes ADG's refusal to grant certifications, the Court cannot conclude that the Nation is likely to succeed on its claim that the actions of ADG fall outside the Compact and are

1   preempted.[7]

2           **B.     Irreparable Harm.**

3           The Nation asserts that the State's actions will cost it substantial sums of money,

4   and that the money constitutes irreparable harm because it cannot be recovered from the

5   State due to sovereign immunity.   The Court finds, however, that the Nation has not

6   shown that ADG's actions will cost it substantial sums.   The Nation plans to open the

7   West Valley Resort on schedule in December.   Although it will open as a Class II facility

8   rather than as a Class III, the Nation's own consultant has opined that the facility will be

9   just as profitable as a Class II operation as it would be as a Class III casino.   Doc. 62-2 at

10  134 ("There is virtually no difference ($\pm$3%) on net income projected by a Class II or a

11  Class III operation at the West Valley interim facility.").   In addition, Elizabeth Francisco

12  testified at her deposition that the estimated costs of opening a Class II and a Class III

13  facility are the same.  *Id.* at 6-7.

14          The Nation asserts that it will cost $7 to $8 million to convert the facility to a

15  Class III operation later, but, as the Nation acknowledged at oral argument, these are

16  "sunk costs" that could not be avoided by an injunction.   They do not support injunctive

17  relief.

18          The Nation argues that the irreparable harm requirement can be satisfied by

19  ADG's interference with the Nation's federal right to gaming under IGRA.   Interference

20

21          [7] This same uncertainty precludes the Court from accepting Bergin's argument
22  that the Nation has failed to plead a preemption claim.   If ADG's actions are not
    authorized by the Compact, they may be preempted.   Although it is true that § 15 of the
23  Compact may require this issue to be resolved through arbitration, that is not the basis on
24  which Bergin asserts that the Nation fails to state a claim.

25          Bergin also argues that *Confederated Tribes of Siletz Indians of Oregon v. Oregon*,
26  143 F.3d 481 (9th Cir. 1998), requires dismissal of count one.   But *Confederated Tribes*
    held that IGRA does not preempt state records laws because those laws had "no effect on
27  the determination of which gaming activities are allowed."  *Id.* at 486 n.7, 487 (internal
28  quotation marks omitted).   ADG's actions in this case indisputably regulate gaming.

with a federal right may suffice as irreparable harm.  *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938-39 (9th Cir. 1987) (finding irreparable harm where the defendant interfered with a federally protected right).  But, as explained above, the Nation has not shown that it is likely to prevail on its claim that the State has interfered with its federal rights.  It therefore has not shown that it is likely to suffer this type of irreparable harm.

The same is true of the Nation's claim that irreparable harm results from the violation of its sovereignty.  Because the Nation has not shown that it is likely succeed in its claim that ADG is violating its sovereignty, a likelihood of this irreparable harm has not been shown.

Finally, the Nation argues that it will suffer loss of goodwill and damage to its reputation, which it also views as irreparable harm.  But the West Valley Resort is scheduled to open on schedule and offer gaming services that the Nation's consultant predicts will generate the same level of profits as would a Class III facility.  This state of affairs does not enable the Court to conclude that ADG's actions will cause a loss of goodwill or damage to the Nation's reputation.

### C.    Conclusion.

The Nation has failed to show that it is likely to succeed on the merits of count one or likely to suffer irreparable harm.  The Nation is not entitled to preliminary injunctive relief, and the Court need not address the remaining requirements for a preliminary injunction.

## IV.    Motions to Seal.

The parties have filed three motions to seal.  Docs. 61, 67, 72.  All of the motions are unopposed.  Documents may be sealed if the court finds that "compelling reasons supported by specific factual findings . . . outweigh the general history of access and the public policies favoring disclosure."  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010).  Given the relatively modest portions of the briefs that will be sealed, the competitive harm that could come to the Nation is they were revealed, and the fact that

redacted versions of the parties' briefs have been or will be filed in the public docket, the Court will permit the parties to file their respective documents under seal.

**IT IS ORDERED:**

1.      Defendants Ducey and Brnovich's motion to dismiss (Doc. 49) is **granted**.

2.      Defendant Bergin's motion to dismiss (Doc. 50) is **granted** with respect to count two and otherwise **denied**.

3.      The Nation's motion for preliminary injunction (Doc. 3) is **denied**.

4.      The motions to seal filed by the parties (Docs. 61, 67, 72) are **granted**.

5.      The Court will set a case management conference by separate order.

Dated this 16th day of September, 2015.

_David G. Campbell_
_____
David G. Campbell
United States District Judge