FENNEMORE CRAIG, P.C.
PATRICK IRVINE (006534)
PIrvine@fclaw.com
DOUGLAS C. NORTHUP (013987)
DNorthup@fclaw.com
CARRIE PIXLER RYERSON (028072)
CRyerson@fclaw.com
2394 East Camelback Road, Suite 600
Phoenix, AZ 85016-3429
Tel.: 602.916.5406
Fax: 602.916.5606

GIBSON, DUNN & CRUTCHER LLP
MATTHEW D. MCGILL (*pro hac vice*)
MMcGill@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel.: 202.955.8500
Fax: 202.467.0539

MATTHEW A. HOFFMAN (*pro hac vice*)
MHoffman@gibsondunn.com
TIMOTHY W. LOOSE (*pro hac vice*)
TLoose@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000
Fax: 213.229.7520

*Attorneys for Defendant Daniel Bergin, Director, Arizona Department of Gaming*

SNELL & WILMER L.L.P.
HEIDI MCNEIL STAUDENMAIER (010387)
HStaudenmaier@swlaw.com
BRETT W. JOHNSON (021527)
BWJohnson@swlaw.com
SARA J. AGNE (026950)
SAgne@swlaw.com
THOMAS CLEES (031638)
TClees@swlaw.com
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2202
Tel.: 602.382.6000
Fax: 602.382.6070

*Attorneys for Defendant Governor Douglas A. Ducey*

OFFICE OF THE ARIZONA ATTORNEY GENERAL (Firm Bar No. 14000)
THOMAS K. CHENAL (006070)
Thomas.Chenal@azag.gov
KAREN J. HARTMAN-TELLEZ (021121)
Karen.Hartman@azag.gov
1275 W. Washington Street
Phoenix, AZ 85007
Tel.: 602.542.8323
Fax: 602.542.4377

*Attorneys for Defendant Attorney General Mark Brnovich*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Tohono O'odham Nation, | Case No. 2:15-cv-01135-DGC |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| Douglas Ducey, Governor of Arizona; Mark Brnovich, Arizona Attorney General; and Daniel Bergin, Director, Arizona Department of Gaming, in their official capacities, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

Gibson, Dunn & Crutcher LLP

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

The Tohono O'odham Nation (the "Nation") has filed an action claiming violations of the Indian Gaming Regulatory Act ("IGRA") and the Supremacy Clause of the United States Constitution. As preliminary relief, the Nation seeks an injunction compelling state officials, including Governor Ducey, Attorney General Brnovich, and Arizona Department of Gaming ("ADG") Director Bergin (collectively referred to as the "State" or "Defendants") to "perform regulatory approvals for Class III gaming" and "to certify … vendors, employees [and] others … for Class III or Class II gaming" at the casino it procured by fraud. Docket Entry ("D.E.") 3 at 26. This is the same relief it seeks upon final judgment. D.E. 1 at 33-34. The Nation claims that, without an order immediately compelling this affirmative action on the part of State officials, it will suffer irreparable harm in the forms of lost profits and diminished goodwill. *See* D.E. 3 at 19-20.

As demonstrated in Defendants' motions to dismiss (D.E. 49, 50), the Nation's lawsuit presents no cognizable claim for relief. The complaint fails to establish subject-matter jurisdiction; it invokes no valid cause of action; and the relief it seeks violates the Tenth Amendment. The Nation does not take issue with a specific state law, but instead attempts to claim that State officials' application of State law is preempted. Those are sufficient bases for this Court to deny the Nation's motion for preliminary relief, but there are other reasons too.

The limited discovery conducted thus far has exposed the Nation's various claims of irreparable harm as shams. There is no threat to the ability of the Nation and its vendors and employees to build and operate a Class II gaming facility at the West Valley casino. First, there is no evidence that any action by the State has delayed construction. The Nation's witnesses testified that construction of the West Valley casino is proceeding according to schedule. Second, the Nation itself has advised its vendors that it is on track to open the West Valley casino as a Class II facility by the end of this year. Finally, vendors seeking assurance from the State have even been informed by ADG that the State does not regulate Class II gaming on Indian lands. Because nothing is "[i]mpeding the Nation's ability to begin gaming

in a timely manner," even on the Nation's own telling, there can be no damage to "the Nation's goodwill and reputation." D.E. 3 at 20.  Moreover, the Nation's own consultants have advised that the West Valley casino is likely to be just as profitable as a Class II facility as it would if it were approved as a Class III facility.  There is no evidentiary support for the Nation's claim that it will suffer "millions of dollars of lost net income" during the brief period of time it takes the parties to litigate the Nation's claims to final judgment.  D.E. 3 at 19.  The Nation's final claim of irreparable injury—that arising from Defendants' alleged unlawful "impairment of the Nation's rights" (D.E. 3 at 21)—fails to support an injunction because the Nation does not have any freestanding "rights" under federal law to engage in Class III gaming, nor any freestanding right to enforce the Supremacy Clause.  D.E. 49 at 15-16.  The Nation cannot justify its requested preliminary injunction simply by asserting that its view of IGRA preemption will prevail.

Absent showings of both a likelihood of success on the merits and irreparable harm, preliminary relief is unavailable, so the Nation's motion must be denied.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  That conclusion is strongly reinforced by the equities, which weigh decidedly *against* an award of preliminary relief.  The West Valley casino is being built upon the Nation's premeditated fraud on the government and voters of Arizona.  Those unclean hands alone should bar the Nation from obtaining any form of equitable relief.  On the other hand, the insubstantial (at most) harms of which the Nation complains are self-inflicted because the Nation did not wait for the legal questions surrounding its West Valley casino to be resolved before charging forward with construction.

Finally, the public interest would be badly disserved by an award of preliminary injunctive relief that compels the State to defy its own laws and to approve Class III gaming at the West Valley casino when such gaming—and even the West Valley casino itself—remain the subject of substantial legal disputes.  Indeed, the Nation's motion is a transparent effort to permanently preempt, and thereby evade, any settling of its account for its fraud

upon the State.  That request is contrary to the public interest, and to equity, and should be denied.

## II.   STATEMENT OF FACTS

The facts surrounding the prior litigation and correspondence between the State and the Nation regarding the Nation's proposed West Valley casino are set forth in Defendants' motions to dismiss. D.E. 50 at 3-5, D.E. 49.  Discovery permitted on the Nation's motion revealed additional relevant facts as set forth below.

The Nation and its representatives began building the West Valley casino in late 2014, and implemented an aggressive construction schedule that called for an interim casino to be completed sometime in 2015 even though the project remained subject to legal challenge.[1] Declaration of Matthew Hoffman ("Hoffman Decl."), Ex. A (Francisco Dep.) 68:8-11, 77:24-78:6; Ex. B (Simpson Dep.) 57:16-59:4.  Despite ADG's April 2015 correspondence stating that it could not approve the West Valley casino as a Class III facility (D.E. 1-5 at 3), the Nation passed several resolutions to hasten the opening of the West Valley casino.  Hoffman Decl., Ex. C (Norris Dep.) 27:10-30:10; Ex. D (Dep. Ex. 35).

In keeping with its conclusion that the West Valley casino could not be authorized as a Class III facility, in May 2015, ADG sent a notice letter ("Notice") to vendors and employees of the Tohono O'odham Gaming Enterprise—a business entity operated by the Nation and charged with managing its casinos.  The Notice underscored every vendor's and employee's obligation not to provide goods or services to unauthorized gaming facilities such as the Nation's proposed Class III operation at the West Valley casino.  Hoffman Decl., Ex. E (Dep. Ex. 12); Ex. F (Dep. Ex. 30).

The Nation, the Gaming Enterprise, and their project manager (Rider Levett Bucknall, or "RLB") all understood, however, that the State did not have authority to regulate Class II

---

[1] In the summer of 2014, the Nation decided to build an interim slots-only casino, and to then build out the full West Valley casino in subsequent phases.  Currently, there is no timetable for the complete build-out of the full resort, and the Nation does not know when it will be able to collect revenue from anything other than the interim casino.  Hoffman Decl., Ex. J (Claw Dep.) 22:11-15.

gaming facilities.  Hoffman Decl., Ex. A (Francisco Dep.) 96:3-21 (explaining that the Enterprise learned this "over time between the April 10 letter from ADOG and the late May letter from ADOG to our vendors and employees"); Ex. C (Norris Dep.) 19:7-20:6; Ex. B (Simpson Dep.) 74:2-22.  Indeed, although each acknowledged it would be advisable to seek clarification from ADG if there were any uncertainty about the State's position with respect to Class II gaming at the West Valley casino, no one from either the Gaming Enterprise or its project manager sought such clarification.  *Id.*, Ex. A (Francisco Dep.) 170:18-172:7; Ex. B (Simpson Dep.) 56:18-57:3, 73:13-22.  Certain vendors, however, did seek clarification from ADG:  A representative from the Gaming Enterprise's general construction contractor (Hunt/PENTA) called ADG on June 4, 2015 and was told that ADG does not regulate Class II gaming.  *Id.*, Ex. E (Dep. Ex. 12).  The Gaming Enterprise's Chief Operating Officer ("COO"), Elizabeth Francisco, acknowledged that ADG's responses "could alleviate some concerns from construction sub[contractors]." *Id.*

Meanwhile, the Nation's Gaming Enterprise commissioned a consultant, REDACTED REDACTED, to determine the potential revenue of a Class II interim casino.  Hoffman Decl., Ex. A (Francisco Dep.) 157:20-158:5.  REDACTED delivered a market demand analysis ("Market Analysis") to the Gaming Enterprise on June 5, 2015 (several weeks before the Nation filed its motion), concluding that "[t]here is virtually no difference ($\pm$ 3%) on net income projected by a Class II or a Class III operation at the West Valley interim facility" and "Class II games are a viable option and substitution for Class III games." *Id.*, Ex. G (Dep. Ex. 2).  The Market Analysis further noted that "Class II games are now at virtual par with and/or exceed Class III on overall acceptance and revenue performance." *Id.*; *see also* Hoffman Decl., Ex. H (Dep. Ex. 4) (stating that "on the outside … Class II gaming … devices mirror in appearance many of the top Class III video slot devices").

REDACTED confirmed these findings in a supplemental analysis (together, with the Market Analysis, "Market Analyses") that observed that Class II machines meet or exceed the performance of Class III machines "even in jurisdictions where both Class II and Class III

gaming are present." Hoffman Decl., Ex. I (Dep. Ex. 1). This supplemental analysis likewise confirmed there is no difference in projected net income from a Class II facility. *Id.* REDACTED delivered this supplemental analysis to the Gaming Enterprise on the same day the Nation filed its motion claiming irreparable harm from an inability to engage in Class III gaming. *Id.*; D.E. 3. Notably, in their depositions, the Nation's witnesses offered no objective evidence to refute the findings of the Market Analyses.[2] *Id.*, Ex. A (Francisco 30(b)(6) Dep.) 187:22-189:19, 194:9-14, 226:4-20; Ex. J (Claw Dep.) 56:16-22. Indeed, Gaming Enterprise COO Francisco testified that it was possible that revenue from a Class II facility could *exceed* revenue from a Class III facility.[3] *Id.*, Ex. A (Francisco Dep.) 166:12-17.

In June and July 2015, the Nation informed RLB, Hunt/PENTA, and other vendors and employees that it intended to open the West Valley casino as a Class II-only facility, and that the State had no authority to regulate such facility. Hoffman Decl., Ex. A (Francisco Dep.) 131:4-132:22; Ex. K (Dep. Ex. 13); Ex. L (Childs 30(b)(6) Dep.) 32:14-23, 33:15-23; Ex. M (Mantia 30(b)(6) Dep.) 33:24-34:8; Ex. B (Simpson Dep.) 80:17-81:5; Ex. H (Dep. Ex. 4); Ex. N (Dep. Ex. 16); Ex. O (Dep. Ex. 17); Ex. P (Dep. Ex. 18) (email from Hunt/PENTA to Nation stating there was "no issue" with constructing the facility); *see also* Ex. Q (Dep. Ex. 5). Apparently satisfied that the State is not seeking to prohibit their provision of goods and services to a Class II-only facility, numerous vendors are working to complete construction of

---

[2] The Nation's treasurer, Ryan Claw, testified that he had not seen the Market Analyses at the time he submitted his Declaration, and if he had seen them, he definitely would have given "more thought" before submitting a declaration to the Court saying that an inability to conduct Class III gaming would cause irreparable injury. Hoffman Decl., Ex. J (Claw Dep.) 23:14-27:1. Claw further admitted that he could not articulate any economic harm to the Nation if it opened the casino as a Class II facility. *Id.*, 18:16-24.

[3] Ms. Francisco speculated during her deposition that it would cost $7−8 million to convert a Class II facility to a Class III facility. Hoffman Decl., Ex. A (Francisco Dep.) 209:23-210:4. But she ultimately admitted that the Gaming Enterprise has not conducted any analysis to determine whether it would be more costly to open the West Valley casino as a Class III facility, or to open the casino as a Class II facility and later convert to a Class III facility. *Id.*, 223:22-224:3.

the interim casino.[4]  *Id.*, Ex. A (Francisco Dep.) 131:4-133:25, (Francisco 30(b)(6) Dep.) 227:11-25; Ex. L (Childs 30(b)(6) Dep.) 39:12-24; Ex. B (Simpson Dep.) 65:23-66:12 (unaware of any contractors or subcontractors leaving the project after Notice), 53:23-55:10 (unaware of regulators in other jurisdictions refusing to certify a company); Ex. R (Ehret Dep.) 16:10-14, 17:18-18:2, 18:9-13, 29:24-30:22, 50:6-14; Ex. S (Dep. Ex. 15) (email from vendor REDACTED reaffirming its commitment to supporting the casino if it operates as a Class II facility); Ex. T (Dep. Ex. 14) (email from vendor REDACTED affirming commitment to work on Class II game purchase order); Ex. U (TOHONO00006629) (email from Nation noting that vendor REDACTED remains committed to the project).

The Nation, the Gaming Enterprise, RLB, and Hunt/PENTA believe that it is "more likely [than not that the casino] will open in December."[5]  Hoffman Decl., Ex. A (Francisco Dep.) 90:10-19, 119:7-120:9 (ADG's conduct has not delayed the opening of the West Valley casino); Ex. C (Norris Dep.) 41:6-42:13; Ex. J (Claw 30(b)(6) Dep.) 44:17-45:1; Ex. B (Simpson Dep.) 15:18-16:3, 18:22-25, 50:16-19, 81:12-18; Ex. L (Childs 30(b)(6) Dep.) 8:9-14, 34:8-12; Ex. R (Ehret Dep.) 15:2-5, 27:6-10.  The Nation and its Gaming Enterprise have communicated to their construction lender (Bank of America), their vendors and employees, and Glendale and Peoria city officials that the West Valley casino will open in December 2015.  *Id.*, Ex. A (Francisco Dep.) 67:11-21; Ex. C (Norris Dep.) 11:6-13:5.  In addition, the dispute between the Nation and the State over Class III gaming at the West Valley casino had no impact on the Nation's construction budget; the current estimated costs for completion are the same regardless of whether the casino opens as a Class II or Class III facility.  *Id.*, Ex. A (Francisco Dep.) 33:10-13 (describing the casino as "within budget"), 56:24-57:2; Ex. B

---

[4] The only vendor that has withdrawn from the project following the Notice is an IT consultant that had only been working on the project for approximately one month. Hoffman Decl., Ex. L (Childs 30(b)(6) Dep.) 31:2-20, 33:24-34:3.

[5] The Nation has already encountered no fewer than seven construction delays on the West Valley casino, but the Nation, its project manager, and its general contractor all admit that none of these delays were caused by the State.  Hoffman Decl., Ex. A (Francisco Dep.) 87:7-19, 94:23-95:10; Ex. B (Simpson 30(b)(6) Dep.) 32:12-15, 35:5-8, 50:2-11; Ex. W (Dep. Ex. 10); Ex. X (Dep. Ex. 11).

(Simpson 30(b)(6) Dep.) 22:11-23:1, (Simpson Dep.) 68:9-11; Ex. R (Ehret Dep.) 14:2-8, 15:19-25.

Moreover, the Gaming Enterprise has acknowledged that, because there is not expected to be any delay in the opening of the West Valley casino, the dispute between the Nation and the State over Class III gaming there has not caused any loss of goodwill. Hoffman Decl., Ex. A (Francisco 30(b)(6) Dep.) 196:24-198:25.  Nor has it affected tribal employment; the West Valley casino will create the same amount of employment opportunities regardless of whether it opens as a Class II or Class III facility.  *Id.*, Ex. C (Norris Dep.) 39:6-10; Ex. Q (Dep. Ex. 5).  And there is no evidence that any prospective employee of the West Valley casino has withdrawn his or her application or otherwise chosen not to seek employment at the casino because of the dispute or the State's Notice.  *Id.*, Ex. M (Mantia 30(b)(6) Dep.) 29:11-30:21, 38:10-16 (for the Gaming Enterprise); Ex. V (Derrick 30(b)(6) Dep.) 14:5-11, 30:6-23 (for the Tohono O'odham Gaming Office); Ex. C (Norris Dep.) 59:2-8 (for the Nation).

### III.   LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  In order to obtain a preliminary injunction, a plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20; *see also Cottrell*, 632 F.3d at 135.  A plaintiff must show not only that irreparable harm is "possible" without an injunction, but that it is "likely."  *Cottrell*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 22).  Injunctive relief is particularly disfavored where, as here, the requested injunction would mandate that the State take certain actions to alter the status quo, such as issuing new certifications to the West Valley casino in contravention of its own laws. *See, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009).  In such situations, the party seeking the injunction must establish that "extreme or very serious damage" will result in the absence of an injunction.  *Id.*

## IV.   ARGUMENT

### A.   The Nation Is Not Likely To Succeed On The Merits.

Defendants' pending motions to dismiss set forth in detail why the Nation is not likely to succeed on the merits (D.E. 49, 50) and Defendants incorporate by reference those arguments. The limited discovery thus far provided by the Nation, however, has proven that there is no live dispute among the parties relating to Class II gaming at the West Valley casino.

As stated in Director Bergin's motion to dismiss, the State has never claimed to have the authority to regulate Class II gaming and the tribal-State Compact disclaims any such authority. *See* D.E. 50 at 7-9. And while the Nation's complaint pretends that the Nation and its vendors are laboring under a cloud of uncertainty, and that vendors and employees are being chilled from assisting the Nation in the development and operation of a Class II facility, discovery provided by the Nation shows that, by the time they received ADG's Notice, the Nation and the Gaming Enterprise already understood that the State did not have any authority over Class II gaming. *See* Hoffman Decl., Ex. A (Francisco Dep.) 95:12-96:21; Ex. C (Norris Dep.) 19:7-20:6; Ex. B (Simpson Dep.) 74:11-22. In accordance with that belief (but contrary to the suggestions in the complaint) by July 2015, the Gaming Enterprise had informed RLB, Hunt/PENTA, vendors, and employees that it intended to open the West Valley interim casino as a Class II-only facility, which would not be subject to any regulation by the State. *See supra* p. 5; *see also* Hoffman Decl., Ex. W (TOHONO00004464) (email from Nation representative to vendor REDACTED noting that the State "has no jurisdiction over Class II"). And those vendors who have sought assurance from the State that they would not be sanctioned for providing goods or services to a Class II-only facility have been informed by ADG that the State does not regulate Class II gaming. *See supra* p. 5.

In discovery, the Nation provided no evidence to substantiate any "chill" of "vendors' and employees' willingness to provide goods and services relating to lawful Class II gaming at the West Valley Resort." D.E. 1 at 32. To the contrary, the Nation has publicly represented to those vendors and to its employees that "there would be no practical impact on

job and vendor opportunities" if it were to open as a Class II facility. Hoffman Decl., Ex. Q (Dep. Ex. 5); Ex. O (Dep. Ex. 17); Ex. C (Norris Dep.) 38:16-39:10. To date, there is no evidence of any employee having withdrawn an application for employment or otherwise having chosen not to seek work at the casino as a result of the Notice or any other action by the State. *Id*., Ex. M (Mantia Dep.) 29:11-30:21, 38:10-16 (for the Gaming Enterprise); Ex. V (Derrick Dep.) 14:5-11, 30:6-23 (for the Gaming Office); Ex. C (Norris Dep.) 59:2-8 (for the Nation). And, of course, numerous vendors today are hard at work building the West Valley casino in accordance with the Nation's schedule to open a Class II interim facility by the end of this year. At this point, there is not even a hypothetical controversy relating to Class II gaming, much less the "substantial controversy … of *sufficient immediacy and reality*" that Article III requires. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citing *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (emphasis added)).

**B.  The Nation Has Not Established That The Remaining Requirements For Preliminary Injunctive Relief Are Met.**

    **1.  The Nation Is Unlikely To Suffer Any Injury, Much Less Substantial, Irreparable Injury.**

The objective evidence provided in discovery refutes the Nation's claims that any "delay in beginning Class III gaming operations would result in millions of dollars of lost net income" as well as lost "goodwill," and that these purported injuries are "irreparable." D.E. 3 at 19, 20. The Nation also claims irreparable harm from the alleged injury to its rights under federal law. Even if the Nation had a "right" under federal law to engage in Class III gaming—and IGRA is to the contrary—that "right" does not go to fundamental liberty interests; the temporary deprivation of such right during the pendency of litigation would not rise to the level of irreparable injury.

    **a.  The Nation's Plan To Open The West Valley Casino As A Class II Gaming Facility Will Not Result In Any Irreparable Economic Injury.**

The limited evidence the Nation has provided in discovery demonstrates the Nation has the ability and intent to open the West Valley casino as a Class II facility by the end of

this year. The evidence further demonstrates that the West Valley casino will generate the same or more revenue as a Class II facility as it would have if it opened as a Class III facility. The Nation's claims of "millions of dollars of lost net income" thus are refuted by the record and accordingly cannot support the Nation's motion.

Weeks before its motion was filed, the Nation sought and received a Market Analysis from REDACTED concluding that "[t]here is ***virtually no difference (± 3%) on net income projected by a Class II or a Class III operation at the West Valley interim facility***" and "Class II games are a viable option and substitution for Class III games." Hoffman Decl., Ex. G (Dep. Ex. 2) (emphasis added). The Nation received a supplemental analysis on June 22, the same day it filed its preliminary injunction motion, which reached the same conclusion as the initial Market Analysis, namely, that there would be no difference in projected net income from a Class II facility. Hoffman Decl., Ex. I (Dep. Ex. 1).

The Nation's representatives have attempted to downplay the conclusions of their own consultants citing the fact that no casino in Arizona currently operates 1,089 Class II machines. But crucially, the Nation's representatives admitted that they have no facts or other objective evidence that would contradict or refute REDACTED findings (Hoffman Decl., Ex. A (Francisco Dep.) 187:22-189:19, 194:9-14, 226:4-20; Ex. J (Claw Dep.) 56:16-22) nor could they identify any economic harm that would come to the Nation if it opened a Class II facility (*id*., Ex. J (Claw Dep.) 18:16-24). Indeed, Gaming Enterprise COO Elizabeth Francisco admitted the revenue might well "exceed" revenue from a Class III facility. *Id*., Ex. A (Francisco Dep.) 166:12-17. Another commentator was in agreement, noting that a Class II facility might actually draw more customers because they have "potentially even better chances" of winning on a Class II gaming machine. *Id*., Ex. O (Dep. Ex. 17). The Nation has fallen far short of demonstrating that the loss of "millions of dollars" is "likely" (*Winter*, 555 U.S. at 22); to the contrary, at this point, the existence of any loss at all is unsubstantiated, "remote and speculative" and thus insufficient "to constitute irreparable harm meriting preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988). Indeed, the evidence shows that if there ever were any loss at all from

limiting the West Valley casino to Class II gaming, it is likely to be less than "3%" (Hoffman Decl., Ex. G (Dep. Ex. 2))—hardly the "considerable" loss required before a financial injury can rise to the level of irreparable harm. *See Arizona Hosp. & Healthcare Ass'n v. Betlach*, 865 F. Supp. 2d 984, 999-1000 (D. Ariz. 2012).

### b. The Nation Has Not Shown Any Likely Loss To Its "Goodwill."

The Nation's motion asserts that the Nation will suffer damage to its "goodwill and reputation with customers, vendors, local municipalities, and employees" if it does not "begin gaming in a timely manner" at the West Valley casino. D.E. 3 at 20. At the threshold, it was the Nation, not the State, that staked the Nation's reputation to its ability to open the West Valley casino in the face of unresolved legal and political disputes. Any injury to the Nation's reputation arising from a delay in "begin[ning] gaming" at the West Valley casino thus would be "self-inflicted" and cannot "satisfy the irreparable harm criterion." *Fiba Leasing Co. v. Airdyne Indus., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993) (citing *San Francisco Real Estate v. Real Estate Invest. Trust of America*, 692 F.2d 814, 818 (1st Cir. 1982)).

But, even more fundamentally, the Nation has failed to demonstrate that the State's withholding of approval of Class III gaming will prevent it from "begin[ning] gaming in a timely manner" at all. To the contrary, the Nation's representatives have testified that it is "more likely [than not]" that the West Valley casino will open on schedule in December 2015. Hoffman Decl., Ex. A (Francisco Dep.) 90:10-19, 119:7-120:9 (ADG's conduct has not delayed the opening of the West Valley casino); Ex. C (Norris Dep.) 41:6-42:13; Ex. J (Claw Dep.) 44:17-45:1; Ex. B (Simpson Dep.) 15:18-16:3, 18:22-25, 50:16-19, 81:12-18; Ex. L (Childs Dep.) 8:9-14, 34:8-12; Ex. R (Ehret Dep.) 15:2-5, 27:6-10. The Nation has not conducted any studies or analyses to quantify potential losses to its goodwill (*see id.*, Ex. A (Francisco Dep.) 176:8-22), but as its representatives admitted, if the Nation succeeds in adhering to its timetable, there will be *no loss* of revenue or "goodwill" at all (D.E. 3 at 19, 20; *see also* Hoffman Decl., Ex. A (Francisco Dep.) 196:24-198:9).

1  While construction delays could cause that opening date to slip into 2016 (*see*
2  Hoffman Decl., Ex. X (Dep. Ex. 38)), no one claims these construction delays are in any way
3  attributable to the State (*id*., Ex. Y (Dep. Ex. 21); Ex. Z (Dep. Ex. 23))).

### c. Alleged Interference With The Nation's Asserted "Right" Under IGRA Is Not Itself An Irreparable Harm.

In its final argument, the Nation argues that the "impairment of [its] rights by a preempted state law is itself irreparable injury." D.E. 3 at 21.  This argument also cannot support a preliminary injunction.  It is true that the temporary deprivation of a constitutional right can itself constitute an irreparable harm, but that is because constitutional rights safeguard fundamental liberty interests the invasion of which cannot readily be quantified in monetary terms.  *See, e.g.*, *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) *rev'd and remanded on other grounds*, 131 S. Ct. 746 (2011) ("Unlike monetary injuries, constitutional violations [there, violations of the right to privacy] cannot be adequately remedied through damages and therefore generally constitute irreparable harm."); *see also Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (violation of equal protection rights not redressable by damages).  Here, as set forth in Director Bergin's motion to dismiss, the Nation does not have a "right" under IGRA to engage in Class III gaming.  D.E. 50 at 9-10.  But even if IGRA conferred such a right, the supposed "right" to operate Class III gaming is nothing like the constitutional liberty interests the temporary invasion of which courts have found "irreparable."  Casino gambling simply does not rise to that level.

To the extent the Nation is claiming that *any* instance of federal preemption constitutes *per se* irreparable harm, that argument cannot be reconciled with the Supreme Court's recent decision in *Armstrong v. Exceptional Child Ctr. Inc.*, 135 S. Ct. 1378, 1383 (2015).  There, the Court explained that the Supremacy Clause does not confer rights, but rather is a "rule of decision." *Id*.  In the absence of a private right of action conferred by statute, an individual has no claim for redress for an abstract injury to "federal supremacy."  *See id*. (Supremacy Clause does not give "affected parties a constitutional … right to enforce federal laws against

the States"). It follows that such an "injury" could not constitute irreparable harm to the Nation.[6]

In sum, the Nation has failed to substantiate—and indeed, the limited evidence provided refutes—its claims of lost profits and lost goodwill. And the Nation's claim of being harmed by a preempted state law rests on a flawed legal premise. Nothing supports the Nation's claim that it will suffer irreparable harm during the short pendency of this litigation.

### 2. The Balance Of Equities Favors Defendants.

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Taylor-Failor v. Cnty. of Hawaii*, No. CIV. 15-00070 DKW, 2015 WL 1142973, at *6 (D. Haw. Mar. 13, 2015) (quoting *Univ. of Hawai'i Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1107-08 (9th Cir. 1999)). Here, the balance of equities weighs decidedly in favor of the State.

As set forth above, the Nation likely will suffer no substantial harm in the short time it takes this Court to enter a final judgment on the merits. The harm the Nation has alleged—that the "opening of the facility will be delayed and it will cost the Nation money that it will not be able to get back" (July 2 Hrg. Tr. 21:16-21)—is illusory. The evidence demonstrates that the Nation does *not* believe there are or will be any delays attributable to the State in opening the casino, and further believes that the Class II facility it intends to open will be at least as lucrative as a Class III facility. If the Nation suffers any harm at all—and there is no evidence that *any* harm is likely—it would be more traceable to the Nation's decision to press forward with construction of West Valley casino in the face of pending legal challenges than to any action of the State.

---

[6] While, after *Armstrong*, there can be no argument that an individual has a claim for redress directly under the Supremacy Clause, the United States conceivably could occupy a different position given its unique role as the federal sovereign and interest in vindicating the proper balance of federal and state authority. That is sufficient basis to distinguish the Nation's citation to *United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011), which, like *Armstrong* and the Nation's action here, stated as claims for relief violations of the Supremacy Clause and preemption under federal law.

On the other hand, the State and its citizens certainly would suffer irreparable harm if the Nation is allowed to force the State to endorse a casino procured by fraud. The State and its officers necessarily suffer irreparable harm when they are enjoined from enforcing validly enacted laws designed to protect the public interest. *See Valeria G. v. Wilson*, 12 F. Supp. 2d 1007, 1027 (N.D. Cal. 1998) (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"); *see also Veasey v. Perry*, 769 F.3d 890, 895-96 (5th Cir. 2014) (collecting authorities). That is precisely the situation the State faces here. State gaming officials have a duty under state law to "ensure that unsuitable individuals or companies are not involved in Indian gaming permitted under the tribal-state compacts" and "shall seek to promote the public welfare and public safety and shall seek to prevent corrupt influences from infiltrating Indian gaming." A.R.S. § 5-602(A); *see also id.*, § 5-602(C) ("The department of gaming shall execute the duties of this state under the tribal-state compacts in a manner that is consistent with this state's desire to have extensive, thorough and fair regulation of Indian gaming permitted under the tribal-state compacts."). Forcing state officials to issue certifications for Class III gaming at the West Valley casino would unjustly require those officials to act in derogation of state law duties that the people of Arizona expect them to fulfill.

Further weighing against the Nation's position here is the fact that its conduct to date has been anything but equitable. Evidence of the Nation's fraud upon the State itself and the public was sufficient to state a claim for promissory estoppel (*Arizona v. Tohono O'odham Nation* ("*TON I*"), 944 F. Supp. 2d at 768-69 (D. Ariz. 2013)), but this Court ultimately held it could not adjudicate that issue in a case brought by the State due to the Nation's sovereign immunity.[7] There is no obstacle, however, to this Court's consideration of the Nation's

---

[7] *See also, e.g., TON I*, No. 11-00296-DGC, D.E. 199-1 [Ex. 11 (Hart Dep.) 93:6-11] (testifying that "all of the tribes that were involved in this negotiation understood … that there [were] not going to be any added facilities in Phoenix")]; *id.* [Ex. 15 (Lunn Dep.) 52:4-7] ("The agreement that we had arrived at among the tribes and with the State was that there would be no more than seven casinos operating in the Phoenix metropolitan area. That was the commitment. That was the deal."); *id.* [Ex. 24 (Quigley Dep.) 72:6-10]

unclean hands in adjudicating *the Nation's* request for extraordinary equitable relief. *See, e.g.*, *Institute of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 947 (9th Cir. 2013) (stating that "traditional equitable considerations such as laches, duress and unclean hands may militate against issuing an injunction that otherwise meets *Winter*'s requirements" for issuance of a preliminary injunction); *House v. Moller*, 2012 WL 1292483, at *7 (E.D. Cal. Apr. 16, 2012) (noting that one party's "unclean hands," and specifically, whether it had made certain misrepresentations in connection with the sale of a property "also weigh against resolving the equities of whether a preliminary injunction should be issued in [its] favor"). The Nation's fraud should weigh heavily against its request that, before the State's defenses even can be fully heard on the merits, the State be compelled to issue certifications to the West Valley casino as if the Nation's fraud did not exist and voters and the State actually understood and agreed to a Compact that would permit the Nation to open a casino in the metropolitan Phoenix area. The Nation should not be permitted to profit from its fraud in such a manner.

### 3.     Granting Preliminary Injunctive Relief Would Be Against The Public Interest.

The primary purpose of the public interest inquiry is to address the impact upon non-parties to the litigation of granting injunctive relief. *See, e.g.*, *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). That inquiry necessarily tips in state officials' favor where the moving party seeks to enjoin governmental enforcement of statutes or regulations enacted in the public interest. *Ft. Funston Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1032 (N.D. Cal. 2000).

---

(representative of the Nation, responding to the question "neither you nor anybody from the [Tohono O'odham] Nation mentioned a location in west Phoenix. Right?" with the response "[u]nless you consider Gila Bend to be west Phoenix, no."); *id*. [Ex. 26 (Ramon Dep.) 5:22-16:10, 19:7-14, 25:17-28:2]; *id*. [Ex. 20 (Miguel Dep.) 19:17-20:16] (testimony showing Nation was actively searching for land in Phoenix metropolitan area suitable to build a casino while participating in compact negotiations); *id*. [Ex. 31 (Walker Dep.) 25:6-26:15] (testimony from Nation lobbyists stating they told legislators that under the compacts there would be no additional casinos in the Phoenix metropolitan area).

15

Here, as part of Proposition 202, in order to protect public safety, the Legislature amended A.R.S. § 5-602 to vest ADG with authority over certification of gaming providers. *See* Laws 2002, Ch. 111, § 1. As set forth in Defendants' respective motions to dismiss, the State's regulatory authority over Class III gaming is not preempted by IGRA. D.E. 50 at 10-13. And the public has a strong interest in ensuring that the State's gaming laws and regulations are enforced, and that entities or individuals who have engaged in wrongdoing are not permitted to benefit from unlawful gaming. *See Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 94 (9th Cir. 2009) (reversing grant of preliminary injunction where it would "frustrat[e] the public's interest in strictly regulating gambling" and in "the enforcement of state and local … laws"); *see also Idaho v. Coeur d'Alene Tribe*, 49 F. Supp. 3d 751, 764 (D. Idaho 2014), *aff'd* No. 14-35753, 2015 WL 4461055 (9th Cir. July 22, 2015) (granting injunction in favor of the state where it would "serve to uphold state law and is therefore in the public interest"). Commanding the State to certify the West Valley casino for Class III gaming in contravention of the expressed wishes of the public and without regard for the public safety protections enacted by their representatives would therefore be a disservice to the citizens of this State.

The Nation's blanket assertions that the West Valley casino will benefit the "local community" by bringing "jobs and economic gains" are not supported by the objective evidence. D.E. 3 at 17. For example, one study commissioned by the City of Glendale reported that the "added costs and potential reduction in revenues to the City of Glendale and its citizens [are] greater than the potential benefits" (Hoffman Decl., Ex. AA (Dep. Ex. 19)), because the casino project would detract from or compete with other city lodging or entertainment businesses and noted that only one-third of projected jobs would go to Glendale residents (many paying only minimum wage or slightly above). *See id*. at 3-5. The Glendale report also noted several other possible negative impacts from the casino project, including traffic congestion, the proximity of the proposed casino to a local high school (within 200 feet), and the volatility of combining a high-profile sports entertainment venue with a virtually adjacent casino. *See id.* at 5-6. Another report, commissioned for the group

"Keeping the Promise of Proposition 202" also projected much lower job and revenue numbers than other reports generated by firms retained by the Nation. Hoffman Decl., Ex. BB (TOHONO00005031) (projecting creation of only 2,886 construction jobs in "person years" as compared with other estimates of 6,236 jobs, and only $1-5 million in revenue to state and local governments, as compared with the $6-18 million in other estimates).

But even if one credited the Nation's assertions, the Nation has not shown that the preliminary relief it requests—compelling state officials to certify the West Valley casino for Class III gaming—is necessary to secure its alleged benefits to the local community. Quite to the contrary, the evidence establishes beyond dispute that the Nation is planning to open the West Valley casino at the end of this year whether or not its motion is granted. *E.g.*, Hoffman Decl., Ex. A (Francisco Dep.) 90:10-19. The evidence further establishes that the interim casino facility will employ the same number of people, whether it is Class II or Class III. *Id.*, Ex. C (Norris Dep.) 39:6-10; Ex. Q (Dep. Ex. 5). And the Nation's consultant expects it to reap substantially the same income from the interim casino, whether it is Class II or Class III. *Id.*, Ex. G (Dep. Ex. 2). Preliminary relief thus is not necessary to safeguard "jobs and economic gains."

The public interest does not support an injunction that requires State officials to disregard Arizona law and to certify West Valley casino for Class III gaming—and certainly not before a full adjudication of the merits of this action.

## V.   CONCLUSION

For the foregoing reasons, the Nation's request for a preliminary injunction should be denied.

DATED:  August 14, 2015                          Respectfully submitted,

FENNEMORE CRAIG, P.C.

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Matthew D. McGill
            Matthew D. McGill

*Attorneys for Defendant Daniel Bergin, Director, Arizona Department of Gaming*

| | |
|---|---|
| 1 | SNELL & WILMER L.L.P. |
| 2 | |
| 3 | By: /s/ Heidi McNeil Staudenmaier |
| 4 | Heidi McNeil Staudenmaier |
| 5 | *Attorneys for Defendant Douglas Ducey, Governor of Arizona* |
| 6 | |
| 7 | OFFICE OF THE ARIZONA ATTORNEY GENERAL |
| 8 | |
| 9 | By: /s/ Thomas K. Chenal<br>Thomas K. Chenal |
| 10 | *Attorneys for Defendant Mark Brnovich, Attorney General of Arizona* |

101972700.11

Gibson, Dunn & Crutcher LLP