FENNEMORE CRAIG, P.C.
Patrick Irvine (No. 006534)
Douglas C. Northup (No. 013987)
Carrie Pixler Ryerson (No. 028072)
2394 E. Camelback Road, Suite 600
Phoenix, AZ  85016-3429
Telephone:  (602) 916-5000
Email:  pirvine@fclaw.com
Email:  dnorthup@fclaw.com
Email:  cryerson@fclaw.com

GIBSON, DUNN & CRUTCHER LLP
Matthew D. McGill (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone:  (202) 955-8500
Email:  MMcGill@gibsondunn.com

Matthew A. Hoffman (*pro hac vice*)
Timothy W. Loose (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  (213) 229-7000
Email:  MHoffman@gibsondunn.com
Email:  TLoose@gibsondunn.com

*Attorneys for Defendant/Counterclaimant*
*Director Daniel Bergin, Arizona Department of Gaming*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| The Tohono O'odham Nation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Douglas Ducey, Governor of Arizona; Mark Brnovich, Arizona Attorney General; and Daniel Bergin, Director, Arizona Department of Gaming, in their official capacities,<br><br>　　　　　Defendants. | No. CV-15-01135-PHX-DGC<br><br><br>**DEFENDANT DANIEL BERGIN'S FIRST AMENDED ANSWER AND COUNTERCLAIM** |
| Daniel Bergin, Director, Arizona Department of Gaming, in his official capacity,<br><br>　　　　　Counterclaimant,<br><br>　　v.<br><br>The Tohono O'odham Nation,<br><br>　　　　　Counterdefendant. | |

Defendant Daniel Bergin, Director, Arizona Department of Gaming ("Director Bergin"), answers Plaintiff's Complaint as follows.

## INTRODUCTION AND NATURE OF ACTION

1.      Director Bergin admits that the Nation seeks equitable and declaratory relief against him but denies the remaining allegations in paragraph 1.

2.      Answering paragraph 2, Director Bergin affirmatively alleges that 25 U.S.C. § 2710(d)(1) is the best evidence of its contents and speaks for itself.  Director Bergin denies that Indian Gaming Regulatory Act ("IGRA") authorizes gaming conducted pursuant to a compact obtained by fraud, misrepresentation, or in violation of a promise supporting promissory estoppel.  With those qualifications, the allegations in paragraph 2 are admitted.

3.      Director Bergin admits that the Nation and the State of Arizona ("State") entered into a compact in 2002 to govern Class III gaming (the "Compact") and the Compact was approved by the U.S. Secretary of the Interior in 2003.  Based on the Nation's fraud and misrepresentations associated with procuring the Compact, Director Bergin affirmatively denies any implication from those facts that the Nation may conduct Class III gaming in the Phoenix metropolitan area simply by virtue of having entered into the Compact.  Director Bergin admits that the land upon which the Nation intends to build a resort and gaming facility was accepted by the Secretary of the Interior into trust for the Nation.  Director Bergin denies any remaining allegations in paragraph 3.

4.      Director Bergin admits that the State and two other tribes sued the Nation as described and that the ruling is currently on appeal.  Director Bergin affirmatively alleges that the Court did not address several arguments raised by the Plaintiffs in that case regarding fraud, misrepresentation and promissory estoppel due to the Nation's assertion of sovereign immunity and that those claims support the State's denial of any right by the Nation to conduct Class III gaming in the Phoenix metropolitan area.  The remainder of the allegations in paragraph 4 are denied.

5.      Director Bergin admits the final sentence of paragraph 5, except for the final

clause that asserts that IGRA and the Compact expressly authorize the project, which is denied.  Director Bergin also admits that the Arizona Department of Gaming ("ADG") has taken the position that it is not required to approve the facility due to the Nation's fraud and misrepresentations during the negotiation process, and that state law, as incorporated within the terms of the Compact, allows the fraud and misrepresentations to be considered by the ADG.  The remaining allegations in paragraph 5 are denied.

6.      Director Bergin denies the allegations in paragraph 6.

7.      Director Bergin denies the allegations in paragraph 7.

8.      Director Bergin admits that the ADG sent out the referenced notices, the content of which speak for themselves.  Director Bergin denies the remaining allegations in paragraph 8.

9.      Director Bergin denies that Count II remains in this case following the dismissal of Count II by the Court.  As a result, no answer is required to these allegations.

10.     Director Bergin admits the Nation has brought this suit, but denies the remaining allegations in paragraph 10.

**PARTIES**

11.     Director Bergin admits the allegations in paragraph 11.

12.     Director Bergin admits the allegations in paragraph 12.

13.     Director Bergin admits the allegations in paragraph 13.

14.     Director Bergin admits the allegations in paragraph 14.

15.     Director Bergin admits the allegations in paragraph 15.

**JURISDICTION AND VENUE**

16.     Director Bergin denies the allegations in paragraph 16.

17.     Director Bergin admits the allegations in paragraph 17.

**GENERAL ALLEGATIONS**

18.     Director Bergin admits the allegations in paragraph 18 but affirmatively alleges that the cited case is the best evidence of its holding and speaks for itself.

19.     Director Bergin admits that Congress enacted IGRA, 25 U.S.C. §§ 2701-

2721, in 1988, but denies the remaining allegations in paragraph 19 to the extent that they imply that IGRA does not recognize the important role states play in regulating Class III gaming or that tribes can conduct Class III gaming without state approval.

20.     Director Bergin admits that the cited statutes have been accurately quoted. Director Bergin affirmatively alleges that 25 U.S.C. § 2702 and 25 U.S.C. § 2710 are the best evidence of their contents and speak for themselves.   Director Bergin denies the allegations in paragraph 20 to the extent that they imply that IGRA does not recognize the important role states play in regulating Class III gaming or that tribes can conduct Class III gaming without state approval.   Director Bergin further affirmatively alleges federal law does not require the State to certify any tribal gaming facility.

21.     Answering paragraph 21, Director Bergin affirmatively alleges that 25 U.S.C. § 2703 is the best evidence of its contents and speaks for itself.

22.     Answering paragraph 22, Director Bergin admits that 25 U.S.C. § 2710(a)(1) states "Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of this chapter."   Director Bergin admits that 25 U.S.C. § 2710(a)(2) states that tribes may regulate Class II gaming but affirmatively asserts that Class II gaming must first be permitted by a state.   Director Bergin admits that the Nation has accurately quoted *Oneida Tribe of Indians of Wis. v. Wisconsin*, 951 F.2d 757 (7th Cir. 1991) but omitted the fact that whether Class II gaming is allowed at all is dependent on state law.   Director Bergin admits that the Nation has accurately quoted *Seneca-Cayuga Tribe of Okla. v. NIGC*, 327 F.3d 1019 (10th Cir. 2003) but affirmatively asserts that in order for a tribe to engage in Class II gaming, three conditions, which are not listed in paragraph 22, must be met.   Director Bergin denies the parenthetical in relation to the Nation's citation of *Wisconsin v. Ho-Chunk Nation*, 784 F.3d 1076, 1077 (7th Cir. 2015) because it is a quotation focused on the facts of that particular compact.

23.     Answering paragraph 23, Director Bergin affirmatively alleges that 25 U.S.C. § 2710 is the best evidence of its contents and speak for itself.   Director Bergin

denies the allegations in paragraph 23 to the extent that they are inconsistent with the language of 25 U.S.C. § 2710.  Director Bergin specifically denies that IGRA authorizes gaming conducted pursuant to a compact obtained by fraud, misrepresentation, or in violation of a promise supporting promissory estoppel.

24.     Answering paragraph 24, Director Bergin affirmatively alleges that 25 U.S.C. § 2710 and court opinions are the best evidence of their contents and speak for themselves.  This paragraph is a legal argument about the meaning of those authorities to which no answer is required, but if an answer is required, it is denied.

25.     Answering paragraph 25, Director Bergin affirmatively alleges that 25 U.S.C. § 2703 and 25 U.S.C. § 2719 are the best evidence of their contents and speak for themselves.  This paragraph is a legal argument about the meaning of those authorities to which no answer is required, but if an answer is required, it is denied.

26.     Director Bergin admits that the ADG was established in 1995 but denies that it was created solely to carry out the State's duties under IGRA.  Director Bergin admits the remaining allegations in paragraph 26.

27.     Answering paragraph 27, Director Bergin affirmatively alleges that A.R.S. § 5-602 is the best evidence of its contents and speaks for itself.  Director Bergin denies the allegations in paragraph 27 to the extent that they are inconsistent with the language of A.R.S. § 5-602.

28.     Answering paragraph 28, Director Bergin affirmatively alleges that A.R.S. § 5-602 is the best evidence of its contents and speaks for itself.  With that qualification, the allegations of paragraph 28 are admitted.

29.     Director Bergin admits the allegations in paragraph 29.

30.     Director Bergin admits the allegations in paragraph 30.

31.     Director Bergin admits that the Gila Bend Act is a public statute, but denies any implication that the Nation's right to acquire replacement land allowed it to engage in fraud and misrepresentations regarding its intentions to conduct Class III gaming in the Phoenix metropolitan area.

32.     Director Bergin lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32, and therefore denies them.

33.     Director Bergin lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33, and therefore denies them.

34.     Paragraph 34 is a legal argument about the interpretation or meaning of the Compact, to which no response is required.   To the extent any response is required, Director Bergin denies paragraph 34.

35.     Answering paragraph 35, Director Bergin affirmatively alleges that the 1993 compact is the best evidence of its contents and speaks for itself.  With that qualification, the allegations of paragraph 35 are admitted.

36.     The allegations in paragraph 36 are admitted.

37.     Director Bergin lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37, and therefore denies them.  Director Bergin affirmatively alleges that AIGA presented itself to the State and to the public as being authorized to speak for the negotiating member tribes with respect to their common positions, and that no tribe publicly or to the State disputed that AIGA had such authority, and that no tribe ever argued that anything AIGA or its officers stated was an inaccurate representation of member tribes' positions.

38.     Director Bergin lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38, and therefore denies them.  Director Bergin affirmatively alleges that the intent of the voters of Arizona in passing Proposition 202 at the 2002 general election was to prohibit any additional casinos in the Phoenix metropolitan area and the Nation was fully aware that the voters understood this to be the effect of passing Proposition 202 to approve the standard form compacts system.

39.     Director Bergin is without knowledge or information sufficient to form a belief as to whether tribes negotiated among themselves at arm's length, and therefore denies this allegation.  Director Bergin admits the other allegations of paragraph 39, but denies any implication that representation by counsel excuses the Nation's fraud and

1    misrepresentations.

2           40.    Director Bergin admits the allegations of paragraph 40.

3           41.    Director Bergin admits the allegations of paragraph 41, but denies any

4    implication that the allegations excuse the Nation's fraud and misrepresentations.

5           42.    Paragraph 42 is a legal argument about the interpretation or meaning of the

6    Compacts, to which no response is required.   To the extent any response is required,

7    Director Bergin denies paragraph 42.   Director Bergin denies any implication that the

8    allegations excuse the Nation's fraud and misrepresentations.   Director Bergin further

9    denies any implication that this paragraph is a complete statement of the parties'

10   negotiations, understandings, and agreements regarding the location of gaming facilities,

11   and affirmatively alleges that the Nation specifically represented to State negotiators that

12   it would locate its facilities in either the Tucson metropolitan area or in rural areas of its

13   existing reservation lands.

14          43.    Director Bergin lacks knowledge or information sufficient to form a belief

15   as to the truth of the allegations in paragraph 43, and therefore denies them.   Director

16   Bergin specifically denies any allegation or implication that the parties believed that the

17   Compact as negotiated would allow any possibility of additional facilities in the Phoenix

18   metropolitan area.

19          44.    Director Bergin lacks knowledge or information sufficient to form a belief

20   as to the truth of the allegations in paragraph 44, and therefore denies them. Director

21   Bergin specifically denies any allegation or implication that the parties believed that the

22   Compact as negotiated would allow any possibility of additional facilities in the Phoenix

23   metropolitan area.

24          45.    Director Bergin lacks knowledge or information sufficient to form a belief

25   as to the truth of the allegations in paragraph 45, and therefore denies them.   Director

26   Bergin specifically denies any allegation or implication that the parties believed that the

27   Compact as negotiated would allow any possibility of additional facilities in the Phoenix

28   metropolitan area.

FENNEMORE CRAIG, P.C.

PHOENIX

1     46.     Director Bergin lacks knowledge or information sufficient to form a belief
2 as to the truth of the allegations in paragraph 46, and therefore denies them.

3     47.     Director Bergin lacks knowledge or information sufficient to form a belief
4 as to the truth of the allegations in paragraph 47, and therefore denies them.

5     48.     Director Bergin admits that the Arizona voters approved Proposition 202 in
6 November 2002 and that the State and the Nation signed the Compact on December 4,
7 2002.

8     49.     Director Bergin admits the allegations in paragraph 49.

9     50.     Paragraph 50 is a legal argument about the interpretation or meaning of the
10 Compact, to which no response is required.  To the extent any response is required,
11 Director Bergin denies paragraph 50.  Director Bergin further specifically denies any
12 implication that the State is required to act on or implement the Compact to allow the
13 Nation to conduct Class III gaming in the Phoenix metropolitan area, due to the fraud and
14 misrepresentations by the Nation.

15     51.     Answering paragraph 51, Director Bergin denies any allegations about the
16 interpretation or meaning of the 2002 Compact.  Director Bergin denies the allegations in
17 paragraph 51 to the extent that they are inconsistent with the 2002 Compact.

18     52.     Paragraph 52 is a legal argument about the interpretation or meaning of the
19 Compact, to which no response is required.  To the extent any response is required,
20 Director Bergin denies paragraph 52.

21     53.     Paragraph 53 is a legal argument about the interpretation or meaning of the
22 Compact, to which no response is required.  To the extent any response is required,
23 Director Bergin denies paragraph 53.

24     54.     Paragraph 54 is a legal argument about the interpretation or meaning of the
25 Compact, to which no response is required.  To the extent any response is required,
26 Director Bergin denies paragraph 54.

27     55.     Paragraph 55 is a legal argument about the interpretation or meaning of the
28 Compact, to which no response is required.  To the extent any response is required,

FENNEMORE CRAIG, P.C.

PHOENIX

Director Bergin denies paragraph 55.    Due to the Nation's fraud and misrepresentations, Director Bergin further specifically denies that the ADG must certify a facility in the Phoenix metropolitan area.

56.    Paragraph 56 is a legal argument about the interpretation or meaning of the Compact, to which no response is required.   To the extent any response is required, Director Bergin denies paragraph 56.  Due to the Nation's fraud and misrepresentations, Director Bergin further specifically denies that the ADG must certify a facility in the Phoenix metropolitan area.

57.    Paragraph 57 is a legal argument about the interpretation or meaning of the Act, to which no response is required.   To the extent any response is required, Director Bergin denies paragraph 57.

58.    Director Bergin lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58, and therefore denies them.

59.    Paragraph 59 is a legal argument about the interpretation or meaning of the Act, to which no response is required.   To the extent any response is required, Director Bergin denies paragraph 59.

60.    Paragraph 60 is a legal argument about the interpretation or meaning of the Act, to which no response is required.   To the extent any response is required, Director Bergin denies paragraph 60.

61.    Director Bergin lacks knowledge or information sufficient to form a belief as to the source of the funds used, and denies that allegation.  Director Bergin denies that the Nation directly purchased the land.  Other allegations in paragraph 61 are admitted.

62.    Director Bergin admits the allegations in paragraph 62.

63.    Director Bergin admits the first sentence in paragraph 63.  Answering the remaining allegations in paragraph 63, Director Bergin affirmatively alleges that the Lands Replacement Act is the best evidence of its contents and speaks for itself.  Director Bergin denies the allegations in paragraph 63 to the extent that they are inconsistent with the language of the Lands Replacement Act.

64.    Director Bergin admits the first sentence of paragraph 64, but denies the remaining allegations in paragraph 64.

65.    Director Bergin admits that the State previously sued the Nation in this Court seeking to enjoin the West Valley Resort project.  Director Bergin denies the remaining allegations of paragraph 65 as misstating the scope of the lawsuit.

66.    Director Bergin admits the allegations in paragraph 66 but affirmatively alleges that they do not fully describe the basis for the prior complaint.

67.    Addressing paragraph 67, the Court's rulings speak for themselves. Director Bergin denies any implication that the Court's ruling requires the ADG to certify the Nation's conduct of Class III gaming in the Phoenix metropolitan area.    Any remaining allegations in paragraph 67 are denied.

68.    Addressing paragraph 68, the Court's rulings speak for themselves. Director Bergin denies any implication that the Court's ruling requires the ADG to certify the Nation's conduct of Class III gaming in the Phoenix metropolitan area, and all other remaining allegations.

69.    Director Bergin admits the allegations in paragraph 69 that this Court did not decide the claims for promissory estoppel, fraud in the inducement, and material misrepresentation, and affirmatively alleges that no court has ever addressed or decided those claims.  Director Bergin denies any implication that the Court's ruling requires the ADG to certify the Nation's conduct of Class III gaming in the Phoenix metropolitan area.

70.    Director Bergin denies the allegations in paragraph 70.

71.    Addressing paragraph 71, the Court's rulings speak for themselves.  This paragraph is otherwise denied, and Director Bergin specifically denies any implication by the Nation that the Court's prior rulings require the ADG to certify the Nation's conduct of Class III gaming in the Phoenix metropolitan area.

72.    Addressing paragraph 72, the Court's rulings speak for themselves. Director Bergin denies any implication by the Nation that the Court's prior rulings require the ADG to certify the Nation's conduct of Class III gaming in the Phoenix metropolitan

area.  Director Bergin denies the allegation that the "principal" evidence of fraud was as described, and affirmatively alleges that there was significant evidence of fraud and misrepresentation by the Nation from many sources.

73.     Addressing paragraph 73, the Court's rulings speak for themselves. Director Bergin denies any remaining allegations in paragraph 73.

74.     Addressing paragraph 74, the Court's rulings speak for themselves. Director Bergin denies any remaining allegations in paragraph 74.

75.     Answering paragraph 75, Director Bergin affirmatively alleges that the cited letters are the best evidence of their contents and speak for themselves.  Director Bergin denies the allegations in paragraph 75 to the extent that they are inconsistent with the language of the cited letters.

76.     Answering paragraph 76, Director Bergin affirmatively alleges that the cited letter is the best evidence of its contents and speaks for itself.  Director Bergin denies the allegations in paragraph 76 to the extent that they are inconsistent with the language of the cited letter.

77.     Answering paragraph 77, Director Bergin affirmatively alleges that the cited letter is the best evidence of its contents and speaks for itself.  Director Bergin denies the allegations in paragraph 77 to the extent that they are inconsistent with the language of the cited letter.

78.     Director Bergin denies the allegations in paragraph 78.  Further answering paragraph 78, Director Bergin affirmatively alleges that the cited letter is the best evidence of its contents and speaks for itself.  Director Bergin denies the allegations in paragraph 78 to the extent that they are inconsistent with the language of the cited letter. In any event, Governor Ducey and Attorney General Brnovich have been dismissed from this action on the Court's grant of their motion.

79.     Answering paragraph 79, Director Bergin affirmatively alleges that the cited letter is the best evidence of its contents and speaks for itself.  Director Bergin denies the allegations in paragraph 79 to the extent that they are inconsistent with the language of the

cited letter.   In any event, Governor Ducey and Attorney General Brnovich have been dismissed from this action on the Court's grant of their motion.

80.     Answering paragraph 80, Director Bergin affirmatively alleges that the cited letter is the best evidence of its contents and speaks for itself.   Director Bergin denies the allegations in paragraph 80 to the extent that they are inconsistent with the language of the cited letter.

81.     Answering paragraph 81, Director Bergin affirmatively alleges that the cited letters are the best evidence of its contents and speak for themselves.   Director Bergin denies the allegations in paragraph 81 to the extent that they are inconsistent with the language of the cited letters.

82.     Director Bergin denies the allegations in paragraph 82.

83.     Answering paragraph 83, Director Bergin affirmatively alleges that the cited letter is the best evidence of its contents and speaks for itself.   Director Bergin denies the allegations in paragraph 83 to the extent that they are inconsistent with the language of the cited letter.

84.     Director Bergin denies the allegations in paragraph 84.

85.     Answering paragraph 85, Director Bergin affirmatively alleges that the cited letter is the best evidence of its contents and speaks for itself.   With that qualification, the allegations are admitted.

86.     Director Bergin admits the allegations in paragraph 86.

87.     Director Bergin admits the allegations in paragraph 87.

88.     Answering paragraph 88, Director Bergin affirmatively alleges that the cited notices are the best evidence of their contents and speaks for themselves.   Director Bergin denies the allegations in paragraph 88 to the extent that they are inconsistent with the language of the cited notices.

89.     Director Bergin denies the allegations in paragraph 89.

90.     Director Bergin admits the allegations in paragraph 90.

91.     Director Bergin admits the allegations in paragraph 91.

92.     Director Bergin denies the allegations in paragraph 92.

93.     Director Bergin denies the allegations in paragraph 93.

**COUNT ONE:**

**FEDERAL PREEMPTION OF DEFENDANTS' OBSTRUCTION OF
LAWFUL CLASS III GAMING**

94.     Director Bergin incorporates by reference his answers to the preceding paragraphs.

95.     Director Bergin admits the quotation from the United States Constitution, but denies the remaining allegations in paragraph 95.

96.     Director Bergin admits the legal references in paragraph 96, but denies any interpretation of those authorities and any implication that the ADG has violated any of the referenced authorities.

97.     Director Bergin denies the allegations in paragraph 97.

98.     Director Bergin admits the legal references in paragraph 98, but denies any interpretation of those authorities and any implication that the ADG must certify a gaming facility when the gaming facility operator has previously engaged in fraud and misrepresentation.

99.     Director Bergin denies the allegations in paragraph 99.

100.    Director Bergin denies the allegations in paragraph 100.

101.    Answering paragraph 101, Director Bergin admits that the ADG takes the position that it may not be required to issue certifications and approvals to the Nation's gaming facility located in the Phoenix metropolitan area because the gaming facility operator has previously engaged in fraud and misrepresentation.  Director Bergin denies the remaining allegations in paragraph 101.

102.    Director Bergin denies the allegations in paragraph 102.

103.    Director Bergin admits the legal references in paragraph 103, but denies any implication that the ADG must certify a gaming facility when the gaming facility operator has previously engaged in fraud and misrepresentation.  Director Bergin denies the

FENNEMORE CRAIG, P.C.

PHOENIX

1    remaining allegations in paragraph 103.

2         104.    Director Bergin denies the allegations in paragraph 104.

3         105.    Director Bergin denies the allegations in paragraph 105.

4         106.    Director Bergin denies the allegations in paragraph 106.

5         107.    Director Bergin denies paragraph 107, and specifically denies any

6    implication that the ADG must certify a gaming facility when the gaming facility operator

7    has previously engaged in fraud and misrepresentation.

8         108.    Director Bergin denies the allegations in paragraph 108.

9         109.    Director Bergin denies the allegations in paragraph 109.

10        110.    Director Bergin denies the allegations in paragraph 110.

11        111.    Director Bergin denies the allegations in paragraph 111.

12        112.    Director Bergin denies the allegations in paragraph 112.

13        113.    Director Bergin denies the allegations in paragraph 113.

14                              **COUNT TWO:**

15           **FEDERAL PREEMPTION OF STATE REGULATION OF**
                          **CLASS II GAMING**
16

17        114.    Director Bergin incorporates by reference his answers to the preceding

18   paragraphs.

19        115.    Director Bergin denies that Count II remains in this case following the

20   dismissal of Count II by the Court and, as a result, no response is required to this count.

21        116.    Director Bergin denies that Count II remains in this case following the

22   dismissal of Count II by the Court and, as a result, no response is required to this count.

23        117.    Director Bergin denies that Count II remains in this case following the

24   dismissal of Count II by the Court and, as a result, no response is required to this count.

25        118.    Director Bergin denies that Count II remains in this case following the

26   dismissal of Count II by the Court and, as a result, no response is required to this count.

27        119.    Director Bergin denies that Count II remains in this case following the

28   dismissal of Count II by the Court and, as a result, no response is required to this count.

Fennemore Craig, P.C.

Phoenix

120.    Director Bergin denies that Count II remains in this case following the dismissal of Count II by the Court and, as a result, no response is required to this count.

121.    Director Bergin denies that Count II remains in this case following the dismissal of Count II by the Court and, as a result, no response is required to this count.

122.    Director Bergin denies that Count II remains in this case following the dismissal of Count II by the Court and, as a result, no response is required to this count.

123.    Director Bergin denies that Count II remains in this case following the dismissal of Count II by the Court and, as a result, no response is required to this count.

124.    Director Bergin denies that Count II remains in this case following the dismissal of Count II by the Court and, as a result, no response is required to this count.

125.    Director Bergin denies each and every allegation of Plaintiff's Complaint not specifically admitted herein.

## **SEPARATE AND AFFIRMATIVE ADDITIONAL DEFENSES**

By alleging the defenses set forth below, Director Bergin is not in any way agreeing or conceding that he has the burden of proof or the burden of persuasion on any of these issues.

1.    Failure to state a claim: The Nation's Complaint and each purported cause of action contained therein fail to state a claim or cause of action against Director Bergin upon which relief can be granted.

2.    Lack of standing: The Nation's claims are barred, in whole or in part, because the Nation lacks standing to assert any or all of the causes of action alleged in the Complaint.

3.    Lack of jurisdiction: The court lacks jurisdiction over some or all of the claims asserted by the Nation.

4.    Promissory estoppel: Promissory estoppel precludes the Nation from asserting each purported cause of action in the Complaint.

5.    Fraud: The Nation's fraud in connection with the negotiation of the 2002 Compact renders it voidable and unenforceable, in whole or in part, and subject to

1  rescission.

2  6.    Material misrepresentation: The Nation's material misrepresentations in

3  connection with the negotiation of the 2002 Compact render it voidable and

4  unenforceable, in whole or in part, and subject to rescission.

5  7.    Unclean hands: The Nation's unclean hands precludes the relief it seeks

6  herein.

7  8.    Laches: By reason of its own conduct, acts, and omissions, the Nation is

8  barred from any relief by the doctrine of laches.

9  9.    Bad faith: The Nation's bad faith in connection with the negotiation of the

10  2002 Compact precludes the relief it seeks herein.

11  10.    Compliance with obligations and legal duties: Director Bergin has

12  appropriately, completely, and fully performed and discharged any and all obligations and

13  legal duties arising out of the matters alleged in the Complaint.

14  11.    Failure to mitigate damages: The Nation has failed to mitigate its damages,

15  if any, and any recovery should be reduced or denied accordingly.

16  12.    Sovereign immunity: Sovereign immunity bars the Nation's Complaint and

17  each purported cause of action contained therein.

18  13.    Violation of the Tenth Amendment: The tenth amendment's anti-

19  commandeering doctrine prohibits the federal government from requiring state officials to

20  issue regulatory approvals to tribal casinos.

21  14.    Adequate remedy at law: The Nation's claims for equitable relief are barred

22  to the extent there is an adequate remedy at law.

23  15.    Speculative equitable relief: The Nation's claims for equitable relief are

24  barred to the extent they seek "future" or "speculative" damages.

25  16.    Affirmative or mandatory injunction: The Nation's claims for equitable

26  relief are barred to the extent they seek an affirmative or mandatory injunction.

27  17.    No causation or injury in fact: The Nation has not sustained any injury or

28  damage as a result of any actions taken by Director Bergin, and thus is barred from

FENNEMORE CRAIG, P.C.

PHOENIX

1   asserting any claim against Director Bergin.

2       18.     No attorneys' fees: The Nation's request for attorneys' fees in this matter is

3   barred because it lacks any basis in law or contract.

4       19.     Director Bergin reserves the right to assert all additional affirmative

5   defenses, including those set forth in Federal Rule of Civil Procedure 8(c), as more

6   information becomes known through discovery.

7                                    **PRAYER**

8       WHEREFORE, Director Bergin prays for the following relief:

9       a.      That the Nation takes nothing by its Complaint;

10      b.      That judgment on the Complaint, and on each cause of action against

11  Director Bergin, be entered in Director Bergin's favor and against the Nation;

12      c.      That Director Bergin be awarded his costs incurred herein, including

13  reasonable attorneys' fees and costs; and

14      d.      For such other relief as the Court deems appropriate.

15                                **COUNTERCLAIMS**

16      Pursuant to Rule 13, Federal Rules of Civil Procedure, Director Bergin asserts the

17  following counterclaims against the Nation.

18      1.      Director Bergin, on behalf of the Arizona Department of Gaming ("ADG"),

19  brings this action under the Indian Gaming Regulatory Act ("IGRA") and the 2002

20  Tohono O'odham Nation—State of Arizona Gaming Compact ("Compact"), which is

21  attached as Exhibit B to Plaintiff's complaint, to enjoin the Tohono O'odham Nation

22  ("Nation") from engaging in Class III gaming activity, the alleged right to which was

23  procured by the Nation's fraudulent conduct in connection with the Compact.

24      2.      Federal law requires that casino-style gaming on Indian lands be governed

25  by Tribal-State compacts. Specifically, the IGRA provides that casino-style gaming

26  ("Class III gaming" as defined in IGRA) "shall be lawful on Indian lands only if such

27  activities are (A) authorized by [a Tribal] ordinance or resolution . . . , (B) located in a

28  State that permits such gaming for any purpose by any person, organization, or entity, and

FENNEMORE CRAIG, P.C.

PHOENIX

(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." 25 U.S.C. § 2710(d)(1).

3.     IGRA also provides, "[t]he United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect." 25 U.S.C. § 2710(d)(7)(A)(ii).

4.     In Arizona, all gaming tribes have identical forms of Tribal-State compacts negotiated between the State of Arizona and seventeen Indian tribes in Arizona, including the Nation. All seventeen tribes negotiated jointly and entered into identical compacts with the intent that all seventeen tribes would benefit from the uniform language of the compacts.  By their terms, none of the compacts became effective until each tribe with gaming facilities in Maricopa, Pima, or Pinal Counties entered into its respective compact with the State and the U.S. Department of the Interior ("Interior") approved each compact.

5.     The identical gaming compacts that the seventeen tribes and the State of Arizona negotiated were incorporated into an initiative called the "Indian Gaming Preservation and Self-Reliance Act" ("Proposition 202") that Arizona voters approved at the 2002 general election.

6.     In negotiations for the seventeen Tribal-State compacts and during the public debate on Proposition 202, the Nation both expressly and impliedly represented to the State, to other tribes, and to the voters of Arizona that the compacts would preclude any tribe, including the Nation, from opening a new gaming facility in the Phoenix metropolitan area.

7.     By representing that the Compact would prevent additional gaming facilities from being opened in the Phoenix metropolitan area, the Nation was necessarily representing that it would not conduct Class III gaming on any lands in the Phoenix metropolitan area it might have taken into trust under the Gila Bend Reservation Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986) ("Gila Bend Act").  The Gila Bend Act authorizes the Nation to acquire by purchase and have taken into trust land in

Maricopa, Pinal, or Pima counties that meets specified requirements.

8.     The Nation intended for the State, other tribes, and the voters to rely upon these representations, and the State and other tribes in fact relied on the Nation's representation in supporting and advocating the passage of Proposition 202 and in entering into the compacts. In return, the Nation received valuable consideration, including but not limited to an increase in the number of gaming devices allowed to the Nation from 1,400 to 2,420 and no decrease in the number of gaming facilities allowed to the Nation (four), despite the total number of gaming facilities for all tribes statewide being reduced from 38 to 29 (including all tribes in the Phoenix metropolitan area giving up one gaming facility each).

9.     The Nation has an obligation not to open any new Class III gaming facilities in the Phoenix metropolitan area.

10.    The Nation has repudiated this obligation and has a definite and concrete plan to violate it by beginning gaming activities as early as December 2015 on a parcel of land in Glendale, Arizona ("Parcel 2") that is part of a property it secretly purchased in 2003 (the "Glendale Property").

11.    The Nation's announcement of its plans to begin gaming activities on Parcel 2, and the publicity and public concerns those plans have generated, have destabilized the compact-based political relationships among tribes and between tribes and the State.

12.    These counterclaims seek to prevent the Nation from conducting Class III gaming activities, the right to which was procured by the Nation's fraudulent conduct.

## PARTIES

13.    The State of Arizona is a party to the Compact.  Director Bergin can act on behalf of the State with respect to gaming.

14.    The Nation is a federally recognized Indian tribe whose headquarters are in Sells, Arizona. The Nation has three gaming facilities on its reservation in Southern Arizona, two in the Tucson area and a third in the town of Why.  By initiating an action to enforce the terms of the Compact, the Nation has waived its sovereign immunity with

1  regard to these counterclaims.

2  **JURISDICTION AND VENUE**

3  15.  This Court has jurisdiction under 28 U.S.C. § 1331 (federal question

4  jurisdiction), 25 U.S.C. § 2710(d)(7)(A)(ii) (jurisdiction over actions brought by States or

5  Indian tribes to enjoin gaming activity that would violate a Tribal-State compact), 28

6  U.S.C. § 1367 (Supplemental jurisdiction over state law claims), and 28 U.S.C. §§ 2201-

7  2202 (the Declaratory Judgment Act).

8  16.  Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2), because the

9  negotiation and signing of the Compact occurred in this federal district and the real

10  property that is the subject of the action is located in this federal district.

11  **GENERAL ALLEGATIONS**

12  17.  IGRA provides that an Indian tribe may conduct Class III gaming on its

13  Indian lands only if authorized pursuant to a Tribal-State compact. On June 24, 1993, the

14  State of Arizona and the Nation entered into a compact authorizing gaming on the "Indian

15  Lands of the Tribe" at up to four locations. 1993 Compact § 3(j)(1).

16  18.  The 1993 Compact provides that "[g]aming Activity on lands acquired after

17  the enactment of the Act of [sic] October 17, 1988 [IGRA] shall be authorized only in

18  accordance with 25 U.S.C. § 2719." 1993 Compact 3(j)(1).  The Nation represented to a

19  federal court and to state negotiators and state legislative staff that this language would be

20  sufficient to prevent any off-reservation casinos in the Phoenix area without the

21  governor's consent, because no tribe could assert that new lands were the settlement of a

22  land claim.

23  19.  On August 18, 1993, Interior published in the Federal Register its approval

24  of the compact, as required by IGRA.

25  20.  In 1999, four years before the scheduled expiration of the existing Arizona

26  Class III Tribal State Gaming compacts with various Arizona tribes, negotiations for new

27  gaming compacts began.

28  21.  Seventeen Arizona Indian tribes, including the Nation, negotiated with then-

FENNEMORE CRAIG, P.C.

PHOENIX

Governor Jane Hull and the ADG regarding material issues that would be a part of each of their respective compacts with the State.

22.     While those parties involved in the negotiations anticipated that each Indian tribe would sign its own compact with the State of Arizona, they collectively negotiated the material terms and conditions as if they were negotiating one standard form of compact.   The compacts would not become effective until each tribe with gaming facilities in Maricopa, Pima, or Pinal Counties approved its respective compact and obtained Interior's approval as well.

23.     After years of negotiations, the State of Arizona and the seventeen tribes reached agreement on the number of gaming devices (*i.e.*, slot machines) and the number and location of gaming facilities (*i.e.*, tribal casinos) that the new compacts would authorize. The seventeen tribes negotiated among themselves to determine how many gaming facilities and machines each would be allocated from the total.

24.     The new compacts would increase the total number of permitted gaming devices for each tribe but reduce the total number of authorized gaming facilities in the State from 38 to 29.

25.     During negotiations, the State asked the Nation to accept a reduction in the number of casinos authorized for it under the compact from four to three, because all other urban tribes had accepted a reduction in the number of facilities.   The Nation argued that it should be allowed a fourth casino because it was both a rural and urban tribe, and it needed four facilities to have a casino in a rural areas while also having the ability to have three Tucson casinos to use its machine allocations fully.   The Nation represented that if it was allowed to retain the authorization for four facilities, it would locate its facilities in either the Tucson metropolitan area or in rural areas of its reservation, at the location of its existing facility in Why and perhaps an additional facility in Gila Bend or Florence if its plans for a third Tucson-area facility (in addition to its two existing Tucson-area casinos) were not realized.   The State relied on these specific, affirmative representations by the Nation in eventually agreeing to allow the Nation alone to retain the right to operate four

casinos while all other urban tribes had agreed to each give up one casino authorization under the compact.

26.     As in the 1993 compacts, gaming would not be allowed on any lands acquired after October 17, 1988 except "in accordance with 25 U.S.C. 2719," which in turn prohibits gaming on lands taken into trust after 1988, subject to certain limited exceptions. Compact 3(j)(1); *see also* A.R.S. § 5-601.02(I)(6)(j)(1).   Further, Compact § 3(p) prohibits the Nation from engaging in "any Class III gaming not specifically authorized in this Section 3."

27.     These limits on the number and location of gaming facilities were a key part of the consideration bargained for by the State and the other tribes.

28.     Moreover, these compact provisions are highly interdependent. If the State and any tribe agree to increase the number of gaming devices, increase the number or size of gaming facilities, increase the wager limits, allow additional types of games, or reduce the payments a tribe must make to the State, then corresponding changes to terms of the compacts for all other tribes must be changed. Compact § 3(g).

29.     This carefully constructed balance was embodied in Proposition 202, which Arizona voters approved in November 2002 after considerable public debate.

30.     Then-Governor Jane Hull announced this historic agreement in a press release dated February 20, 2002, which included a bullet point emphasizing that under the agreement, there would be "[n]o additional casinos allowed in the Phoenix metropolitan area and one additional casino in the Tucson area." The Tucson-area casino language referred to a fourth but unused casino site available to the Nation under the Compact. All parties intended this site to be limited to the Tucson area or a rural portion of the Nation's reservation or a rural portion of the Nation's reservation, consistent with the Nation's express representations.

31.     The Nation misrepresented and failed to disclose its plans for and claimed authority to seek and obtain a gaming facility in the Phoenix metropolitan area.

32.     The Nation knew that it was a basic assumption of the State and the other

sixteen tribes that, under the new compacts, no new class III casinos would be permitted in the Phoenix metropolitan area.

33.     Further, the Nation's failure to disclose its plans or to assert the right to obtain additional reservation lands in the Phoenix metropolitan area that would be eligible for gaming under 25 U.S.C. § 2719 was, under the circumstances, equivalent to an assertion that it had no such plans or right, because the Nation: (1) joined in, endorsed, or authorized statements that the compacts would not allow it to open such a facility; and (2) never contradicted or corrected any of those statements.

34.     Proposition 202 addressed legal issues that had been raised in litigation with the horse-and-dog-racetrack industry, resolving "any technical deficiencies in current state law and authoriz[ing] the governor to execute new tribal-state compacts, in accordance with specified parameters, so that Indian casinos can continue to operate." Prop. 202, § 2 (declaration of purpose). It also provided voters with an alternative to other ballot measures that affected Indian gaming, including Proposition 201, which would have authorized racetrack-based gaming (or "racinos"), and Proposition 200, which was supported by a single tribe and was not the product of joint Tribal-State negotiations.

35.     In 2002, the 17 tribes (including the Nation) and civic leaders formed a coalition called "Arizonans for Fair Gaming and Indian Self Reliance" ("the Coalition") to urge Arizona voters to approve Proposition 202 and reject Propositions 200 and 201. The Nation provided $1.8 million in funding to the Coalition.

36.     The Coalition provided voters with a document called "Answers to Common Questions" that made plain that no additional gaming facilities would be in Phoenix. A notation on the face of this document stated that it was paid for with "[m]ajor funding provided by . . . Tohono O'odham Nation and other Indian tribes in Arizona." The text of this document also was included on the Coalition's website. The Nation intended for voters to rely on the Answers to Common Questions.

37.     The Nation played a very significant leadership role in the development of the Answers to Common Questions document, and Nation representatives Matt Smith and

Alexander Ritchie helped draft the document.  It was approved by tribal leaders, including the Nation's leaders.   The Nation distributed the Answers to Common Questions document during the campaign in support of Proposition 202.  Nation officials specifically agreed with the statement in the Answers to Common Questions document that "there will be no additional facilities authorized in Phoenix, and only one additional facility permitted in Tucson."

38.     The language "one additional facility permitted in Tucson" refers explicitly to the fact that the Nation, which is based in and has aboriginal lands in the Tucson area, had only three gaming facilities in operation but would be allowed a fourth facility in the Tucson area.  The Nation also understood it had the option of operating this fourth casino in a rural part of its reservation.

39.     This statement that "there will be no additional facilities authorized in Phoenix, and only one additional facility permitted in Tucson" was repeated widely by various proponents of Proposition 202, including State officials testifying before the Arizona Legislature.  The reference to no additional facilities in Phoenix or in the Phoenix metropolitan area was also reported widely in the media. The Nation never suggested that this statement was inaccurate in any respect.

40.     While the Nation was looking for a west Phoenix casino location, Nation lobbyists Alexander Ritchie and Joe Abate stated to State legislators that under the compacts there would be no additional casinos in the Phoenix metropolitan area and only one in the Tucson area. In addition, Nation Chairman Manuel (along with other tribal leaders) approved statements by David LaSarte-Meeks, the Executive Director of AIGA, to the State Legislature saying this same thing.

41.     Ned Norris, who was later elected Chairman of the Nation and extensively promoted its efforts to put a casino in Glendale, served as a public relations spokesman for the Nation during the Prop 202 campaign.  In that role, he publicly supported Proposition 202 and urged Arizona voters at a Town Hall Meeting in Tucson to cast their vote for approval. On September 25, 2002, he argued that voters should choose Proposition 202

1   because it would not "open gaming into cities." He argued that opening gaming into cities

2   would be unacceptable, because "the citizens of Arizona have, repeatedly over the years,

3   expressed their desire to keep gaming on the reservation."

4        42.    Then-Governor Jane Hull campaigned in favor of Proposition 202 and

5   against Propositions 200 and 201. In the Publicity Pamphlet published by the Arizona

6   Secretary of State to inform voters about the ballot measures they will be asked to

7   consider at the general election, the Governor urged Arizona voters to rely on the balance

8   that had been struck by the State and the tribes. Governor Hull stated:

9   
10   
11   
12   
13
> I strongly urge you to vote 'YES' on Proposition 202, the '17 Tribe' Initiative. Proposition 202 keeps casinos limited to Indian reservations and limits the number of casinos on reservations . . . . Proposition 202 ensures that no new casinos will be built in the Phoenix metropolitan area and only one in the Tucson area for at least 23 years. Proposition 202 keeps gaming on Indian Reservations and does not allow it to move into our neighborhoods . . . . Plain and simple, this is the best gaming proposal for all Arizona citizens.

14        43.    In its support for Proposition 202, the Nation both expressly and impliedly

15   represented to the State, to other tribes, and to the voters of Arizona that the compacts

16   would not authorize any tribe, including the Nation, to open a casino in the Phoenix

17   metropolitan area.

18        44.    David LaSarte-Meeks previously testified that "everybody also understood

19   that the concept of no increase in the number of facilities in the Phoenix area market was

20   also very critical to getting the initiative past the electorate.  It was a major talking point,

21   because it was a major concern for the public.  So the very concept of no increase in the

22   Phoenix market was a critical piece getting it passed, especially considering we barely

23   passed." *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 762 (D. Ariz. 2013).

24        45.    Chairman Manuel and his assistant Alexander Ritchie met with the editorial

25   boards of Tucson-area newspapers and told them that under the compact there would be

26   no increase in the number of facilities in the Phoenix market, and there would be up to one

27   more facility potentially in the Tucson market.

28        46.    "Albert Manuel, Jr., a member of the Nation who served for a time as

chairman of Vi-ikam Doag Industries ("VDI"), an economic development corporation chartered by the Nation allegedly for the purpose of the Phoenix-area casino project, also testified that Proposition 202 included the understanding that no additional casinos would be built in the Phoenix area." *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 762-63 (D. Ariz. 2013).

47.    At the 2002 general election, Arizona voters approved Proposition 202 and defeated the two other ballot measures that affected Indian gaming.

48.    The State and other tribes relied on the Nation's express and implied representations that the compacts would not allow another casino in the Phoenix area in supporting and advocating for the passage of Proposition 202 and in entering into the compacts.

49.    None of the compacts became effective until all tribes with gaming facilities in Maricopa, Pima, or Pinal Counties had their new compacts approved by Interior. Compact § 2(vv)(4).

50.    The State would not have entered into the compact with the Nation but for the representations by the Nation that the compact did not allow new gaming facilities in the Phoenix metropolitan area.

51.    The Nation had a secret plan to build a casino in the Phoenix metropolitan area notwithstanding its participation in the negotiations that led to Proposition 202, its vocal support for Proposition 202, and its entering into the 2002 Compact after voters approved Proposition 202.

52.    "Mary Ann Antone, a former member of the Nation's Legislative Council, testified that the Nation was looking for land to purchase in the Phoenix area as early as 1988 or 1989, and that while that land was not specifically for casino purposes, casinos were an option." *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 763 (D. Ariz. 2013).

53.    In approximately 1992, the Nation requested an opinion from Interior on whether lands acquired under the Gila Bend Act would qualify as part of a "settlement of

a land claim" under IGRA and therefore be eligible for gaming. The Nation was given a preliminary assessment that Interior would consider Gila Bend Act lands part of a settlement of a land claim on May 6, 1993. The Nation withheld this material information from the State and all other Arizona tribes from 1993 to 2009, including during the 2002 compact negotiations, and failed to disclose that the Nation claimed the right to conduct gaming on Gila Bend Act lands under § 2719.

54.     The Nation was actively looking for land in West Phoenix to purchase as potential reservation lands and gaming locations during the negotiations over the 2002 compacts, well before the compacts were executed.

55.     On January 25, 2000, the Nation requested a waiver from the Secretary of the Interior of requirements in Section 6(d) of the Gila Bend Act—that one area of land be contiguous to San Lucy Village near Gila Bend, Arizona—and that the Nation be permitted to take more than three areas of contiguous tracts of land in trust. In sum, the Nation requested that it be allowed to place up to five separate areas of land in trust.  On May 31, 2000, the Secretary of the Interior granted the waiver of the requirement that at least one parcel of land must be contiguous to San Lucy Village and Interior also granted a waiver of the requirement that no more than three separate areas of land may be acquired under the Gila Bend Act. The Nation did not disclose these facts to the State or to the 17-tribe coalition during the negotiation of the compacts.

56.     "Handwritten notes from a meeting that allegedly occurred in May 2001, attended by . . . members of the Nation's Legislative Council, . . . contemplate the building of a casino west of Phoenix while noting that the participants were 'unsure what will happen' with the gaming compact. . . . The notes say: 'Buy Land West Phx, put in trust and build a casino,' and 'Put it in a shell company—need to keep it quiet expecially [sic] when negociations [sic] of compact [with] State.' . . . When asked about the notes in his deposition, Mr. Manuel stated that he had no reason to dispute the notes and that the notes refreshed his memory to some extent, particularly with regard to what appears to be a proposed location for a casino represented by a hand–drawn map on the fourth page, but

Manuel did not know who took the meeting notes." *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 763 (D. Ariz. 2013).

57.     A "transcript of a June 26, 2001, meeting of the San Lucy District Council in which Richard Ramirez refers to plans to build a casino 'on the west end of Phoenix' and the need to keep the plans confidential 'to minimize the impact of public hearings' due to 'resentment from the public about ... Indian tribes building casinos.' . . . Transcripts from meetings of VDI also reflect a VDI employee stating that the new casino would be 'way out there, but ... still [in] the Phoenix area.' . . . Another employee states that 'if that's going to be the position of the State, they don't want any more casinos around the Phoenix area, then they're going to fight it, whoever the new governor is.' . . . The first employee responds: 'Which is why we really want to wait until the initiative passes before it gets out.'" *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 763 (D. Ariz. 2013).

58.     During negotiations and the Proposition 202 campaign, Nation Chairman Manuel and members of the Nation's legislative council—its entire Commerce Committee—were actively involved in compact negotiations while simultaneously participating in the search for land in the Phoenix metropolitan area for a casino.

59.     On August 1, 2002, the VDI board held a joint meeting with the Nation's Commerce Committee.  Five members of the Nation's Commerce Committee attended: Albert Manuel, Jr., Frances Miguel, Dennis Ramon, Kenneth Williams, and Barbara Salvicio.  The minutes indicate that the purpose of the meeting is "the land purchase for the West Buckeye Property . . . for a casino to be built on that property."  Commerce Committee member Frances Miguel stated that she felt the project was long overdue. Commerce Committee member Kenneth Williams encouraged the VDI board to move forward with the property.  The minutes state that "[t]he Commerce Committee is in full support of the land purchase for gaming purposes."

60.     On August 21, 2002, just two months before Proposition 202 passed, Chairman Edward Manuel and the Commerce Committee attended a formal presentation

regarding the secret land search where a West Phoenix Land Presentation document was distributed to the attendees.

61.     Within months of the passage of Proposition 202, in August 2003 the Nation purchased the Glendale Property, which consists of approximately 135 acres at 91st and Northern Avenues, in Glendale, Arizona.

62.     The Nation purchased the Glendale Property through its wholly owned Delaware corporation called "Rainier Resources, Inc."  Rainier Resources, Inc. acquired title in fee simple. The Nation structured the transaction in this manner to conceal its ownership of the property.

63.     The Nation kept its ownership of the Glendale Property secret for more than five years. During that time, a public high school was opened across the street from the site. Restaurants, hotels, and retail establishments were developed adjacent to and in close proximity to the Glendale Property, all without the knowledge that the Nation planned to build a casino in the neighborhood.

64.     On January 20, 2009, Rainier Resources, Inc. conveyed the fee title to the Nation.

65.     On January 27, 2009, the Nation's Legislative Council passed Resolution No. 09-049, which states in part:

> BE IT . . . RESOLVED that the Tohono O'odham Legislative Council hereby requests that the Office of Indian Gaming of the Department of the Interior issue an opinion that the Settlement Property was acquired under the settlement of a land claim, and thus is excepted from IGRA's general prohibition on gaming on lands acquired after the date of enactment of IGRA.

66.     On January 28, 2009, the Nation filed an application asking Interior to take the Glendale Property in trust for the benefit of the Nation pursuant to the Gila Bend Act.

67.     The letter to Interior conveying the Nation's fee-to-trust application stated: "The Nation intends to use portions of the property for gaming purposes pursuant to IGRA." The application asserted that gaming would be authorized under an IGRA exception for land taken into trust as part of "a settlement of a land claim." 25 U.S.C.

§ 2719(b)(1)(B)(i).

68.     At present, the Nation intends to use portions of the Glendale Property, including Parcel 2, for gaming activities beginning in December 2015.

69.     Notwithstanding its prior representations and non-disclosures, the Nation now claims the right to operate a new casino in the Phoenix metropolitan area. Its present position regarding gaming on land acquired under the Gila Bend Act could open the door to as many four new casinos in the Phoenix metropolitan area, because the Nation could choose to close its less profitable operations in Southern Arizona in favor of locations in the Phoenix metropolitan area.

70.     The Nation has stated that it will commence gaming activities in the Phoenix metropolitan area in December 2015, notwithstanding its prior representations that the Compact would not allow such activities.

71.     On February 2, 2015, Director Bergin wrote to the Nation to express his concern that, in view of the fraudulent manner in which the Nation developed the casino project, the casino could not be authorized and therefore would not be able to obtain state approvals for the vendors, employees, and casino facilities.  The Nation responded that it had no intention of halting construction.

72.     On April 10, 2015, Director Bergin again wrote to the Nation, notifying it that pursuant to A.R.S. §§ 5-602(A) and (C), he could not approve the casino because doing so would be inconsistent with his mandate to ensure that the gaming in question is "permitted" and consistent with "extensive, thorough and fair regulation."   Director Bergin noted that based on his review of the relevant evidence, he believed there was "credible and largely unrefuted evidence that [the Nation] engaged in deceptive behavior and made significant misrepresentations during the compact negotiation process and the run-up to Proposition 202."   As such, Director Bergin concluded he would exceed his statutory authority if the Arizona Department of Gaming were to proceed with certifying and approving the casino as a Class III gaming facility.

73.     The Compact allows Director Bergin to utilize provisions of Title 5,

Chapter 6 of the Arizona Revised Statutes to regulate gaming, and therefore authorizes Director Bergin to withhold certifications on the basis of the Nation's fraud.  Additionally or alternatively, Director Bergin may refuse to certify or authorize the Nation's proposed class III gaming facility on the Glendale Property or any other Nation-owned or operated class III gaming facility in the Phoenix metropolitan area because the Compact was invalidly entered into based on the Nation's fraud.

**FIRST CAUSE OF ACTION**

**DECLARATORY RELIEF – NO DUTY TO CERTIFY**

74.     Director Bergin realleges and incorporates the preceding paragraphs.

75.     An actual controversy exists between Director Bergin and the Nation regarding Director Bergin's obligations under the Compact and whether the Compact was validly entered into.  Director Bergin requests a judicial declaration that ADG is not obligated to certify or authorize the Nation's proposed class III gaming facility on the Glendale Property or any other Nation-owned or operated class III gaming facility in the Phoenix metropolitan area.

**SECOND CAUSE OF ACTION**

**PROMISSORY ESTOPPEL**

76.     Director Bergin realleges and incorporates the preceding paragraphs.

77.     In negotiating and entering into the 2002 Tribal-State compacts and in advocating for voter approval of Proposition 202, the State relied on the Nation's commitment that its compliance with the compacts would ensure that no new gaming facilities would be opened in the Phoenix metropolitan area, and its promises that it would locate any additional facilities in the Tucson metropolitan area or in rural areas of its reservation.

78.     The Nation expected its promises to induce support for the Compact by the State, the public and the Arizona voters; knew it was reasonable their promises would induce such acceptance; intended its promises to induce such acceptance; and said promises did in fact induce such acceptance.

79.     The State has detrimentally relied on the Nation's promises in making significant regulatory and policy decisions.

80.     The State detrimentally relied on the Nation's promises in deciding to advocate acceptance of Proposition 202.

81.     The Arizona voters detrimentally relied upon the Nation's promises and upon the State's advocacy of the compact in approving Proposition 202.

82.     The Nation should be estopped and enjoined from upsetting those substantial reliance interests by opening a Class III gaming facility in the Phoenix metropolitan area.

83.     The Nation should be estopped and enjoined from opening a Class III gaming facility in the Phoenix metropolitan area based upon an invalidly entered into compact induced by its promises.

84.     Because of the Nation's fraudulent promises, the Compact was not validly entered into.

85.     Because the Compact was not validly entered into, it would be beyond ADG's authority under Federal and State law to certify or authorize the Nation's Class III gaming facility in the Phoenix metropolitan area.

86.     This Court held in the prior lawsuit initiated by the State that a promissory estoppel claim was barred by tribal sovereign immunity.  *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 769-770 (D. Ariz. 2013).  By initiating this action to force the ADG to certify or authorize its Phoenix metropolitan area Class III facility, as allegedly required by the Compact, the Nation has waived its sovereign immunity.

## THIRD CAUSE OF ACTION

### FRAUD IN THE INDUCEMENT

87.     Director Bergin realleges and incorporates the preceding paragraphs.

88.     On information and belief, the Nation had a secret plan at the time it was negotiating the Compact to build a gaming facility in the Phoenix metropolitan area and to assert the right to do so under IGRA and the Gila Bend Act, notwithstanding its contrary,

false, representations to the State, the public and the Arizona voters.

89.     The Nation made these material misrepresentations knowing they are likely to induce the State and the public to approve the Compact and intended that they do so.

90.     The Nation's representations induced the State accept the negotiated compact language, advocate acceptance of Proposition 202 and to enter into the Compact. The State would not have signed the Compact had it known of the Nation's plans to build a new Class III casino in the Phoenix metropolitan area and to assert the right to do so under IGRA and the Gila Bend Act.

91.     The State is entitled to have the fraudulently induced and invalidly entered into Compact reformed to prevent the Nation from opening any new Class III casinos in the Phoenix metropolitan area.

92.     Alternatively, based on the Nation's representations and the State's reliance on those representations, the State is entitled to a declaration prohibiting the Nation from conducting class III gaming activities on the Glendale Property and in the Phoenix metropolitan area.

93.     Because of the Nation's fraudulent material misrepresentation, the Compact was not validly entered into.

94.     Because the Compact was not validly entered into, it would be beyond ADG's authority under Federal and State law to certify or authorize the Nation's Class III gaming facility in the Phoenix metropolitan area.

95.     This Court held in the prior lawsuit initiated by the State that a fraud in the inducement claim was barred by tribal sovereign immunity. *Arizona v. Tohono O'odham Nation*, No. CV11–0296–PHX–DGC, 2011 WL 2357833, *12-13 (D. Ariz. June 15, 2011).   By initiating this action to force the ADG to certify or authorize its Phoenix metropolitan area Class III facility, as allegedly required by the Compact, the Nation has waived its sovereign immunity.

**FOURTH CAUSE OF ACTION**

**INTENTIONAL MISREPRESENTATION AND OMISSION OF MATERIAL FACTS**

96.　Director Bergin realleges and incorporates the preceding paragraphs.

97.　The Nation materially and fraudulently misrepresented that it had no plans, claimed no authority under IGRA or other federal laws, and claimed no power under the express terms of the Compact to open a Class III gaming facility in the Phoenix metropolitan area.

98.　The Nation materially and fraudulently misrepresented that it could not and was not seeking to acquire additional reservation lands for gaming purposes in the Phoenix metropolitan area.

99.　The Nation failed to disclose that it was working to and had definite plans to acquire additional reservation lands in the Phoenix metropolitan area and to assert the right under IGRA and the Gila Bend Act to open gaming facilities on those lands.

100.　The Nation failed to disclose the material fact that it had obtained a waiver from Interior of the requirement that at least one parcel of land taken into trust under the Gila Bend Act must be contiguous to San Lucy Village and the requirement that no more than three separate areas of land may be acquired under the Gila Bend Act.

101.　The Nation made these material misrepresentations and omissions knowing they were likely to induce the State and the public to approve the Compact and intended that they do so.

102.　The State's assent to the Compact was induced by the Nation's misrepresentations and intentional failures to disclose material facts.

103.　The State's reliance on the Nation's representations was justified in the circumstances.

104.　The State is entitled to a declaration that because its assent to the Compact was induced by the Nation's material misrepresentations and omissions, and the Compact was invalidly entered into, the Compact is voidable and unenforceable, in whole or in

1   part, and is subject to rescission.

2          105.   Additionally, because the State's assent to the Compact was induced by the

3   Nation's material misrepresentations and omissions, and the Compact was invalidly

4   entered into, the State is entitled to a declaration prohibiting the Nation from conducting

5   class III gaming activities on the Glendale Property and in the Phoenix metropolitan area.

6          106.   Because of the Nation's fraudulent material misrepresentations and

7   omissions, the Compact was not validly entered into.

8          107.   Because the Compact was not validly entered into, it would be beyond

9   ADG's authority under Federal and State law to certify or authorize the Nation's Class III

10  gaming facility in the Phoenix metropolitan area.

11         108.   This Court held in the prior lawsuit initiated by the State that a material

12  misrepresentation claim was barred by tribal sovereign immunity.  *Arizona v. Tohono*

13  *O'odham Nation*, No. CV11–0296–PHX–DGC, 2011 WL 2357833, *12-13 (D. Ariz. June

14  15, 2011).  By initiating this action to force the ADG to certify or authorize its Phoenix

15  metropolitan area Class III facility, as allegedly required by the Compact, the Nation has

16  waived its sovereign immunity.

17                                      **RELIEF REQUESTED**

18         WHEREFORE, in accordance with the Compact, the Indian Gaming Regulatory

19  Act, 25 U.S.C. § 2710(d)(1) and § 2710 (d)(7)(A)(ii), and the Declaratory Judgment Act,

20  22 U.S.C. § 2201, *et seq.*, the Counterclaimant seeks:

21         a.     A declaration that ADG is not obligated to certify or authorize the Nation's

22  proposed class III gaming facility on the Glendale Property or any other Nation-owned or

23  operated class III gaming facility in the Phoenix metropolitan area;

24         b.     A judgment that the Nation is estopped from opening any class III gaming

25  facilities in the Phoenix metropolitan area;

26         c.     A declaration and/or judgment and injunction prohibiting the Nation from

27  conducting class III gaming activities on the Glendale Property and in the Phoenix

28  metropolitan area;

1        d.     Reformation of the Compact to prohibit the Nation from opening any new

2    class III gaming facilities in the Phoenix metropolitan area;

3        e.     A declaration that the Compact is voidable and unenforceable, in whole or

4    in part, and subject to rescission;

5        f.     An award to the Counterclaimant of his reasonable attorneys' fees;

6        g.     All other costs and fees as allowed by law; and

7        h.     Such other and additional relief as the Court deems just and equitable.

8    DATED this 29th day of October, 2015.

9                          FENNEMORE CRAIG, P.C.

11                         By s/ *Douglas C. Northup*

12                         Patrick Irvine
                      Douglas C. Northup

13                         Carrie Pixler Ryerson

14                         -and-

15                         Matthew D. McGill
                      Matthew A. Hoffman

16                         Timothy W. Loose
                      GIBSON, DUNN & CRUTCHER LLP

17

18                         *Attorneys for Defendant/Counterclaimant
Director Daniel Bergin, Arizona
Department of Gaming*

19

20

21

22

23

24

25

26

27

28

FENNEMORE CRAIG, P.C.

PHOENIX

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on October 29, 2015, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a

3

Notice of Electronic Filing to the following ECF registrants:

4    Seth P. Waxman                              Jonathan Landis Jantzen
     Danielle Spinelli                           Laura Lynn Berglan
5    Kelly P. Dunbar                             Tohono O'odham Nation
     Sonya L. Lebsack                            Office of the Attorney General
6    Wilmer Cutler Pickering Hale & Dorr LLP     P. O. Box 830
     1875 Pennsylvania Ave. NW                   Sells, AZ  85634
7    Washington, DC  2006                        Email: jonathan.jantzen@tonation-nsn.gov
     Email:  seth.waxman@wilmerhale.com          Email: laura.berglan@tonation-nsn.gov
8    Email:  danielle.spinelli@wilmerhale.com    *Attorneys for Plaintiff*
     Email:  kelly.dunbar@wilmerhale.com         *The Tohono O'odham Nation*
9    Email:  sonya.lebsack@wilmerhale.com
     *Attorneys for Plaintiff*
10   *The Tohono O'odham Nation*

11   Heidi McNeil Staudenmaier                   Thomas K. Chenal
     Brett W. Johnson                            Karen J. Hartman-Tellez
12   Sara J. Agne                                Office of the Arizona Attorney General
     Thomas Clees                                1275 W. Washington Street
13   Snell & Wilmer LLP                          Phoenix, AZ  85007
     One Arizona Center                          Email:  thomas.chenal@azag.gov
14   400 E. Van Buren, Suite 1900               Email:  karen.hartman@azag.gov
     Phoenix, AZ  85004-2202                     *Attorneys for Defendant*
15   Email:  hstaudenmaier@swlaw.com             *Attorney General Mark Brnovich*
     Email:  bwjohnson@swlaw.com
16   Email:  sagne@swlaw.com
     Email:  tclees@swlaw.com
17   *Attorneys for Defendant*
     *Governor Douglas A. Ducey*

18

19

20                                    s/ *Phyllis Warren*
                                      An employee of Fennemore Craig, P.C.
21

22
     10993517
23

24

25

26

27

28

FENNEMORE CRAIG, P.C.

PHOENIX