**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tohono O'odham Nation, | No. CV-15-01135-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Douglas A. Ducey, et al., | |
| Defendants. | |

In May 2013, this Court ruled that the Gaming Compact between the State of Arizona and the Tohono O'odham Nation did not prohibit the Nation from building a new casino in the Phoenix metropolitan area. *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748 (D. Ariz. 2013) ("*Tohono O'odham II*"). Subsequently, the Nation began constructing a casino known as the West Valley Resort in Glendale, Arizona, a suburb of Phoenix. In April 2015, while construction was ongoing, Daniel Bergin, Director of the Arizona Department of Gaming ("ADG"), wrote a letter to the Nation reiterating the Department's longstanding position that the Nation engaged in fraud during the formation of the Compact, and asserting authority to withhold certification from the Resort's vendors and employees based on this conduct. In response, the Nation brought this lawsuit, claiming that federal law preempts any state-law authority ADG might have to withhold these certifications.

The Director has asserted counterclaims against the Nation for promissory estoppel, fraudulent inducement, and material misrepresentation. Doc. 96. The Director

seeks a variety of relief, including (1) a declaration that "ADG is not obligated to certify or authorize the Nation's proposed class III gaming facility on the Glendale property or any other Nation-owned or operated class III gaming facility in the Phoenix metropolitan area"; (2) a judgment that "the Nation is estopped from opening any class III gaming facilities in the Phoenix metropolitan area"; (3) a declaration or injunction that the Nation is prohibited from conducting class III gaming activities on the Glendale property; (4) a declaration that the Compact is voidable and unenforceable and subject to rescission; and (5) reformation of the compact.  *Id.* at 35-36.[1]  The Nation moves to dismiss these counterclaims.  Doc. 108.  The motion has been fully briefed and the Court heard oral argument on March 9, 2016.  For the reasons set forth below, the Court will grant the motion in part and deny it in part.

## I.    Background.

### A.    The Indian Gaming Regulatory Act.

In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Supreme Court held that states that permitted some form of gambling could not prohibit such gambling on Indian lands.  In response, Congress passed the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, to give states "some role in the regulation of Indian gaming."  *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003).   IGRA divides gaming into three classes: Class I, which includes social games with prizes of minimum value and traditional forms of Indian gaming; Class II, which includes bingo and certain card games; and Class III, which includes all other games, including "casino-style" games.   25 U.S.C. § 2703(7)(A), (7)(B), (8).  Class III gaming is permitted on Indian land only if it is authorized by a tribal ordinance, conducted in a state that permits such gaming, and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State."  § 2710(d)(1).

/ / /

---

[1] Citations are to page numbers attached to the top of each page by the Court's CM/ECF system, not to the original page number at the bottom of each page.

## B.    Arizona Department of Gaming.

Arizona created the ADG to carry out the state regulation authorized by IGRA. Among other things, ADG is charged with executing the state's duties under tribal-state compacts, certifying persons and entities involved in gaming under tribal-state compacts, and "cooperat[ing] with appropriate law enforcement and prosecutorial agencies in the investigation and prosecution of . . . violations." A.R.S. § 5-602. ADG is authorized to promulgate regulations and impose civil penalties, and may request that the Attorney General file a civil action to recover such penalties. § 602.01. ADG is required to discharge these duties so as to "promote the public welfare and public safety" and "prevent corrupt influences from infiltrating Indian gaming." § 602(A).

## C.    The Compact.

On January 24, 2003, the U.S. Secretary of the Interior approved a tribal-state compact between the Nation and Arizona (the "Compact"). *See Tohono O'odham II*, 944 F. Supp. 2d at 754. The Compact permits the Nation to operate four Class III gaming facilities on Nation land in Arizona. Doc. 1-2 at 24-25. The Compact requires prospective gaming employees, contractors, and vendors to obtain certification from ADG. Specifically, the Compact provides that ADG "shall conduct the necessary background investigation to ensure the Applicant is qualified for State Certification." Doc. 1-3 at 4. Once ADG has completed its background check, it must either issue the certification or deny the application and provide the grounds for the denial. *Id.* ADG may refuse to certify an applicant who has been convicted of a felony, has previously violated a gaming law, or has provided false statements in his application. *Id.* at 5.

After the Compact was executed, the Nation purchased unincorporated land in Glendale. Several years later, the Nation announced plans to use the land for a Class III gaming facility to be known as the West Valley Resort. The State of Arizona filed suit in this Court, arguing that the Nation's plans were not authorized by IGRA and violated the Compact's ban on additional casinos in the Phoenix area. *See Tohono O'odham II*, 944 F. Supp. 2d 748. The State also asserted that the Nation committed fraud by

misrepresenting that the Compact would preclude the Nation from building an additional casino in the Phoenix area.  The Court held that the Nation's construction of a casino on the Glendale land was not prohibited by IGRA or the Compact.  The Court also found that the State's fraud and promissory estoppel claims were barred by the Nation's sovereign immunity.  The Ninth Circuit recently affirmed.  *Gila River Indian Cmty. v. Tohono O'odham Nation*, No. 13-16517, --- F.3d --- (9th Cir., Mar. 29, 2016).

**D.    This Action.**

The Nation began construction of the West Valley Resort in December 2014.  On February 2, 2015, Director Bergin expressed concern to the Nation that the casino was "not authorized, and, as a consequence . . . ADG would not have the authority to participate in any certification or approval processes relating to the opening or operation of the casino."  Doc. 1, ¶ 75.  On April 10, 2015, Bergin informed the Nation that "ADG lacks statutory authority to approve [the Nation's] Glendale casino notwithstanding [the Court's earlier decision]."  Doc. 1-5 at 2.  Bergin expressed his belief that the Nation committed fraud during the formation of the Compact and that the fraud "nullif[ied] any right that [the Nation] would otherwise have under the compact to build the Glendale casino."  *Id.*  He referenced A.R.S. § 5-602(C), which "requires ADG to execute the State's duties under tribal-state compacts 'in a manner that is consistent with this state's desire to have *extensive, thorough and fair regulation* of Indian gaming *permitted* under the tribal-state compacts.'"  *Id.* at 3 (quoting § 5-602(C) (emphasis in Bergin letter)). Bergin stated that "the record created in [the prior litigation] includes credible and largely unrefuted evidence that [the Nation] engaged in deceptive behavior and made significant misrepresentations during the compact negotiations."  *Id.* at 3-4.  He concluded that gaming at the casino would not qualify as "Indian gaming permitted under the Tribal-State compact."  *Id.*

In May 2015, ADG issued a new notice for its certification applications:

Please be advised this application for certification is valid only for authorized Arizona gaming facilities.  Providing goods or services to any

- 4 -

location considered by the State to be unauthorized, or in pending litigation with the State concerning whether it is authorized, would be outside the approval granted through State Certification.  Vendors providing goods or services to unauthorized facilities may be subject to legal and/or regulatory risks.

Doc. 1, ¶ 86.  The notice also stated that "based upon the fraud and misrepresentation committed" by the Nation, "[ADG] has determined that the proposed West Valley casino is not authorized." *Id.*, ¶ 88.

On June 22, 2015, the Nation filed this action against Arizona Governor Douglas Ducey, Arizona Attorney General Mark Brnovich, and Director Bergin, alleging that IGRA preempted Defendants' policy of refusing to provide certifications for the West Valley Resort.  *Id.* at 32, ¶ 1.  The Nation asked the Court to enter a preliminary injunction prohibiting Defendants from carrying out this policy and Defendants filed a motion to dismiss.  On September 17, 2015, the Court denied the motion for preliminary injunction, granted the motion to dismiss the Governor and Attorney General, and denied the remainder of the motion to dismiss.  Doc. 82.  Thereafter, the Director asserted the counterclaims at issue in this order.

The Nation argues that the Director lacks capacity under Arizona law to assert counterclaims against the Nation, and that the counterclaims are barred by the Nation's sovereign immunity.  Doc. 108 at 17-25.  The Nation also argues that the Director has failed to state a claim on some counterclaims.

## II.  Capacity.

Capacity is "a party's personal right to litigate in federal court."  6A Wright, Miller, & Kane, Fed. Prac. & Proc. Juris. § 1542 at 469 (2010).  Ordinarily, a state official's capacity to sue and be sued is governed by state law.  Fed. R. Civ. P. 17(b)(3).  Arizona law provides that Arizona officials lack capacity to sue or be sued absent a specific statutory grant of this authority.  *Grande v. Casson*, 72 P.2d 676, 681 (Ariz. 1937); *see also Braillard v. Maricopa Cty.*, 232 P.3d 1263, 1269 (Ariz. Ct. App. 2010) ("a governmental entity may be sued only if the legislature has so provided") (citing

*Kimball v. Shofstall*, 494 P.2d 1357, 1359 (Ariz. 1972)); *Skinner v. Pinal Cty.*, No. CV-09-00195-PHX-MHM, 2009 WL 1407363 at *2 (D. Ariz. May 20, 2009) ("the test is whether specific statutory authority authorizes the political subdivision to sue and be sued").

The parties fail to identify any Arizona statute authorizing the Director to sue or be sued, and the Court has found none. The Director's powers and duties are set forth in A.R.S. §§ 5-602 and 5-602.01, and neither provision empowers the Director to sue or be sued. To the contrary, § 602(J) states that the Director will "cooperate with appropriate law enforcement authorities and prosecutorial agencies in the investigation and prosecution of . . . violations," and § 602.01(c) provides that "the *attorney general* shall file an action in superior court to recover civil penalties imposed pursuant to this section" (emphasis added). Given the absence of any statutory authorization, the Court concludes that the Director lacks the capacity under state law to either sue or be sued.

The Court is not persuaded, however, that the Director's capacity in this case should be determined by applying Arizona law. The Nation's suit against the Director is not based on his capacity under state law, but instead is based on the doctrine established in *Ex Parte Young*, 209 U.S. 123 (1908). That case holds, as a matter of federal common law, that any state officer who allegedly violates federal law may be sued for injunctive relief in federal court. *Id. Ex Parte Young* thus appears to create an exception to Rule 17(b)'s requirement that a state officer's amenability to suit be determined by state law. At least some courts have so held. *See Cimerman v. Cook*, 561 F. App'x 447, 450 (6th Cir. 2014) ("Because the doctrine of *Ex parte Young* preserves the suit for equitable relief from dismissal on immunity grounds, it was error to dismiss the suit in this case simply for lack of capacity to be sued under state law.").

We thus have a situation where the Nation has haled the Director into court on the basis of federal common law, in disregard of his lack of capacity to be sued under Arizona law, and yet asks the Court to hold that his capacity to counterclaim is limited by Arizona law. Doc. 108 at 9. The Court cannot accept such an inequitable result. If the

Director can be forced into court and required to defend this case, he can participate as a normal litigant in the case, including by asserting counterclaims. Capacity is concerned "with the personal qualifications of a party to litigate" and is "determined without regard to the particular claim or defense being asserted." Fed. Prac. & Proc. Juris. § 1559 at 604-05; *see also State ex rel. Montgomery v. Mathis*, 290 P.3d 1226, 1234 (Ariz. Ct. App. 2012) ("Capacity does not depend on the nature of a claim in a particular lawsuit"). Put differently, either the Director is qualified to litigate in this case or he isn't. Having sued the Director, the Nation cannot now claim that he is unqualified to litigate.

In an attempt to justify its position, the Nation quotes *Gomez v. Illinois State Board of Education* for the proposition that "capacity to sue and capacity to be sued are not necessarily coterminous." 811 F.2d 1030, 1043 n.5 (7th Cir. 1987). But *Gomez* stands only for the proposition that a state may choose to make a party amenable to suit and yet incapable of initiating suit. As *Gomez* explained, "many states have provisions which deprive foreign corporations of the capacity to sue unless they first qualify to do business within the state, yet do not prevent such corporations from defending any action which is brought against them." *Id. Gomez* does not suggest that a party haled into court lacks the power to assert counterclaims. To the contrary, in cases dealing with unregistered foreign corporations – the very example used in *Gomez* – courts reject such an incongruous result, allowing defendant foreign corporations to assert counterclaims notwithstanding their lack of capacity to sue under state law. *See Envtl. Coatings, Inc. v. Baltimore Paint & Chem. Co.*, 617 F.2d 110, 112 (5th Cir. 1980); *Clayton Carpet Mills, Inc. v. Martin Processing, Inc.*, 563 F. Supp. 288 (N.D. Ga. 1983)); *see also Smith v. Kincade*, 232 F.2d 306 (5th Cir. 1956); 19 C.J.S. Corporations § 1006 (Dec. 2015).[2]

The Court thus concludes that Arizona law does not limit the Director's ability to assert counterclaims in this case. Two additional considerations support this conclusion.

---

[2] The Court has found two cases where a defendant foreign corporation was found incapable of asserting counterclaims. *See* 19 C.J.S. Corporations § 1006 at n.7 (citing *E&E Indus., Inc. v. Crown Textiles, Inc.*, 342 S.E.2d 397 (N.C. App. 1986); *Kutka v. Temporaries, Inc.*, 568 F. Supp. 1527 (S.D. Tex. 1983)). These cases appear to be contrary to the weight of authority.

First, capacity is not a question of jurisdictional significance.  A litigant may waive an objection to another litigant's lack of capacity by failing to assert an objection in its answer.  *Summers v. Interstate Tractor & Equip. Co.*, 466 F.2d 42, 50 (9th Cir. 1972).  Similarly, a plaintiff who sues a defendant necessarily acknowledges the defendant's "personal right to litigate in federal court," Fed. Prac. & Proc. Juris. § 1542 at 469, and should not be heard to argue that he is incapable of counterclaiming.

Second, courts have instructed that the capacity of an *Ex Parte Young* defendant to assert a counterclaim should be "resolved consistently with the fundamental policy underlying Rule 13; that is, the expeditious resolution of all controversies growing out of the same transaction or occurrence or between the same parties in a single suit."  *Aldens, Inc. v. Packel*, 524 F.2d 38, 51 (3d Cir. 1975).  Here, the policy of Rule 13 militates in favor of recognizing the Director's capacity to assert counterclaims.

## III.   Sovereign Immunity.

Indian tribes are "domestic dependent nations" whose existence predates the U.S. Constitution.  *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (citations omitted).  As such, Indian tribes enjoy sovereign immunity.  They are not amenable to suit unless Congress has clearly abrogated this immunity or the tribe has clearly waived it.  *Id.* at 2030-3l.  Tribal sovereign immunity applies to suits brought by states as well as those brought by individuals, and to suits arising out of the tribe's commercial activities as well as those arising out of its governmental activities.  *Id.*  Moreover, tribal sovereign immunity applies to both claims and counterclaims.  "Supreme Court precedent couldn't be clearer on this point: a tribe's decision to go to court doesn't automatically open it up to counterclaims – even compulsory ones."  *Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1011 (10th Cir. 2015) (citing *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509-10 (1991)).

Congress has not abrogated the Nation's sovereign immunity with respect to the type of claims at issue here.  *See Gila River Indian Cmty.*, No. 13-16517 (slip op. at 24).

The Director nonetheless asserts that his counterclaims may proceed, either because they fall within the equitable recoupment exception to sovereign immunity or because the Nation has waived its immunity by bringing this action.  Doc. 111 at 4-10.

### A. Equitable Recoupment.

Equitable recoupment is a "narrow exception" to the doctrine of sovereign immunity.  *United States v. Park Place Assocs., LTD*, 563 F.3d 907, 932 n.16 (9th Cir. 2009).  It allows a defendant sued by a sovereign to recast an affirmative defense (typically, a set-off, contribution, or indemnity defense) as a counterclaim.  *See Bull v. United States*, 295 U.S. 247, 262 (1935); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 511 (1940).  A counterclaim sounds in recoupment if it seeks to "defeat or diminish recovery by the sovereign," but not if it seeks affirmative relief.  *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970); *see Ute Indian Tribe*, 790 F.3d at 1011 (recoupment is "not a vehicle for pursuing an affirmative judgment").

Although the Director acknowledges that counterclaims cannot proceed in recoupment if they seek affirmative relief (Doc. 111 at 5 (citing *Agnew*, 423 F.2d at 514)), he nonetheless seeks affirmative relief.  He requests (1) an injunction prohibiting the Nation from conducting Class III gaming activities anywhere in the Phoenix area; (2) a declaration that the Nation is estopped from opening any Class III gaming facilities in the Phoenix area; (3) reformation of the Compact to prohibit the Nation from opening any new Class III gaming facilities in the Phoenix area; and (4) a declaration that the Compact is voidable, unenforceable, and subject to rescission.  Doc. 96 at 35.  The Director does not explain how these claims – which would significantly affect the rights and obligations of the parties – are not a form of affirmative relief.  Because these claims "ask [the] Court to do much more than deny th[e] relief" the Nation seeks, they cannot proceed in recoupment.  *Ute Indian Tribe*, 790 F.3d at 1011.

The Director also seeks a declaration "that ADG is not obligated to certify or authorize the Nation's proposed class III gaming facility on the Glendale Property."  Doc. 96 at 35.  The Director argues that this counterclaim may proceed in recoupment

because it seeks the "mirror image" of the relief sought by the Nation.  Doc. 111 at 5 (citing *Oneida Tribe of Indians of Wis. v. Vill. of Hobart*, 500 F. Supp. 2d 1143, 1149 (W.D. Wis. 2007)).  The Nation does not dispute that this counterclaim seeks the inverse of the relief it requests.  Doc. 115 at 7.  Instead, it contends that the equitable recoupment exception does not apply to counterclaims seeking declaratory relief, even if they seek the opposite of the relief sought by the sovereign.  Doc. 115 at 7-8.

The weight of authority supports the Nation's position.  The Supreme Court has described the equitable recoupment exception as applying where the counterclaim seeks to "recoup . . . *an amount* equal to the principal claims," *U.S. Fid.*, 309 U.S. at 511 (emphasis added), and has never applied the exception to counterclaims seeking relief other than damages, *see id.*; *Bull*, 295 U.S. at 262.  Several federal courts have also concluded that the exception is limited to counterclaims seeking to reduce a sovereign's recovery of money damages.  *See Bolduc v. Beal Bank, SSB*, 167 F.3d 667, 674 n.4 (1st Cir. 1999) ("Classically, recoupment is permitted only to reduce or eliminate damages, not to gain some other form of relief[.]") (citation omitted); *Citizen Band Potawatomi Indian Tribe of Okla. v. Okla. Tax Comm'n*, 888 F.2d 1303, 1305 (10th Cir. 1989) ("Recoupment . . . is an equitable defense that applies only to suits for money damages."), *aff'd in part, rev'd in part on other grounds*, 498 U.S. 505 (1991); *Chemehuevi Indian Tribe v. Cal. State Bd. of Equalization*, 492 F. Supp. 55, 58 (N.D. Cal. 1979) ("Since the Tribe has dropped its claim for monetary damages . . . and now seeks only declaratory and injunctive relief and nominal damages, the recoupment exception to the doctrine of sovereign immunity does not apply.") (citations omitted), *aff'd in part*, *rev'd in part on other grounds*, 757 F.2d 1047 (9th Cir. 1985), *rev'd on other grounds*, 474 U.S. 9 (1985); *see also In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 214 n.35 (3d Cir. 2013) ("Equitable recoupment is '[a] principle that diminishes a party's right to recover a debt") (citing Black's Law Dictionary (9th ed. 2009)).

The Director cites four cases that he views as applying the recoupment exception to counterclaims for declaratory relief.  *See* Doc. 111 at 5, n.2 (citing *Vill. of Hobart*, 500

F. Supp. 2d at 1149-50; *Cayuga Indian Nation of N.Y. v. Vill. of Union Springs*, 293 F. Supp. 2d 183, 194 (N.D.N.Y. 2003); *Oneida Indian Nation of N.Y. v. New York*, 194 F. Supp. 2d 104, 137 (N.D.N.Y. 2002); *Rupp v. Omaha Indian Tribe*, 45 F.3d 1241, 1245 (8th Cir. 1995)).  In each of these cases, a tribe brought an action to vindicate its claim to a piece of land, the defendant counterclaimed to vindicate a competing claim, and the court held that the counterclaim could proceed despite the tribe's sovereign immunity. But while *Cayuga Indian Nation* and *Oneida Indian Nation* concluded that these counterclaims could proceed under the equitable recoupment exception to sovereign immunity, *Village of Hobart* and *Rupp* applied a different analysis.  They held that the counterclaims could proceed because the tribe consented to them by invoking the court's jurisdiction to determine the legal status of the land.  *Vill. of Hobart*, 500 F. Supp. 2d at 1149 ("By invoking the jurisdiction of the Court to 'declare the rights and other legal relations of the parties,' the Tribe expressly waived its immunity from suit as to that issue.") (citing 28 U.S.C. § 2201); *Rupp*, 45 F.3d at 1245 (by bringing quiet title action, tribe "consented to and assumed the risk of the court determining that the Tribe did not have title to the disputed tracts").  The Court finds that *Village of Hobart* and *Rupp* are best explained as waiver cases, and that *Cayuga Indian Nation* and *Oneida Indian Nation* are contrary to the weight of authority that equitable recoupment does not apply to counterclaims for declaratory relief.  This is supported by the Ninth Circuit's reminder that recoupment is "a narrow exception" to sovereign immunity.  *Park Place Assocs.*, 563 F.3d at 932 n.16.

**B.    Waiver.**

Having determined that the Director's counterclaims cannot proceed in equitable recoupment, the Court must determine whether the Nation waived its immunity to these counterclaims by initiating this action.  The Supreme Court has held that "a tribe does not waive its sovereign immunity from actions that could not otherwise be brought against it merely because those actions were pleaded in a counterclaim to an action filed by the tribe."  *Oklahoma Tax Comm'n*, 498 U.S. at 509.  In *Oklahoma Tax Commission*, a tribe

filed suit in federal district court to enjoin the State of Oklahoma from collecting cigarette taxes from a convenience store located on tribal land.  The State counterclaimed, "asking the District Court to enforce its $2.7 million [sales tax] claim against the Tribe and to enjoin the [Tribe] from selling cigarettes in the future without collecting and remitting state taxes on those sales."  *Id.* at 508.  The Supreme Court held that the tribe "did not waive its sovereign immunity" with respect to counterclaims seeking to collect sales taxes "merely by filing an action for injunctive relief."  *Id.* at 510.

At first blush, *Oklahoma Tax Commission* would appear to suggest that sovereign immunity bars all counterclaims against all sovereigns.  Other federal cases have made clear, however, that the rule is not so broad.  As noted above, many cases hold that counterclaims for equitable recoupment can proceed notwithstanding the plaintiff's sovereign immunity.  *See Bull*, 295 U.S. at 262 (defendant's counterclaim for overpayment of estate tax could proceed in recoupment where United States initiated action to collect overdue income tax); *Park Place Assocs.*, 563 F.3d at 935 n.16 ("when the United States files suit it may subject itself to various compulsory and permissive counterclaims for recoupment or set-off.") (citing cases).

Courts also recognize that a sovereign's filing of a lawsuit can constitute a limited waiver with respect to issues the sovereign itself has put at issue.  As *Village of Hobart* explained, a sovereign necessarily consents to a judicial determination of the "'rights and other legal relations of the parties'" when it seeks a declaration of those rights and relations.  500 F. Supp. 2d at 1149 (quoting 28 U.S.C. § 2201).  Having placed a question before the court, a sovereign acknowledges the court's authority to resolve that question, whether in favor of the sovereign or in favor of a counterclaimant seeking the opposite resolution.  *See id.*; *Rupp*, 45 F.3d at 1245; *see also United States v. Tsosie*, 92 F.3d 1037, 1043 (10th Cir. 1996) ("Because Ms. Tsosie's counterclaim asserts claims and seeks relief based on issues asserted by the United States in its complaint, sovereign immunity has been waived with respect thereto.").

/ / /

The Ninth Circuit has reached a similar conclusion.  In *United States v. State of Oregon*, 657 F.2d 1009 (9th Cir. 1981), the Court of Appeals held that the Yakima Tribe waived its sovereign immunity when it intervened in an action addressing salmon fishing rights on the Columbia River.  As the court explained:

> Here, the Tribe intervened to establish and protect its treaty fishing rights; a basic assumption of that action was that there would be fish to protect.  Had the original decree found the species to be in jeopardy, and enjoined all parties from future fishing in order to conserve the species, the Yakimas could not have then claimed immunity from such an action.  Otherwise, tribal immunity might be transformed into a rule that tribes may never lose a lawsuit.

*Id.* at 1014.  The Ninth Circuit further explained:  "By intervening, the Tribe assumed the risk that its position would not be accepted, and that the Tribe itself would be bound by an order it deemed adverse."  *Id.* at 1015.

This waiver-by-litigation doctrine is narrow.  In a later decision, the Ninth Circuit confirmed that "[i]nitiation of a lawsuit necessarily establishes consent to the court's adjudication of the merits of that particular controversy."  *McClendon v. United States*, 885 F.2d 627, 630 (9th Cir. 1989).  The Court of Appeals also explained, however, that "a tribe's waiver of sovereign immunity may be limited to the issues necessary to decide the action brought by the tribe; the waiver is not necessarily broad enough to encompass related matters, even if those matters arise from the same set of underlying facts."  *Id.* This limitation in *McClendon* comports with the Supreme Court's decision in *Oklahoma Tax Commission*, which held that a tribe, by filing an action to enjoin the collection of taxes, was not subjecting itself to an action to collect the taxes even though that action arose out of the same facts.  498 U.S. at 509.[3]

_____

[3]  *Oklahoma Tax Commission* specifically rejected an argument that a tribe's lawsuit waives sovereign immunity with respect to all compulsory counterclaims under Rule 13(a) of the Federal Rules of Civil Procedure.  498 U.S. at 509.  That rule applies to any counterclaim "arising out of the transaction or occurrence that is the subject matter of the opposing party's claim."  Fed. R. Civ. P. 13(a)(1)(A).  Thus, the Supreme Court, like the Ninth Circuit in *McClendon*, rejected the argument that any counterclaim arising out

On the basis of these authorities, the Court concludes that the Nation, by filing this action, has waived its sovereign immunity with respect to "the issues necessary to decide the action." *McClendon*, 885 F.2d at 630.   It therefore is subject to counterclaims addressing those same issues. *Rupp*, 45 F.3d at 1244-45 (permitting counterclaims).   To determine the scope of the Nation's waiver – the issues necessary to decide the action – the Court will examine the Nation's complaint.[4]

The complaint repeatedly alleges that the Nation has a "federal right to engage in Class III gaming at the West Valley Resort."   Doc. 1, ¶ 5; *see also id.* at ¶¶ 4, 7, 23, 98-100, 109.   The complaint alleges that this right arises "where three statutory conditions are satisfied.   Such gaming [1] must be authorized by tribal ordinance; [2] must be located in a State that permits such gaming; and [3] must be 'conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State.'   25 U.S.C. § 2710(d)(1)." *Id.* at ¶ 2.   The complaint asserts that the first two conditions have never been disputed by the State, and that the third condition is satisfied because "the Nation and the State entered into a tribal-state compact governing Class III gaming (the "Compact") in 2002, and the Compact was approved by the U.S. Secretary of the Interior in 2003." *Id.* at ¶ 3.   This allegation – that the Nation has a federal right to engage in Class III gaming because the Nation and the State have entered into the Compact – is repeated throughout the complaint, including in the count for injunctive and declaratory relief. *Id.* at ¶¶ 7, 23, 29, 98-100.   It is the premise for this action.   Thus, the Nation puts squarely at issue the question of whether it has a federal right to engage in Class III gaming at the West Valley Resort, and the Director's assertion that the Compact is invalid due to fraud responds directly to this issue.[5]

---

of the same transaction or occurrence was fair game.

[4] As the parties acknowledged during oral argument, these issues could be litigated in this case on the basis of the Director's defenses and affirmative defenses to the complaint.   But the Director has elected to assert them in counterclaims, the Nation has moved to dismiss them, and the Court must revolve that motion.

[5] The Nation has noted that States have no power to block Class III gaming conducted without a valid compact, *see Florida v. Seminole Tribe*, 181 F.3d 1237, 1242-

The Compact itself, and Defendant's fraud allegations, are also heavily featured in the Nation's complaint.  The complaint asserts that the Nation and the State entered into the Compact in 2002 (*id.* at ¶ 20), and includes more than 20 paragraphs describing the Compact's negotiation, terms, and voter approval (*id.* at ¶¶ 36-56).  The complaint then proceeds to set forth a detailed factual refutation of Defendants' fraud allegation, relying on the Nation's reading of this Court's prior rulings.  *Id.* at ¶¶ 70-74.  The complaint describes in detail ADG's position that certifications will not be granted because the Compact was procured through fraud.  *Id.* at ¶¶ 75-92.  Following this full set of factual allegations, Count One alleges that because "Class III gaming at the West Valley Resort would be 'conducted in conformance' with the Compact."  *Id.* at ¶¶ 99-100.  Thus, the complaint puts squarely at issue the terms and scope of the Compact.

The complaint asserts that the Director's actions are not authorized by IGRA or the Compact and are therefore preempted, either because Congress has occupied the field with respect to the regulation of gaming on Indian lands or because the Director's policy conflicts with the purposes and objectives of IGRA.  *Id.*, ¶¶ 94-113.  The Nation argues that field preemption applies because (1) "'the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact,'" (Doc. 1, ¶ 105 (quoting *Dorsey & Whitney*, 88 F.3d at 546)), and (2) "IGRA and the compact nowhere authorize the State to deny the Nation the right to engage in Class III gaming if the State decides that the Nation has engaged in 'disqualifying conduct.'"  *Id.*  To rule on this claim, the Court, again, will need to address the terms and validity of the Compact.

The Nation argues that conflict preemption applies because the Director's position "countermands the federal scheme by 'depriv[ing]' the Nation of a right 'given [to] it' by federal law."  *Id.* at ¶ 108 (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982)).  Conflict preemption applies where a state law "stands as an obstacle to

43 (11th Cir. 1999), implying that the invalidity of the Compact in this case would not authorize the Director to block gaming at the West Valley Resort.  But if the Compact is invalid, the Nation would have no legal right to Class III gaming (25 U.S.C. § 2710(d)(1)) and presumably could not invoke the jurisdiction of this Court to protect such gaming.

the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012) (citation and internal quotation marks omitted). Most often, such an obstacle is found where a state law "forbid[s], or impair[s] significantly, the exercise of a power that Congress explicitly granted." *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996); *see also de la Cuesta*, 458 U.S. at 155 (conflict preemption occurs where state interferes with federal right). The Nation's conflict preemption claim asserts that the Director's policy burdens the Nation's exercise of its federal right to Class III gaming. *See* Doc. 1, ¶¶ 108, 109. Thus, again, the Nation puts at issue the question of whether it has a right to Class II gaming under the Compact.

Finally, it is relevant that the Nation seeks equitable relief. By doing so, the Nation has "consented to the district court exercising equitable jurisdiction to resolve [the issues raised in this lawsuit]." *Rupp*, 45 F.3d at 1245. The complaint itself asserts that relief sought by the Nation would not be "inequitable" because "the State's allegations of fraud are meritless." Doc. 1, ¶ 110. The Nation has consented to the Court's resolution of matters necessary to the granting of equitable relief.

Having determined the scope of the Nation's waiver, the Court must decide which of the Director's counterclaims falls within the scope of that waiver. It is clear that the Nation has waived its immunity to the Director's counterclaim for a declaration "that ADG is not obligated to certify or authorize the Nation's proposed class III gaming facility on the Glendale Property." Doc. 96 at 35, ¶ A. This counterclaim mirrors the Nation's claim for declaratory relief, and thus implicates only issues necessary to decide that claim.[6] Having asked the Court to declare the "rights and other legal relations of the parties," 28 U.S.C. § 2201, the Nation has acknowledged the Court's authority to determine those rights and relations and cannot object to the Director's counterclaim

---

[6] The Nation admits as much. Doc. 115 at 7 ("The Nation seeks to bar ADG from relying on claims of purported fraud as a basis for refusing certification in connection with the West Valley Resort . . . The 'mirror' image of the Nation's requested relief would be a judgment that ADG has such authority.").

seeking a contrary determination of the same rights and relations.  *See Vill. of Hobart*, 500 F. Supp. 2d at 1149; *Rupp*, 45 F.3d at 1245.

The Nation has also waived its immunity to the Director's counterclaim for a declaration that the Nation is prohibited from conducting Class III gaming at the West Valley Resort.  Doc. 96 at 35, ¶ C.  As explained, the Nation's complaint repeatedly asserts that the Nation has a right to conduct this type of gaming, and alleges that the Director's policy deprives the Nation of this right.  Doc. 1, ¶ 108.  Having asserted a claim premised on its entitlement to conduct Class III gaming at the West Valley Resort, the Nation has opened the door to counterclaims asserting that it is not so entitled. Similarly, because the Nation's asserted right to conduct this gaming depends on a valid compact (25 U.S.C. § 2710(d)(1)), the Director may seek a declaration that the Compact is invalid.  Doc. 96 at 35, ¶ E.

The Director's counterclaims for promissory estoppel, fraudulent inducement, and material misrepresentation may bear on whether the Nation has a right to conduct Class III gaming at the West Valley Resort and whether the Nation engaged in disqualifying conduct during the negotiation of the Compact.  Hence, these claims may fall within the scope of the Nation's waiver and cannot be dismissed at this time on sovereign immunity grounds.  The Court will, however, strike the Director's demands for (1) a declaration that ADG is not obligated to certify or authorize any additional Nation-owned or operated Class III gaming facilities in the Phoenix metropolitan area, (2) a declaration or injunction prohibiting the Nation from conducting Class III gaming activities at other locations in the Phoenix metropolitan area, and (3) reformation of the Compact.  Doc. 96 at 35, ¶¶ B-D.  These demands "venture outside the subject of the original cause of action," *Tsosie*, 92 U.S. at 1043, because the Nation's claim does not concern casinos other than the West Valley Resort and does not seek reformation of the Compact.

**IV.    Failure to State a Claim.**

**A.    Promissory Estoppel.**

The Director asks the Court to enforce a promise the Nation allegedly made during

negotiation of the Compact that no new gaming facilities would be opened in the Phoenix metropolitan area.  Doc. 96, ¶¶ 76-86.  But "Arizona law prohibits an action based on the promissory estoppel theory of liability if there is an express, written contract on the same subject matter."  *Bowman v. Honeywell Int'l, Inc.*, 438 F. App'x 613, 615 (9th Cir. 2011) (citing *Chanay v. Chittenden*, 563 P.2d 287, 290 (Ariz. 1977)); *see Chanay*, 563 P.2d at 290 ("There can be no implied contract where there is an express contract between the parties on the same subject matter.") (citations omitted).

In this case, there is a fully-integrated written agreement – "agreed to by sophisticated, represented parties after years of tedious negotiations" – that, in a provision titled "Location of Gaming Facilities," speaks directly to the question of where the Nation may locate its gaming facilities.  *Gila River Indian Cmty.*, No. 13-16517 (slip op. at 21-22).  The alleged promise addresses the same subject matter.

The Director argues that his claim may proceed on the theory that there is "no direct conflict . . . between the Compact and the Nation's promise" because "the Compact does not contain a provision explicitly allowing the Nation to operate a casino in the Phoenix area."  Doc. 111 at 16.  But Arizona law does not require a direct conflict.  As the Director himself recognizes, all that is required is that the written contract and the extra-contractual promise "'reference . . . the same subject matter.'"  *Id.* at 15 (quoting *Chanay*, 563 P.2d at 290).  The Compact and the extra-contractual promise at issue here reference the same subject matter – namely, the location of the Nation's casinos.  The Director's promissory estoppel claim must be dismissed.

### B.    Fraudulent Inducement and Material Misrepresentation.

The Director asserts counterclaims for fraudulent inducement and material misrepresentation based on the Nation's alleged representation during negotiation of the Compact that it had no plans, and no authority under federal law, to open a Class III gaming facility in the Phoenix metropolitan area.  Doc. 96 at 87-108.  The Nation moves to dismiss on the ground that the Director cannot establish actual or justifiable reliance on the alleged misrepresentations.  Doc. 108 at 27-32.

- 18 -

1                         **1.      Actual Reliance.**

2              The Nation argues that the Director cannot establish actual reliance because the

3     Governor had a nondiscretionary duty to enter into the Compact, and "'[a] party . . .

4     cannot be defrauded into doing that which it was already legally obligated to do.'"

5     Doc. 108 at 28-30 (quoting *Bank Leumi Tr. Co. of N.Y. v. D'Evori Int'l, Inc.*, 163 A.D.2d

6     26, 33 (N.Y. App. Div. 1990)).  To establish the Governor's duty to execute the Compact,

7     the Nation points to A.R.S. § 5-601.02(A), which provides that "[n]otwithstanding any

8     other law . . . the state, through the governor, shall enter into the new standard form of

9     tribal-state gaming compact with [any] requesting Indian tribe."

10            The Director acknowledges that the Governor had a nondiscretionary duty to enter

11    a standard-form compact with a requesting tribe, but notes that the Governor also had

12    authority "to negotiate and enter into amendments to new compacts."   A.R.S. § 5-

13    601.02(E).  The Director contends that the Governor would have exercised this authority

14    to limit the Nation's ability to construct a new casino in the Phoenix area but for the

15    Nation's misrepresentations.  Doc. 111 at 17-18.  Additionally, the Director argues that

16    but for those misrepresentations, the Salt River Pima-Maricopa Indian Community ("Salt

17    River Community") could have prevented the Nation's Compact from taking effect by

18    refusing to enter the standard compact.  *Id.* at 18-19 (citing Compact, § 2(vv)(4)).

19            The Nation replies that the Governor's ability to negotiate amendments is

20    immaterial because (1) the Governor was limited to negotiating amendments "consistent"

21    with the standard-form compact, and an amendment prohibiting gaming in the Phoenix

22    metropolitan area would be inconsistent with the compact, and (2) the Governor could

23    not have required the Nation to accept amendments.  Doc. 115 at 17-18 (citing *Salt River*

24    *Pima-Maricopa Indian Cmty. v. Hull*, 945 P.2d 818 (Ariz. 1997)).  The Nation also

25    argues that the provision purporting to authorize the Salt River Community to veto the

26    Nation's compact is preempted by IGRA.  *Id.* at 18.

27            The Court cannot at this stage grant the Nation's motion to dismiss on this issue.

28    It does appear that the Governor had authority under § 601.02(E) to propose an

amendment to the Compact that would have prohibited Class III gaming in the Phoenix metropolitan area, and such an amendment would not necessarily have been inconsistent with the Compact, which "does not say anything about the location of [the Nation's] fourth casino." *Tohono O'odham II*, 944 F. Supp. 2d at 765. Whether the Governor would have proposed an amendment to the Compact but for the Nation's representations, and whether such an amendment would have been accepted, are factual questions that cannot be decided on a motion to dismiss.

The *Salt River* decision does not change this analysis. In that case, the Arizona Supreme Court explained:

> a governor is free to negotiate with the tribe about any compact term. He or she may use the power of persuasion and the considerable authority of the governor's office to persuade a tribe to accept something different from the standard compact. He or she may bargain by giving some advantage in one clause for some consideration in another. But as a matter of state law, the statute adopted by the people requires that if a governor is unable to persuade, bargain, cajole, or otherwise reach an agreement, the governor is [required to execute the standard compact].

945 P.2d 818, 822 (1997). Although the Governor could not have required the Nation to accept an amendment prohibiting gaming in the Phoenix metropolitan area, she could have required the Nation to consider such an amendment, and could have used her considerable authority and influence to persuade the Nation to accept it. As noted above, whether she would have taken such action and whether it would have been successful are factual issues that cannot be decided in this motion. *See also* Restatement (Second) of Contracts § 167, cmt. a (1981) ("It is not necessary that this reliance have been the sole or even the predominant factor in influencing [the plaintiff's] conduct. It is not even necessary that he would not have acted as he did had he not relied on the assertion. It is enough that the manifestation substantially contributed to his decision to make the contract.").

The Court will also reserve judgment on the Director's argument that actual reliance can be based on the ability of the Salt River Community to veto the Nation's compact. As the Nation notes, the Secretary of the Interior has determined that the

provision purporting to authorize the veto is preempted by IGRA.[7]  This determination may be entitled to deference.  *See United States v. Mead Corp.*, 533 U.S. 218 (2001) (legal positions set forth in agency letter are entitled to *Skidmore* deference).  In addition, the Salt River Community is not a party to this case, and it is not clear that the Director may assert its rights.  *See* Restatement (Second) of Torts § 533 (1977) (setting forth standard for determining whether third party's actual reliance is relevant to fraudulent misrepresentation claim).  These issues should be clearer once summary judgment briefing has been completed.

### 2.       Justifiable Reliance.

The Nation argues that the State could not have justifiably relied on a representation that the Compact would prohibit new Class III gaming facilities in the Phoenix metropolitan area.  Doc. 108 at 30-32.  The Court agrees: a sophisticated, well-counseled party such as the State of Arizona could not have justifiably relied on a representation by the Nation *that the Compact* would prohibit new Class III gaming facilities in the Phoenix metropolitan area, since the Compact plainly did not contain such a prohibition.  *See* Restatement (Second) of Torts § 541 (1977) (party cannot justifiably rely on obviously false representation); *Tohono O'odham II*, 944 F. Supp. 2d at 765 (Compact is not "reasonably susceptible" to an interpretation that would prohibit new Class III gaming facilities in the Phoenix metropolitan area), *aff'd by Gila River Indian Cmty.*, No. 13-16517 (slip op. at 22) (Compact is "unambiguous and not reasonably susceptible to Plaintiffs' interpretation").

But that is not the Director's only theory of justifiable reliance.  He also asserts that the State justifiably relied on the Nation's representation that it had no intention of building a new casino in the Phoenix metropolitan area, and no plans to have Phoenix-area land taken into trust on which to build such a casino.  Docs. 96, ¶¶ 88, 97; 111 at 21-22.  The Nation does not explain why the State could not have justifiably relied on such a

---

[7] Compact Approval Letter from Dep't Int. to Gov. Janet Napolitano 2-3 (Jan. 24, 2003),  http://indianaffairs.gov/cs/groups/xoig/documents/text/idc-038169.pdf  (citing  25 U.S.C. § 2710(d)(3)(B)).

representation.   It acknowledges that a party may justifiably rely on representations "'regarding things outside the scope of the contractual terms.'"   Doc. 115 at 19-20 (quoting *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 930 (E.D. Mich. 2005)).   The Compact does not govern, or purport to govern, the Nation's ability to have Phoenix-area land taken into trust.   Thus, a representation regarding the Nation's plans to obtain such land is akin to a party's representation regarding its "solvency, indebtedness, experience, clientele, client retention rate, business structure, etc."   *Star Ins. Co.*, 392 F. Supp. at 930.   In other words, it is the type of collateral representation on which a party might justifiably rely, notwithstanding the fact that it is not included in the parties' fully-integrated contract.

## V.    Leave to Amend.

The Director seeks leave to amend if any of his counterclaims are dismissed.   The Court will deny the request because the defects in the counterclaims identified above could not be cured by amendment.

**IT IS ORDERED:**

1.    The Nation's motion to dismiss (Doc. 108) is **granted** with respect to the Director's counterclaim for promissory estoppel.

2.    The Court will **strike** the Director's demands for (1) reformation of the Compact and (2) declaratory and injunctive relief with respect to casinos other than the West Valley Resort.

3.    The Nation's motion to dismiss is otherwise **denied**.

4.    Because the Director has withdrawn his jury demand (Doc. 116), the Nation's motion to strike this demand (Doc. 114) is **denied as moot**.

Dated this 30th day of March, 2016.

David G. Campbell
United States District Judge