Paul K. Charlton, SBN 012449
Karl M. Tilleman, SBN 013435
Erin N. Bass, SBN 030104
STEPTOE & JOHNSON LLC
201 E. Washington Street
Suite 1600
Phoenix, AZ 85004
(602) 257-5200
pcharlton@steptoe.com
ktilleman@steptoe.com
ebass@steptoe.com

Seth P. Waxman (*Pro hac vice*)
Danielle Spinelli (*Pro hac vice*)
Kelly P. Dunbar (*Pro hac vice*)
Sonya L. Lebsack (*Pro hac vice*)
Kevin M. Lamb (*Pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
kelly.dunbar@wilmerhale.com
sonya.lebsack@wilmerhale.com
kevin.lamb@wilmerhale.com

Laura Berglan, Acting Attorney General, SBN 022120
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
(520) 383-3410
laura.berglan@tonation-nsn.gov

*Counsel for Plaintiff Tohono O'odham Nation*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| THE TOHONO O'ODHAM NATION,<br><br>                          Plaintiff,<br><br>          v.<br><br>DOUGLAS DUCEY, Governor of Arizona;<br>MARK BRNOVICH, Arizona Attorney General;<br>and DANIEL BERGIN, Director, Arizona<br>Department of Gaming, in their official<br>capacities,<br><br>                          Defendants. | Case No. 2:15-cv-01135-PHX-DGC<br><br>**THE TOHONO O'ODHAM NATION'S OPPOSITION TO DEFENDANT BERGIN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................................ii

BACKGROUND ........................................................................................................ 1

ARGUMENT ............................................................................................................. 3

I.      THE LEGISLATIVE PRIVILEGE IS ABSOLUTE HERE ......................................... 3

        A.      Non-Federal Legislators Are Protected By The Legislative Privilege ............... 3

        B.      Legislative Privilege Extends to Indian Tribes ..................................... 4

        C.      The Legislative Privilege Is Absolute In This Case ............................. 5

        D.      Director Bergin's Authorities Are Not To The Contrary .................................. 6

II.     QUALIFIED-PRIVILEGE ANALYSIS INDEPENDENTLY COMPELS DENIAL OF THE
        MOTION ....................................................................................................... 7

III.    DIRECTOR BERGIN MISUNDERSTANDS THE SCOPE OF THE PRIVILEGE....................... 12

IV.     THE ANCILLARY ISSUES RAISED DO NOT REQUIRE JUDICIAL RESOLUTION .............. 14

CONCLUSION .......................................................................................................... 15

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ACORN v. County of Nassau*, 2009 WL 2923435 (E.D.N.Y. Sept. 10, 2009) ...................... 10

*Arizona v. Arpaio*, 2016 WL 2587991 (D. Ariz. May 5, 2016)...................................... *passim*

*Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ................................................................................................. 7, 9

*Bethune-Hill v. Virginia State Board of Elections*, 114 F. Supp. 3d 323 (E.D.
    Va. 2015) ................................................................................................................ *passim*

*Bogan v. Scott-Harris*, 523 U.S. 44 (1998)................................................................. 3, 13

*Buonauro v. City of Berwyn*, 2011 WL 2110133 (N.D. Ill. May 25, 2011) ...................... 12

*Committee for a Fair & Balanced Map v. Illinois State Board of Elections*, 2011 WL
    4837508 (N.D. Ill. Oct. 12, 2011) ............................................................................. 6

*Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491 (1975) ....................................... 4, 13

*EEOC v. Washington Suburban Sanitary Commission*, 631 F.3d 174
    (4th Cir. 2011) ...................................................................................................... 5, 11

*Favors v. Cuomo*, 285 F.R.D. 187 (E.D.N.Y. 2012) ...................................................... 6

*Grand Canyon Skywalk Development, LLC v. Hualapai Indian Tribe of Arizona*,
    966 F. Supp. 2d 876 (D. Ariz. 2013)............................................................................ 4

*In re Grand Jury Proceedings*, 563 F.2d 577 (3d Cir. 1977) ...................................... 11

*Harris v. Arizizona Independent Redistricting Commission*, 993 F. Supp. 2d 1042 (D.
    Ariz. 2014).................................................................................................................... 6

*In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015) ......................................................... 5

*Kaahumanu v. County of Maui*, 315 F.3d 1215 (9th Cir. 2003)............................... 13

*Kay v. City of Rancho Palos Verdes*, 2003 WL 25294710
    (C.D. Cal. Oct. 10, 2003) .................................................................................... 6, 12

*Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014) ........................ 5, 6

*Page v. Virginia State Board of Elections*, 15 F. Supp. 3d 657 (E.D. Va. 2014).................. 3

*Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y. 2003) ................................ 6

*Runs After v. United States*, 766 F.2d 347 (8th Cir. 1985) ........................... 4

*Tenney v. Brandhove*, 341 U.S. 367 (1951) .............................. 4, 10, 11

*United States v. Gillock*, 445 U.S. 360 (1980) ............................. 3, 4, 5

*United States v. Irvin*, 127 F.R.D. 169 (C.D. Cal. 1989) .......................... 6

## STATUTES AND RULES

1 Tohono O'odham Code ch. 2, § 2103(A), *available at* http://www.tolc-nsn.org/docs/Title1Ch2.pdf ........................................ 4, 12, 14

Tohono O'odham Legis. R., *available at* http://www.tolc-nsn.org/docs/LegislativeRules.pdf
    art. I, § 1(F) ........................................................................ 12
    art. I, § 1(F)(1) ...................................................................... 2
    art. I, § 1(F)(2) ................................................................. 2, 14
    art. I, § 1(F)(3)(b) .................................................................. 2
    art. I, § 1(F)(4) ...................................................................... 2
    art. V, § 1 ............................................................................. 2
    art. VIII, § 2(B)(1) ................................................................ 13

## CONSTITUTION

Tohono O'odham Const., *available at* http://www.tolc-nsn.org/docs/Constitution.pdf
    art. V, § 1 ............................................................................. 1
    art. VI, § 1(c)(2) .................................................................... 1
    art. VI, § 1(f) ........................................................................ 1
    art. VI, § 1(i) ........................................................................ 1
    art. VI, § 1(j) ........................................................................ 1
    art. IX, § 5 .......................................................................... 14

## OTHER AUTHORITIES

Congressional Research Service, *Federal Land Ownership: Acquisition and Disposal Authorities* 3 (May 19, 2015) ........................................... 13

Tohono O'odham Legis. Council Res.
    03-375 (Aug. 18, 2003), *available at* http://tolc-nsn.org/docs/Actions03/03375.pdf ......... 2
    09-049 (Jan. 27, 2009), *available at* http://tolc-nsn.org/docs/actions09/09049.pdf ........... 2
    10-116 (Apr. 6, 2010), *available at* http://tolc-nsn.org/docs/actions10/10116.pdf ............ 4

San Lucy District Council By-Laws
    art. II, § 1.1 ......................................................................... 1
    art. IV, § 1.5 ........................................................................ 2

1    This Court should deny Director Bergin's motion to compel (Doc. 153) ("MTC Br.").

2    Absent a countervailing federal constitutional or statutory interest—which Director Bergin

3    does not seek to vindicate—the Nation's legislative privilege, like that of other non-federal

4    sovereigns, is absolute, and it applies fully to the closed legislative sessions at issue.  Even if

5    the privilege is qualified, the relevant factors weigh decisively against breaching the

6    privilege here, for reasons that this Court recently set out in *Arizona v. Arpaio*, 2016 WL

7    2587991 (D. Ariz. May 5, 2016).  Director Bergin's separate objections to the scope of the

8    privilege, whether it is absolute or qualified, fail as a matter of law.  And the scattered

9    ancillary discovery issues he raises are not ripe for judicial resolution.

10                                    **BACKGROUND**

11    Director Bergin's motion preemptively seeks to pierce the legislative privilege of the

12    Nation's legislative body—the "Tohono O'odham Council" ("the Council")—by asking this

13    Court to authorize him to probe the intent of tribal legislators and others at depositions and to

14    require the disclosure of confidential documents involving closed legislative sessions of the

15    Council and the council of the Nation's San Lucy District ("SLD Council").

16    Like the U.S. Constitution, the Nation's Constitution establishes three separate bodies

17    of government, with "[a]ll legislative powers of the [Nation] … vested in the Tohono

18    O'odham Council."  Tohono O'odham Const. art. V, § 1.  The Council exercises broad

19    legislative jurisdiction, including the authority to pass "laws, ordinances or resolutions" that

20    "promote, protect and provide for … [the] general welfare of the Tohono O'odham Nation

21    and its members."  *Id.* art. VI, § 1(c)(2).  More specifically, the Council has express authority

22    to "consult, negotiate and conclude agreements and contracts on behalf of the Tohono

23    O'odham Nation," *id.* art. VI, § 1(f); to "administer land and other public property" by "law,

24    ordinance or resolution," *id.* art. VI, § 1(i); and to "consult with the Congress of the United

25    States and appropriate federal agencies regarding federal activities that affect the Tohono

26    O'odham Nation," *id.* art. VI, § 1(j).  The SLD Council also has legislative authority, but

27    with respect to matters of local concern affecting the San Lucy District.  *See* San Lucy

28    District Council By-Laws art. II, § 1.1 ("Legislative Powers") (Exhibit 1).

In order to consider proposed legislation and engage in other legislative activity, the Council sometimes acts through closed legislative sessions.  Those sessions "consist of legislative representatives, persons providing testimony or advice, and others the Legislative Council may feel to be appropriate."  Tohono O'odham Legis. R. art. I, § 1(F)(2).  The sessions—roughly analogous to closed sessions held by the U.S. Congress—are convened "by majority vote" and are reserved for specific purposes, including "matters … affect[ing] the integrity, sovereignty, security and resources of the Nation."  *Id.* art. I, § 1(F)(1), (3)(b).  By rule, such sessions are confidential.  *Id.* § 1(F)(4); *see also id.* art. V, § 1.  The SLD Council follows a similar protocol.  *See* San Lucy District Council By-Laws art. IV, § 1.5 ("Closed Sessions").

Director Bergin seeks broad discovery into legislative discussions and documents pertaining to closed legislative sessions involving the Nation's decision to purchase the Glendale property in 2003 and to have that property taken into trust in 2009.  Exercising its authority under the Nation's Constitution, the Council enacted a series of resolutions in 2003 that led to the purchase of the Glendale property.  *See, e.g.*, Tohono O'odham Legis. Council Res. 03-375 (Aug. 18, 2003).  And in 2009 the Council enacted a resolution requesting that the Glendale property be taken into trust by the U.S. Department of the Interior.  *See* Tohono O'odham Legis. Council Res. 09-049 (Jan. 27, 2009).  The 2009 resolution recounts the flooding of the Gila Bend Indian Reservation that led to the relocation of San Lucy District members, the passage of the Gila Bend Indian Reservation Lands Replacement Act, and the Nation's decision in 2003, at the request of San Lucy District, to purchase the property.  *Id*.

When Director Bergin first raised concerns regarding a handful of privilege assertions made during the prior litigation ("*TON I*")—objections that the State, the actual party to the Compact, did not pursue at the time—and during preliminary-injunction discovery in this case, the Nation worked in good faith to address his concerns by explaining in detail the basis for each privilege assertion, including by coordinating with the San Lucy District with

respect to the District's privilege assertions.  *See* MTC Br. Ex. J (Apr. 27, 2016 Letter from Karl Tilleman) (Doc. 153-10).[1]  Notwithstanding those explanations, and before any of Director Bergin's depositions has even taken place, Director Bergin preemptively seeks authorization to pierce the privilege and force the disclosure of confidential legislative materials in a broad range of circumstances.  His request should be denied.

## ARGUMENT

### I.   THE LEGISLATIVE PRIVILEGE IS ABSOLUTE HERE

This Court should deny Director Bergin's motion to pierce the legislative privilege. Under federal common law, the legislative privilege for non-federal legislators (such as those of the Nation and the San Lucy District) is absolute, absent a federal constitutional or statutory basis that would render the privilege qualified.  *See United States v. Gillock*, 445 U.S. 360, 372-373 (1980); *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 333-335 (E.D. Va. 2015).  Because Director Bergin does not seek to vindicate any such federal constitutional or statutory interest, the legislative privilege is unqualified.

### A.   Non-Federal Legislators Are Protected By The Legislative Privilege

"The [legislative] privilege is rooted in the absolute immunity granted to federal legislators by the Speech or Debate Clause of the United States Constitution and exists to safeguard that immunity."  *Page v. Virginia State Bd. of Elections*, 15 F. Supp. 3d 657, 661 (E.D. Va. 2014).  Although the Speech or Debate Clause applies by its terms only to members of Congress, federal common law has long recognized both an absolute legislative immunity from civil liability and a corresponding evidentiary privilege for non-federal legislators—that is, "[s]tate legislators and other legislative actors."  *Bethune-Hill*, 114 F. Supp. 3d at 332 (citing *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951)); *see Bogan v. Scott-*

---

[1]  That letter provided a full explanation of the grounds for the Nation's decision to withhold the Nation's documents that Director Bergin identified in his initial correspondence.  The Nation also coordinated with the San Lucy District with respect to the District's documents (which make up seven of the eight documents whose production Director Bergin now seeks to compel), and later invited Director Bergin to confer directly with the District if he had concerns with its privilege assertions.

*Harris*, 523 U.S. 44, 48-49 (1998); *Arpaio*, 2016 WL 2587991, at *3. Legislative privilege "prevents compelled testimony or documentary disclosure" regarding legislative activities, *Bethune-Hill*, 114 F. Supp. 3d at 335, and, like the legislative immunity on which it is based, exists "'to protect the integrity of the legislative process'" and to safeguard legislators' independence, *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 502 (1975); *Tenney*, 341 U.S. at 373. Considerations of comity also undergird the privilege for non-federal legislators. *See Gillock*, 445 U.S. 360, 372; *Bethune-Hill*, 114 F. Supp. 3d at 332-333.

### B.    The Legislative Privilege Extends To Indian Tribes

Tribal legislators and legislatures may invoke these common-law protections in federal court. Legislative *immunity*—the conceptual foundation of legislative *privilege*—applies fully to tribal legislators. *See Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) ("[I]ndividual members of the Tribal Council … enjoy absolute legislative immunity from liability … for official actions taken when acting in a legislative capacity."); *cf. Grand Canyon Skywalk Dev., LLC v. Hualapai Indian Tribe of Arizona*, 966 F. Supp. 2d 876, 885-886 & n.6 (D. Ariz. 2013) (applying immunity to tribal legislators and recognizing the privilege is "broad"). Indeed, the laws of the Nation recognize such immunity. *See* 1 Tohono O'odham Code ch. 2, § 2103(A) ("The Tohono O'odham Legislative Council, Legislative Council representatives and staff, and other persons engaged in legislative activity possess legislative immunity and are not subject to suit, process, or liability for the performance of legislative functions."); Tohono O'odham Legis. Council Res. No. 10-116 (Apr. 6, 2010) (enacting § 2103 to "reaffirm[]" and "clarify" "legislative immunity").

Although no federal court appears to have considered the application of legislative *privilege* to tribal legislators or legislatures, that privilege is a "corollary" of tribal legislative *immunity*. *Arpaio*, 2016 WL 2587991, at *3; *see Tenney*, 341 U.S. at 371-372. Thus, judicial decisions recognizing tribal legislative immunity compel the conclusion that legislative privilege is also applicable to tribal legislators and legislatures. Indeed, a contrary rule would countermand the principles of "comity" on which the legislative privilege for non-federal legislators is in part based. *Gillock*, 445 U.S. at 373. As "'separate sovereigns

pre-existing the Constitution,'" Indian tribes retain that "'common-law immunity from suit traditionally enjoyed by sovereign powers,'" which "is 'a necessary corollary to Indian sovereignty and self-governance.'" *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014).  It would deeply offend comity to treat legislators of sovereign tribes differently from legislators of States or localities for purposes of this essential privilege at the heart of self-government.  *Cf. id.* at 2041 ("[D]isparate treatment of these two classes of domestic sovereigns would hardly signal … respect for tribal sovereignty.") (Sotomayor, J., concurring).  Director Bergin identifies no justification for such disparate treatment.

### C.   The Legislative Privilege Is Absolute In This Case

The remaining question, then, is whether the legislative privilege is absolute or qualified.  Under federal common law, the "*default*" rule is that privilege for non-federal legislators is *absolute*, unless abrogated by Congress or the Constitution.  *Bethune-Hill*, 114 F. Supp. 3d at 334 (emphasis added); *see Gillock*, 445 U.S. 360, 372-373; *In re Hubbard*, 803 F.3d 1298, 1313 (11th Cir. 2015); *EEOC v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 180-181 (4th Cir. 2011).  That absolute privilege may yield and "become[] qualified when it stands as a barrier to the vindication of important federal interests." *Bethune-Hill*, 114 F. Supp. 3d at 334.  "This is because both state legislative immunity and privilege … are based on an interpretation of the federal common law that is necessarily abrogated when the immunity or privilege is incompatible with federal statutory law." *Id.*; *see Gillock*, 445 U.S. at 373 ("[A]lthough principles of comity command careful consideration, … where important federal interests are at stake … comity yields."); *Hubbard*, 803 F.3d at 1312 (where subpoenas served on the governor and state legislators did "not serve an important federal interest" because the federal claim was meritless, the state legislative privilege "must be honored and the subpoenas quashed").

Under that framework, the legislative privilege is absolute in this case.  Director Bergin's counterclaims for fraudulent inducement do not seek to vindicate any federal statutory or constitutional right.  In fact, he acknowledges that he does not rely on a "federal interest in the enforcement of federal law."  MTC Br. 14 n.9.  That concession is dispositive:

1    Absent a countervailing federal constitutional or statutory interest, the privilege recognized

2    by the common law for non-federal legislators and legislatures is unqualified.

3            That Director Bergin brings counterclaims on behalf of the State does not change that

4    analysis.  The Nation's privileges and immunities are "'not subject to diminution by the

5    States.'"  *Bay Mills*, 134 S. Ct. at 2030-2031.  Although the legislative privilege may be

6    qualified in litigation against a state or local government seeking "'to vindicate important

7    public rights guaranteed by federal law,'" *Arpaio*, 2016 WL 2587991, at *5 (quoting

8    *Bethune-Hill*, 114 F. Supp. 3d at 336), that circumstance is lacking here, where Director

9    Bergin is not enforcing a federal constitutional or statutory right.

10           **D.     Director Bergin's Authorities Are Not To The Contrary**

11           All of the authorities cited by Director Bergin are consistent with this legal rule.  In

12   fact, the majority of decisions that Director Bergin cites (at 6-8) involve *federal*

13   *constitutional and statutory* challenges to voter redistricting plans—cases implicating the

14   essential federal right to vote.  *See Harris v. Arizona Indep. Redistricting Comm'n*, 993 F.

15   Supp. 2d 1042 (D. Ariz. 2014); *Favors v. Cuomo*, 285 F.R.D. 187 (E.D.N.Y. 2012);

16   *Committee for a Fair & Balanced Map v. Illinois State Bd. of Elections*, 2011 WL 4837508

17   (N.D. Ill. Oct. 12, 2011); *Kay v. City of Rancho Palos Verdes*, 2003 WL 25294710, at *12

18   (C.D. Cal. Oct. 10, 2003); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y. 2003); *United*

19   *States v. Irvin*, 127 F.R.D. 169 (C.D. Cal. 1989).  Those decisions provide no basis for

20   departing from the default absolute legislative privilege here, where Director Bergin is not

21   suing to enforce a federal constitutional or statutory right.

22           Indeed, Director Bergin does not cite, nor is the Nation aware of, *any* federal decision

23   invading the legislative privilege absent an assertion of a federal statutory or constitutional

24   right.  Here, where Director Bergin concededly has no such federal interest, the Nation's

25   legislative privilege is "absolute."  *Bethune-Hill*, 114 F. Supp. 3d at 337.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   QUALIFIED-PRIVILEGE ANALYSIS INDEPENDENTLY COMPELS DENIAL OF THE MOTION

Were the legislative privilege qualified (it is not), this Court should still deny Director Bergin's motion.  A qualified privilege should be overcome only in rare circumstances.  As the Supreme Court has recognized, even when there is a paramount federal interest at stake (such as protecting against unconstitutional racial discrimination), it will be the "extraordinary instance[]" in which privilege will not protect state or local legislators. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 268 (1977).

Under qualified-privilege analysis, "[w]hether privileged material must be disclosed is determined by balancing the legislator's interest in non-disclosure with the movant's interest in obtaining the material."  *Arpaio*, 2016 WL 2587991, at *5.  That balancing looks to "'(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of government in the litigation; and (v) the purposes of the privilege.'"  *Id.*[2]

In *Arpaio*, this Court *denied* a motion to compel legislative documents in connection with a federal constitutional challenge under qualified-privilege analysis, finding that factors one and three weighed in favor of disclosure, while factors two, four, and five weighed against disclosure.  The case for protecting the privilege is even stronger here:

***Relevance of the Evidence.***  Director Bergin has not explained with specificity the relevance of the documents and testimony he seeks to compel to any element of his claims.

---

[2] Citing cases involving the deliberative-process privilege, Director Bergin points to two tests that substantially overlap with the test applied by this Court in *Arpaio*.  *See* MTC Br. 6 (citing 4-factor test from *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)); *id.* at 7 n.4 (citing 8-factor test from *Irvin*, 127 F.R.D. at 173).  *Arpaio*'s test accounts for the broader purposes of the legislative privilege and should be applied here.  Regardless of the test chosen, however, the result would be the same.  Director Bergin also objects to deliberative-process privilege assertions with respect to some of the identified documents, but because those documents are protected by the legislative privilege, that issue is moot.  In any event, the same qualified-privilege analysis discussed above would weigh in favor of the deliberative-process privilege for those documents in the event that legislative privilege were for some reason unavailable.

Nonetheless, the Nation will assume for the sake of argument that, as in *Arpaio*, at least some of the information sought by Director Bergin could be relevant.

***Availability of Other Evidence*.** As in *Arpaio*, factor two weighs heavily against disclosure here. Director Bergin asserts (at 2) that the information he seeks is "necessary" to pursue his fraud claims. But that claim of necessity is in substantial tension with the history of this litigation and the State's and ADG's actions to date. The same topics on which Director Bergin seeks to pierce the legislative privilege were thoroughly explored during comprehensive, year-long discovery in *TON I*. As this Court noted at the case management conference, and as counsel for Director Bergin agreed, "[m]uch" of the discovery from *TON I* is "focused on … the fraud" claims Director Bergin pursues now. 11/10/2015 Sch. Conf. Tr. 28:21-22 (Doc. 105).

Indeed, in *TON I*, the State deposed the former chief financial officer of VDI, who spearheaded the San Lucy District/VDI search for replacement lands. Likewise, the State deposed the former chief executive officer of the Nation's Gaming Enterprise, who was responsible for the Gaming Enterprise's search for potential casino locations. Throughout that extensive testimony, privileges were asserted only a handful of times, and in response to questions directly inquiring about communications with a lawyer. The State also deposed several members of the Tohono O'odham Council.

In addition, during the *TON I* discovery, the Nation and the San Lucy District at times did assert legislative privilege, and the State—the actual party to the Compact—did not see the need to pierce those privileges in order to litigate its claims. In fact, the State proceeded to prosecute theories of promissory estoppel and bad faith—which the State argued implicated questions regarding the Nation's knowledge and intent—and it sought summary judgment on those theories. *See* Pls.' Cross MSJ, 2:11-cv-00296-DGC, Doc. 198 (Jan. 14, 2013). In doing so, the State submitted a lengthy, 242-paragraph statement of purportedly undisputed material facts, with Section X titled "The Nation's Secret Plan – The West Phoenix Project." *Id.*, Doc. 199 (Jan. 14, 2013). That makes abundantly clear that prior discovery has not precluded the State (or Director Bergin now) from access to evidence

regarding the land search or information relating to the Nation's knowledge and intent of that search.  *Cf. Arpaio*, 2016 WL 2587991, at *6 (finding that factor two weighed against abrogation of the privilege where the plaintiff had access to "traditional sources of legislative history" and other evidence of intent).

In this litigation, moreover, Director Bergin has propounded waves of written discovery on the same topics.  And in the course of the prior litigation as well as in this litigation, the Nation has already stated that the San Lucy District (or VDI, an entity the District controlled), was engaged in evaluating properties for economic development (which might or might not include gaming) during the 2002 compact negotiations.  Although Director Bergin alludes to the need to probe the Nation's knowledge and intent further, he does not explain why he cannot show the Nation's supposed intent through circumstantial or other forms of evidence, as is often used in cases involving legislative motive.  *E.g.*, *Arlington Heights*, 429 U.S. at 266.[3]

Beyond that, Director Bergin's decision to deny the Nation the right to engage in Class III gaming at the West Valley Resort—the decision at issue in this case—flatly contradicts his current position that the Nation is shielding evidence "necessary" to pursue his claims.  Director Bergin has based his regulatory actions to date on his determination, as well as the determinations of the Governor and the Attorney General, that there is "uncontroverted" evidence of the Nation's fraud.  *See* Compl. Exh. F 3-4 (Doc. 1-5) ("credible and largely unrefuted evidence"); Letter to Dir. Cocca 1 (May 18, 2015)

---

[3] None of the issues Director Bergin points to (at 13) demonstrates a need to pierce the privilege.  First, whether the Nation's negotiators did or did not have authority to bind the Nation speaks only to whether the Nation made any representations (or misrepresentations) in the first place.  Discovery into closed legislative sessions will not address that issue.  Second, as to knowledge of the Nation's alleged plans or intentions, Director Bergin can, as the State did in *TON I*, ask about speakers' knowledge that any alleged representations were true or false.  That does not require the disclosure of privileged legislative communications.  Third, the Nation's objections to the interpretation and admissibility of evidence in the prior litigation do not give Director Bergin license to nullify the Nation's legislative privilege to sidestep those objections.

1    ("overwhelming and uncontroverted evidence") [ADG0000506-507] (Exhibit 2).  Director

2    Bergin should not be able to assert, on the one hand, that he has "uncontroverted evidence"

3    of fraud sufficient to deny certifications in connection with the West Valley Resort and, on

4    the other hand, argue that the Nation is holding back evidence necessary to prove that fraud.

5        In short, Director Bergin's preference for different evidence of the Nation's

6    knowledge or intent does not "ma[ke] the showing necessary to overcome the legislative

7    privilege." *Arpaio*, 2016 WL 2587991, at *6.  Otherwise, this factor would always favor

8    disclosure in any case in which legislative motives are at all implicated.

9        ***Seriousness of the Litigation.***  Unlike in *Arpaio*, factor three here weighs against

10   disclosure.  To be sure, this case raises serious issues for the Nation and perhaps for Director

11   Bergin, but the seriousness-of-the-litigation factor typically focuses on the nature of the

12   *federal* interest the party seeking to pierce the privilege asserts.  *See, e.g.*, *Arpaio*, 2016 WL

13   2587991, at *6 ("Plaintiffs seek to protect serious constitutional rights."); *Bethune-Hill*, 114

14   F. Supp. 3d at 341 ("there is no more foundational right than meaningful representation");

15   *ACORN v. County of Nassau*, 2009 WL 2923435, at *4 (E.D.N.Y. Sept. 10, 2009) ("the

16   'seriousness of the litigation,' *i.e.*, the civil rights implicated").  Director Bergin does not

17   seek to vindicate public rights guaranteed by federal law, which takes his claims outside the

18   type of "serious" litigation in which the privilege could potentially be breached.

19       Director Bergin's assertion (at 14-15) that this litigation implicates serious

20   "government misconduct" by the Nation is legally and factually wrong.  For present

21   purposes, however, it is sufficient to note that a "claim of unworthy purpose does not destroy

22   the privilege." *Tenney*, 341 U.S. at 377; *see also Arpaio*, 2016 WL 2587991, at *3 n.3.

23       ***Government's Role in the Litigation.***  This factor also counsels against disclosure.

24   The Nation is both a plaintiff and a counter-defendant and seeks not only to vindicate its

25   federal gaming rights but also to protect tribal legislators and the integrity of the Nation's

26   legislative process "from unwarranted intrusion."  *Arpaio*, 2016 WL 2587991, at *6.

27       ***Purposes of the Privilege.***  As in *Arpaio*, the fifth factor likewise weighs heavily

28   against disclosure.  Tribal legislative privilege furthers the same goals as state legislative

privilege:  (1) "guard[ing] legislators from the burdens of compulsory process"; and (2) "encourag[ing] legislators to engage deeply in the legislative process and act boldly in the public interest without fear of personal consequence." *Bethune-Hill*, 114 F. Supp. 3d at 341. Tribal legislators are charged with making weighty financial and policy decisions that affect the Nation's sovereignty and the basic needs of the Nation's members.  Both the interest in protecting the integrity of the legislative process "from unwarranted interference," *Arpaio*, 2016 WL 2587991, at *6, and the interest in freeing legislators to act in the public interest without fear of retaliation for those acts, *see Tenney*, 341 U.S. at 373, strongly disfavor disclosure here.  Just as the "practical import" of the privilege "is difficult to overstate," *Washington Suburban Sanitary Comm'n*, 631 F.3d at 181, so too the consequences of compelling disclosure regarding closed sessions are tremendous.

Director Bergin speculates (at 14) that there will be no chilling effect from piercing the privilege, but that ignores that the privilege serves the broader purpose of preventing undue judicial interference with legislative proceedings.  *See Bethune-Hill*, 114 F. Supp. 3d at 338 ("[t]he legislative privilege … has a wider sweep based on different purposes" than merely protecting against chilling deliberations).  In any event, Director Bergin's speculation is incorrect.  First, unlike the decision on which Director Bergin relies (*In re Grand Jury Proceedings*, 563 F.2d 577 (3d Cir. 1977)), this case does not involve criminal misconduct, but legislative decision-making regarding the Nation's land acquisition and economic development.  The chill that would result from disclosure under these circumstances would reach virtually all business conducted in closed sessions.  Second, as explained below, closed-session documents and testimony concerning the Glendale property are plainly legislative, whether they involve deliberations or fact-gathering.  Such communications concern the exercise of the Nation's land-replacement rights and the administration of the Nation's public lands, functions constitutionally assigned to the Council and carried out by formal legislative resolutions.  Third, the Nation safeguards the legislative immunity of Council members and others engaged in legislative functions both by tradition and by statute,

1    *see* 1 Tohono O'odham Code ch. 2, § 2103(A), and rules governing closed sessions create

2    unequivocal expectations of confidentiality, *see* Tohono O'odham Legis. R. art. 1, § 1(F).

3         In sum, even if the privilege is qualified, Director Bergin's motion should be denied.

4    Four of the five relevant factors weigh in favor of the privilege, making this an even stronger

5    case for protecting the privilege than *Arpaio*.  At the very least, the same three factors that

6    drove the Court's decision in *Arpaio* apply with equal force here.

7    **III.    DIRECTOR BERGIN MISUNDERSTANDS THE SCOPE OF THE PRIVILEGE**

8         Director Bergin also advances three arguments about the *scope* of the privilege—that

9    is, when and under what circumstances it attaches—aside from the question whether the

10   privilege is absolute or qualified.  Each argument fails as a matter of law.

11        *First*, Director Bergin insists that the communications and documents at issue are not

12   "deliberative."  But the legislative privilege, unlike deliberative-process privilege, is not

13   limited to deliberative documents.  It extends to "all of a legislator's communications 'that

14   bear on potential legislation,'" including gathering facts and soliciting advisory or factual

15   input.  *Arpaio*, 2016 WL 2587991, at *5; *see also Bethune-Hill*, 114 F. Supp. 3d at 338; *Kay*,

16   2003 WL 25294710, at *11.  Confidential discussions and fact-gathering about such matters

17   by Council members, close advisors, and counsel are plainly covered, at a minimum, by

18   legislative privilege.  *See, e.g.*, *Buonauro v. City of Berwyn*, 2011 WL 2110133, at *4-5

19   (N.D. Ill. May 25, 2011).  And pre-decisional communications during closed sessions of the

20   Council or the SLD Council are "deliberative" under any reasonable standard.[4]

21        *Second*, Director Bergin insists that the communications and documents at issue are

22   not "legislative."  Along the same lines, he asks (at 1) for a blanket ruling that deponents

23   must disclose the content of closed-session deliberations "unless the testimony sought

24   pertains directly to a discussion of legislation or policy in such a session."  That

---

26       [4] The Council often proceeds in closed sessions in part to receive legal advice from
counsel.  Attorney-client privilege—in addition to the legislative and deliberative-process

27   privileges—applies to those sessions.  Many of the communications at issue, in addition to
being protected by those privileges, would thus be protected by attorney-client privilege.

28

misunderstands the nature of the legislative privilege, and it misunderstands the nature of the closed legislative sessions that Director Bergin seeks to probe.  The privilege applies broadly to acts "in the sphere of legitimate legislative activity."  *Bogan*, 523 U.S. at 54; *Arpaio*, 2016 WL 2587991, at *5 ("[A]ll of a legislator's communications 'that bear on potential legislation' are privileged, 'regardless of their motivation.'" (citations omitted)).  That does not mean that the privilege applies *only* to the enactment of legislation.  Such a cramped view would mean, for example, that quintessentially legislative federal activities—such as oversight hearings, investigations, or the Senate's exercise of its advice and consent function—that are not directly tied to legislation would not be protected by the privilege.

In any event, the Nation's decision to exercise its land-replacement rights and apply to have property taken into trust was accomplished by a Council "resolution"—a formal legislative enactment by the Nation's legislative body.  *See* Tohono O'odham Legis. R. art. VIII, § 2(B)(1) ("[a]ll other legislative actions which have the full effect of law shall be enacted in the form of a resolution, ordinance, or other law").  Those are all matters that the Nation's Constitution commits expressly to its legislative body, the Council.  *See supra* pp. 1-2; *see also, e.g.*, *Eastland*, 421 U.S. at 504 (legislative immunity extends to activities concerning "proposed legislation or … other matters which the Constitution places within the jurisdiction of either House").  And the idea that public land purchases would be "legislative" in character is hardly unique to the Nation.  *See, e.g.*, Congressional Research Service, *Federal Land Ownership:  Acquisition and Disposal Authorities* 3 (May 19, 2015) ("Congress sometimes enacts legislation authorizing and governing specific land acquisitions").

Nothing in *Kaahumanu v. County of Maui*, 315 F.3d 1215 (9th Cir. 2003), is remotely to the contrary.  That decision recognized only that a city council's vote to deny a conditional use permit for a single individual was not legislative for purposes of liability under § 1983.  Here, the Council was exercising "legislative" authority granted to it by the Nation's Constitution, and the land purchase and trust decisions were part and parcel of the

1    Council's efforts to advance the economic well-being of the Nation as a whole through

2    lawmaking—specifically, by adopting resolutions which are quintessentially legislative.

3         ***Third***, contrary to Director Bergin's position (at 10), communications between

4    legislators and VDI at closed sessions or otherwise are protected.  The legislative privilege

5    applies to a wide variety of communications and meetings with groups and people outside

6    the legislature in which legislators customarily engage.  *See Arpaio*, 2016 WL 2587991, at

7    *4 (collecting cases).  The Nation's rules governing legislative immunity and closed sessions

8    recognize that tribal legislators rely not only on staff and others performing legislative

9    functions but also on persons outside the legislative process who provide essential

10   information as well as policy advice.  *See* 1 Tohono O'odham Code ch. 2, § 2103(A)

11   (extending immunity to staff and "other persons engaged in legislative activity"); Tohono

12   O'odham Legis. R. art. I, § 1(F)(2) (defining "closed sessions" to include not only Council

13   members but "persons providing testimony or advice, and others the Legislative Council

14   may feel to be appropriate").  Even assuming VDI was not itself performing a legislative

15   function, the information legislators received from it in closed sessions falls within the larger

16   ambit of legitimate legislative fact-gathering.

17   **IV.    THE ANCILLARY ISSUES RAISED DO NOT REQUIRE JUDICIAL RESOLUTION**

18        In addition to legislative privilege, Director Bergin raises a handful of issues that are

19   irrelevant to the privilege analysis and do not presently require judicial intervention.

20        ***San Lucy District***.  Director Bergin's request (at 15) that the Nation be ordered to

21   produce documents from San Lucy District is a nonissue.  As a constitutionally empowered

22   political subdivision with autonomy in matters of local concern, *see* Tohono O'odham Const.

23   art. IX, § 5, the District is not in fact similarly situated to a state agency like ADG, which

24   belongs to the same executive branch as the Governor and Attorney General.  A more

25   appropriate analogy would be whether the State of Arizona has control over documents of

26   the city of Phoenix.  Nevertheless, in a good-faith effort to facilitate discovery in *TON I*, the

27   Nation conveyed the State's requests for production to the District and coordinated the

28

                                       14

1    production of documents from the District.  The Nation has also been authorized to defend

2    the San Lucy District's assertions of legislative privilege here.

3        ***Attorney-Client Privilege*.**  With respect to "entry 3," Director Bergin for the first

4    time objects (at 10-11) to the San Lucy District's separate assertion of attorney-client

5    privilege.  The Nation agrees that "the mere inclusion of a lawyer in a communication does

6    not confer privilege."  MTC Br. 10-11.  However, if Director Bergin's objection is to the

7    specificity with which the attorney-client privilege has been asserted, the parties should

8    confer on that issue.  Judicial resolution now is particularly unnecessary because this issue

9    will be moot if the Court holds that an absolute or qualified privilege attaches.

10       ***Responsiveness to the Court's December 16, 2011 Order in* TON I.**  With respect to

11   "entry 8," Director Bergin objects (at 11) to the San Lucy District's assertion that documents

12   were withheld not only because of legislative privilege but because they were

13   "nonresponsive" to the Court's December 16, 2011 Order (*TON I*, ECF No. 80).  He argues

14   that order is not binding here, but he has offered no basis to question this Court's decision

15   about the scope of discovery in that litigation.  The appropriate time limits for discovery

16   have been the subject of many of the Nation's objections to written discovery to date, and

17   Director Bergin has not sought to meet and confer on that issue or brief that question before

18   this Court.  And, as with entry 3, his objection to entry 8 will be moot if the Court holds that

19   an absolute or qualified privilege protects the document.[5]

20                                           **CONCLUSION**

21       Director Bergin's motion to compel should be denied.

22

23

24

25

26       [5] In the alternative, Director Bergin requests (at 15) that the Court review the
     documents *in camera*.  Such review is unnecessary given that the Nation's response
27   fundamentally turns on legal questions, regardless of whether the privilege is qualified or
     absolute.  But the Nation, of course, will abide by any such order.
28

Dated:  June 3, 2016                    Respectfully submitted,


                                        /s/      Danielle Spinelli
                                        Laura Berglan,
                                           Acting Attorney General, SBN 022120
                                        Office of Attorney General
                                        TOHONO O'ODHAM NATION
                                        P.O. Box 830
                                        Sells, AZ  85634
                                        Telephone: (520) 383-3410
                                        laura.berglan@tonation-nsn.gov


                                        Seth P. Waxman (*Pro hac vice*)
                                        Danielle Spinelli (*Pro hac vice*)
                                        Kelly P. Dunbar (*Pro hac vice*)
                                        Sonya L. Lebsack (*Pro hac vice*)
                                        Kevin M. Lamb (*Pro hac vice*)
                                        WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                        1875 Pennsylvania Avenue, N.W.
                                        Washington, D.C.  20006
                                        Telephone:  (202) 663-6000
                                        seth.waxman@wilmerhale.com
                                        danielle.spinelli@wilmerhale.com
                                        kelly.dunbar@wilmerhale.com
                                        sonya.lebsack@wilmerhale.com
                                        kevin.lamb@wilmerhale.com


                                        Paul K. Charlton, SBN 012449
                                        Karl M. Tilleman, SBN 013435
                                        Erin N. Bass, SBN 030104
                                        STEPTOE & JOHNSON LLC
                                        201 E. Washington Street
                                        Suite 1600
                                        Phoenix, AZ  85004
                                        (602) 257-5200
                                        pcharlton@steptoe.com
                                        ktilleman@steptoe.com
                                        ebass@steptoe.com

                                        *Counsel for Plaintiff Tohono O'odham Nation*

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on this 3rd day of June, 2016, I electronically transmitted the

3  foregoing document to the Clerk's Office using the CM/ECF System, which will send a

4  notice of filing to all counsel of record.

5                                        /s/  Danielle Spinelli

6                                        DANIELLE SPINELLI

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28