# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

```
State of Arizona, et al.,      )
                               )
            Plaintiffs,        )
                               )
      vs.                      ) No. CV11-0296-PHX-DGC
                               )
Tohono O'odham Nation,         )
                               )
            Defendant.         )
_____)
```

DEPOSITION OF EILEEN MAUREEN RAMIREZ

Gila Bend, Arizona
April 30, 2012
1:06 p.m.

REPORTED BY:
PAMELA J. MAYER, RMR-CRR
Certified Reporter
Certificate No. 50207

PREPARED FOR:
ASCII/CONDENSED

(Copy)

1   was discussed?
2        A.   I believe so.
3        Q.   During your time at VDI, do you remember
4   discussions about the Painted Rock property?
5        A.   Yes.
6        Q.   What do you recall about discussions concerning
7   the Painted Rock property?
8        A.   Purchase it.
9        Q.   Purchase it for what?
10       A.   Homes.
11       Q.   During your time at VDI, do you remember
12  discussions about the west Phoenix property?
13       A.   Yes.
14       Q.   What do you recall about those discussions?
15       A.   Purchase it for economic development.
16       Q.   And you understood that economic development
17  included building a casino?
18            MR. HARDY:  Foundation.
19            THE WITNESS:  No.
20  BY MR. SCHULMAN:
21       Q.   After having reviewed these exhibits that we
22  have gone through today, does it refresh your memory at
23  all about conversations concerning VDI's interest in
24  building a new casino?
25       A.   No.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

State of Arizona, et al.,      )
                               )
            Plaintiffs,        )
                               )
       vs.                     ) No. CV11-0296-PHX-DGC
                               )
Tohono O'odham Nation,         )
                               )
            Defendant.         )
_____)


DEPOSITION OF DANIEL J. QUIGLEY, ESQ.

VOLUME I

(Pages 1 through 204)

Tucson, Arizona
March 16, 2012
9:10 a.m.


REPORTED BY:
PAMELA J. MAYER, RMR-CRR
Certified Reporter
Certificate No. 50207

PREPARED FOR:


(Copy)

1      A.   I don't recall.
2      Q.   How would -- how would someone go about
3   determining that?
4      A.   At this point in time, you would probably have
5   to talk to the people who were involved back at the time
6   of the acquisition or sometime, you know, after the
7   acquisition.
8      Q.   What's the latest date that you think that it's
9   possible that there was such an intention, based on all
10  the information that you have from the Nation?
11           MR. RUSING:  Object to the form, misstates
12  testimony.
13           THE WITNESS:  I don't recall the time.
14  And, you know, I'm not sure that, if there was an
15  intention, it was necessarily an intention of the Nation
16  itself to do that.
17  BY MR. GODFREY:
18     Q.   Okay.  Has the Nation ever taken any concrete
19  steps toward conducting gaming on the San Lucy Farm?
20     A.   No.
21     Q.   What about the Painted Rock property?  Has there
22  been any intention to conduct gaming on that property?
23     A.   From whose perspective?
24     Q.   The Nation.  The persons at the Nation who could
25  have set that in motion.

1      A.   I don't believe so.

2      Q.   Were there ever any efforts by the Nation or by

3  any of the Nation's districts or by any of the Nation's

4  or its districts' entities to keep the search for a

5  casino site in west Phoenix secret?

6           MR. RUSING:  Let me interpose an

7  objection.  He's not here to testify on behalf of any of

8  the subsidiaries of the Nation but, rather, the Nation

9  itself, and there's been 30(b)(6)s filed recently for the

10 other entities.

11 BY MR. GODFREY:

12     Q.   Okay.  I'm asking for the Nation's knowledge.

13 To the Nation's knowledge, were there any such efforts to

14 keep --

15          MR. RUSING:  I'll also object to the

16 extent it may implicate attorney/client privilege.

17          THE WITNESS:  There were efforts at

18 various times in relation to acquisitions under the

19 Gila Bend Act that were not for gaming purposes to keep

20 them confidential for the reason that publicity about

21 acquisitions in the past had impacted the ability to

22 acquire property.

23 BY MR. GODFREY:

24     Q.   Okay.  I'm asking specifically about the search

25 for a casino site, a gaming facility site in west

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

State of Arizona, et al.,         )
                                  )
         Plaintiffs,              )
                                  )
vs.                               ) No. CV11-0296-PHX-DGC
                                  )
Tohono O'odham Nation,            )
                                  )
         Defendant.               )
                                  )

DEPOSITION OF JAMES ALBERT CHASTON

Phoenix, Arizona
Wednesday, April 25, 2012
10:03 a.m.

REPORTED BY:
Rachelle K. Young, RPR

Certified Reporter

Certificate No. 50701

PREPARED FOR:

ASCII/MINI/E-TRAN

(Certified Copy)

Page 87

1   A.   I do.

2   Q.   What land was being represented by Columbus
3   Newport Company?

4   A.   I don't recall.

5   Q.   Do you recall anything about that potential
6   acquisition?

7   A.   I don't re- -- no, I don't remember specifically
8   what land that was.

9   Q.   Did VDI enter into multiple confidentiality and
10  non-circumvention agreements with Mr. Amavisca, to your
11  knowledge?

12  A.   The formal agreements, I don't know.

13  Q.   What about informal agreements?

14  A.   Yes.

15  Q.   In what context did VDI enter into informal
16  agreements with Mr. Amavisca on confidentiality?

17  A.   When we were dealing with the Painted Rock land
18  property, I don't know if there was an actual
19  confidentiality agreement that was signed to purchase that
20  land, but there was certainly an understanding.

21  Q.   What was your understanding of that agreement?

22  A.   That Mr. Amavisca would keep the ultimate party
23  of VDI or the Nation or the -- or the District
24  confidential from the land owners.

25  Q.   And the reason for that was because of the

Page 88

1  pricing issues that we've discussed before?
2     A.   Absolutely.
3          (Exhibit No. 168 was marked for
4           identification.)
5  BY MR. SCHULMAN:
6     Q.   Mr. Chaston, I'm handing you what has been marked
7  as Exhibit 168.  If you look at the very last page of this
8  document, you'll see that there's a fax line up at the top
9  that says, March 21st, 2002, "Associates Land
10 Specialists," and then at the bottom of that page, you'll
11 see your name.
12    A.   Yes.
13    Q.   Do you recall seeing this document before?
14    A.   This was a common format that Mr. Amavisca would
15 fax to me.
16    Q.   By the way, I need to represent to you that while
17 this is together as one exhibit, I'm not sure that these
18 three pages go together.
19    A.   Okay.
20    Q.   If you look at the bottom, right-hand corner of
21 each page, you'll see what we call a Bates label, and I
22 should have explained this to you before, but the parties
23 have produced documents in this litigation, and the
24 documents that begin with the prefix "T-O-N" are documents
25 that have been produced by the Nation in this litigation;

```
                                                             Page 1
              IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF ARIZONA


   State of Arizona, et al.,      )
                                  )
                     Plaintiffs,  )
                                  )
                vs.               ) No. CV11-0296-PHX-DGC
                                  )
   Tohono O'odham Nation,         )
                                  )
                     Defendant.   )
   _____)




                DEPOSITION OF RICHARD RAMIREZ


                       Tucson, Arizona
                       March 28, 2012
                         9:04 a.m.











   REPORTED BY:
   PAMELA J. MAYER, RMR-CRR
   Certified Reporter
   Certificate No. 50207

   PREPARED FOR:
   ASCII/CONDENSED

   (Copy)
```

1    as chairman at this meeting?
2         A.    Yes.
3         Q.    At the beginning of the minutes, it indicates
4    that this was a telephone conference between yourself and
5    the four other board members to take care of signing the
6    land purchase agreement.
7               Do you see that?
8         A.    Yes.
9         Q.    Do you recall this telephone conference?
10        A.    No, I don't recall this conference call.
11        Q.    Do you know what land purchase was being
12   referenced in these minutes?
13        A.    I can only speculate what it is.
14        Q.    Go ahead.
15              MR. RUSING:  Well, don't speculate.
16              MR. SCHULMAN:  I'm -- in this case, I want
17   him to speculate.
18              MR. RUSING:  Then objection, calls for
19   speculation.
20              THE WITNESS:  That would -- I can only
21   think of one property that has that size acreage that we
22   were involved in recommending part of that.  It's the
23   property referred to as Painted Rock, west of San Lucy.
24   That's the only piece of land that's that large.
25   ///

1  BY MR. SCHULMAN:

2     Q.   Why is it that you are speculating that you
3  think that this is referencing Painted Rock?
4     A.   Because I don't -- because it's -- I really
5  can't say it is that.
6     Q.   I'm just trying to understand what you're
7  looking at in these minutes that suggests that it might
8  even be Painted Rock.
9     A.   10,000 acres, or whatever it says.  10,000 would
10 be purchased.  I'm assuming that is the size of this
11 land.  And that's the only land, like I said, VDI looked
12 at or was involved in that was eventually purchased by
13 the district, Nation.
14    Q.   Do you recall Eleanor Ortega expressing
15 discomfort with the agreement to purchase the Painted
16 Rock land?
17    A.   No, I don't.
18    Q.   If you'll look at the second paragraph, in the
19 middle, the minutes read, "Richard is ok with the
20 agreement with Tohono O'odham Nation and Kimble wick
21 Land, LLC, with the term of what the District wants and
22 what they will benefit from this land purchase."
23         Do you see that?
24    A.   Yes.
25    Q.   Does that refresh your memory about what land

1    purchase was being considered in these minutes?
2         A.   Not really.
3         Q.   Was VDI considering using Kimblewick as the
4    buyer of the Painted Rock land?
5         A.   I really can't say, but Kimblewick is part of
6    VDI because when we originally started looking for land,
7    like Mr. O'Brien, he was familiar with the settlement and
8    had -- his asking price for land has always been more
9    than appraised value.  And so we decided that we would
10   use a company to minimize any, you know, sellers to
11   increase price, because it's -- if they're familiar with
12   it.
13            So -- and that's the reason why we -- but more
14   specifically, Kimblewick was established to pursue that
15   land deal in Prescott Valley.  But, again, there's a
16   developer that came to us with that particular property.
17   So -- it's been that way with -- with 99-503, people come
18   to sell us land or we look for land, and once they find
19   out, the price goes up.
20        Q.   Let's try to break down some of that answer.
21            Is it your testimony that the -- VDI used
22   Kimblewick as a purchasing agent, as the buying agent, in
23   order to hide the fact that the tribe was behind the
24   purchase?
25        A.   No.