**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tohono O'odham Nation, | No. CV-15-01135-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Douglas A. Ducey, et al., | |
| Defendants. | |

In May 2013, this Court ruled that the 2003 Gaming Compact between the State of Arizona and the Tohono O'odham Nation (the "Compact") did not prohibit the Nation from building a new casino in the Phoenix metropolitan area.  *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748 (D. Ariz. 2013).  Subsequently, the Nation began constructing a casino known as the West Valley Resort ("WVR") in Glendale, Arizona, a suburb of Phoenix.  In April 2015, while construction was ongoing, Daniel Bergin, Director of the Arizona Department of Gaming ("ADG"), wrote a letter to the Nation alleging that the Nation engaged in fraud during the formation of the Compact and asserting authority to withhold certification from the WVR's vendors and employees based on this conduct.  In response, the Nation brought this lawsuit against the Arizona Governor and Attorney General, as well as Director Bergin, claiming that federal law preempts any state-law authority to withhold these certifications.

The Court dismissed claims against the Governor and Attorney General, leaving

Director Bergin as the sole Defendant.  Doc. 82.  The Director has asserted counterclaims against the Nation.  Doc. 93.  In an order dated March 30, 2016, the Court dismissed the Director's counterclaim for promissory estoppel, but left in place his counterclaims for fraudulent inducement and material misrepresentation.  Doc. 127.

After completion of discovery, the Nation moved for summary judgment against the Director on the remaining counterclaims.  Doc. 253.  The Nation also seeks summary judgment on its preemption claim.  *Id*.  The Court heard oral argument on December 14, 2016.  Ruling from the bench, the Court found that disputed issues of fact prevent summary judgment on several of the Nation's arguments:  that the Nation had no definite plans to game in the Phoenix area before the Compact was signed, that the Nation made no actionable omissions, that the State did not actually or justifiably rely on any alleged misrepresentations or omissions in entering into the Compact, and that sovereign immunity bars the counterclaims.  The Court took three of the Nation's arguments under advisement:  that the State ratified the Compact after it learned of the alleged fraud and cannot now seek partial rescission, that the alleged misrepresentations and omissions were not made with the authority of the Nation, and that the Nation is entitled to summary judgment on preemption.  This order will address those issues.  The Court will also address the Nation's pending motion for spoliation sanctions.  Doc. 251.

## I.      Summary Judgment Standard.

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the movant meets this initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a genuine dispute of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).  The Court's function is not to weigh the

1   evidence and determine the truth, but to determine whether there is a genuine issue for

2   trial.  *Id.* at 249.  The Court must believe the nonmovant's evidence and draw all

3   inferences in its favor.  *Id.* at 255.

4   **II.    Ratification.**

5          The Nation argues that the Court should grant summary judgment on the

6   Director's fraud and misrepresentation counterclaims because "the State has ratified the

7   Compact by continuing to accept contractual benefits and exercise contractual rights

8   since learning in 2009 of the Nation's alleged fraud."  Doc. 253 at 10.[1]  In support of this

9   argument, the Nation relies primarily on the Restatement (Second) of Contracts.  Indeed,

10  the Nation cites to the Restatement at least ten times in its four-page argument.  *Id.* at 14-

11  18.  The Director also cites the Restatement on this issue.  Doc. 273 at 18.

12         The Court agrees that the Restatement provides the relevant law.  In a related case,

13  the Ninth Circuit held that the Compact in this case is governed by general principles of

14  "federal contract law."  *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 560 (9th Cir.

15  2016).  Federal contract law, in turn, looks to the Restatement.  *See Pauma Band of*

16  *Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155,

17  1163 (9th Cir. 2015) ("We 'often look to the . . . Restatement when deciding questions of

18  federal common law.'") (quoting *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 n.6

19  (D.C. Cir. 2001)); *Cty. of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1244 (9th Cir.

20  2009) (looking to Restatement to define federal common law of contracts), reversed on

21  other grounds, *Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110 (2011); *Wallach v.*

22  *Eaton Corp.*, 837 F.3d 356, 368 (3d Cir. 2016) (explaining that Restatement (Second) of

23  Contracts carries persuasive force in defining federal common law); *Bowden v. United*

24  *States*, 106 F.3d 433, 439 (D.C. Cir. 1997) (explaining that the principles of the

25  Restatement (Second) of Contracts are those "from which we would be inclined to

26  fashion a federal common-law rule"); *Turner v. American Fed'n of Teachers Local 1565*,

27

28         [1] Citations are to the page number applied by the Court's CMECF system to the top of each page, not the original number on the bottom of each page.

138 F.3d 878, 882 (11th Cir. 1998) (similar).

The Nation notes that "fraud in the inducement and misrepresentation do not void a contract; they merely render the contract 'voidable' at the election of the purportedly defrauded party." Doc. 253 at 15 (citing Restatement §7 & cmt. b). The defrauded party then has a choice: it can either rescind or affirm the contract. *Id.* If the defrauded party "acts in a manner 'inconsistent with disaffirmance' after the alleged misrepresentation is known – such as by accepting benefits or performing under the contract – it no longer has any right to rescind." *Id.* (citing Restatement § 380(2)).

Relying on these principles, the Nation contends that the State ratified the Compact by accepting benefits and performing obligations under the Compact for some 27 months after it learned of the Nation's alleged fraud, and thereby lost its right to rescind. The Court might agree, except that the Nation has not established the first step in this argument – when the State learned of the Nation's fraud.

Section 380(2) of the Restatement, which is the primary provision on which the Nation relies, makes clear that actual knowledge of fraud is required. It states:

> The power of a party to avoid a contract for mistake or misrepresentation is lost if after he knows or has reason to know of the mistake or of the misrepresentation if it is non-fraudulent or *knows of the misrepresentation if it is fraudulent*, he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance.

Restatement (Second) of Contracts § 380(2) (1981) (emphasis added). Thus, constructive knowledge – "knows or has reason to know" – is sufficient to trigger the election obligation only for non-fraudulent misrepresentation. Actual knowledge is required for fraudulent misrepresentation. Because the Director claims fraudulent misrepresentation, the State's duty to act arose only when it actually knew of the Nation's fraud.[2]

---

[2] The Nation also cites *Johns Hopkins University v. Hutton*, 488 F.2d 912, 917 (4th Cir. 1973), which applies a constructive knowledge standard. But that case concerned federal securities fraud law, not federal contract law which looks to the Restatement. The Court will apply the Restatement in this order, but notes that the parties have not briefed the question of what level of knowledge is required to trigger the

The Nation's motion does not establish when the State knew of the alleged fraud. The Nation asserts that it met with the Governor in January 2009 to discuss its plans to build the WVR, and announced the plans publicly on January 27, 2009.  Doc. 254, ¶¶ 3-4.  The Director does not dispute that the WVR plans became public at this time. Doc. 274 at 12.  But the Nation makes no attempt to show that a 2009 disclosure of plans to build the WVR was tantamount to disclosure that the Nation (as the Director alleges) was planning in 2001 and 2002 to open a casino in the Phoenix area.  The Director's allegation of fraud focuses on the 2001-2002 time period when the Compact was being negotiated: "the Nation had a secret plan *at the time it was negotiating the Compact* to build a gaming facility in the Phoenix metropolitan area and to assert the right to do so under IGRA and the Gila Bend Act, notwithstanding its contrary, false, representations to the State, the public and the Arizona voters."  Doc. 96 at 32-33 (emphasis added).  The Nation's disclosure in 2009 of plans to open the WVR said nothing about when those plans were formed or the truthfulness of representations made during negotiation of the Compact.  It was quite possible that the plans were formed well after the Compact was signed, in which case they would not support a claim of fraudulent inducement.

The Director does not address this issue.  He disputes the Nation's factual assertion that the State "knew or should have known" of the fraud no later than January 2009.  *See* Doc. 254, ¶ 5; Doc. 274 at 12, ¶ 5.  But he makes no argument on this point.  The Court cannot act as counsel for the Director, and normally would not raise an issue his lawyers have failed to address, but, as shown above, the Nation bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(a) (summary judgment warranted "*if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law") (emphasis added); *Celotex*, 477 U.S. at 323 ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis

election obligation.

- 5 -

1  for its motion, and identifying those portions of "the pleadings, depositions, answers to

2  interrogatories, and admissions on file, together with the affidavits, if any," which it

3  believes demonstrate the absence of a genuine issue of material fact.").  If the Nation fails

4  to discharge this duty, the Court cannot grant summary judgment.

5          The Nation cites only one item of evidence in support of its assertion that the State

6  knew of the fraud in January 2009 – a January 19, 2010 letter from Governor Brewer to

7  the Nation's chairman.  Doc. 256-1.  But that letter, which was written one year after

8  plans for the WVR were disclosed, says nothing about fraud.  The letter does assert that

9  the State and others understood that "casino style gambling would be limited to existing

10 tribal communities and would not become part of off-reservation neighborhoods" under

11 the Compact.  *Id.* at 2.  But this assertion could be nothing more than an allegation that

12 the Nation was breaching the Compact, as the State later asserted in court.  It does not

13 suggest that the Nation had plans for the WVR during negotiation of the Compact.  The

14 letter also asserts that the WVR would produce an imbalance by placing an urban gaming

15 facility "within the markets of several other tribes," would not provide jobs for tribal

16 members who live far from the WVR, and would "significantly frustrate[] community

17 relationships."  *Id.* at 2-3.  The letter provides no support for the suggestion that the State

18 knew the Nation had misled it in 2001-2002.

19         The Nation notes that the State did not assert a claim of fraud until April 22, 2011,

20 when it filed an amended complaint in *State of Arizona, et al. v. Tohono O'Odham*

21 *Nation*, CV-11-00296-PHX-DGC (Doc. 26).  But the Nation provides no evidence that

22 the State knew before that date that the Nation was planning (as the Director alleges) to

23 build a west-Phoenix casino during the years when it was representing otherwise to the

24 State's Compact negotiators.  Because the Nation has failed to show as a matter of

25 undisputed fact that the Nation knew of the fraud before its allegedly ratifying conduct,

26 as required by § 380(2) of the Restatement, the Court cannot conclude as a matter of

27 summary judgment that the State lost its right to rescind the Compact.

28         The parties spent most of their briefing and oral argument focusing on whether the

- 6 -

Compact is divisible and therefore subject to partial rescission. But because the Court cannot conclude at this point that the Director has lost his right to rescind, it need not decide this issue. For purposes of trial, if the Court finds that the Director has not lost his right to rescind through ratification, the Court will consider the divisibility analysis contained in § 383, comment b, of the Restatement, and its cross-reference to § 240. The Court will also consider whether it has an equitable power of divisibility as suggested by the Director from cases such as *Jones v. CPR Div., Upjohn Co.*, 584 P.2d 611, 617 (Ariz. Ct. App. 1978) ("[A] right of partial rescission may be upheld because the peculiar circumstance make it essential to a just result" and "there may be a partial rescission where the point at which good faith ends and fraud begins clearly appears."); *Farina v. Bevilacqua*, 13 Cal. Rptr. 791, 792-93 (Cal. Ct. App. 1961) (effecting equitable rescission of portion of land sale tainted by fraud).

## III. Authority of the Nation's Negotiators.

The Nation also argues that it is entitled to summary judgment on the fraud and misrepresentation counterclaims because its Compact negotiators, Daniel Quigley and Mark Curry, did not have authority to make representations on behalf of the Nation, a fact known by all parties to the negotiations. Doc. 253 at 7; Doc. 283 at 20. The Director argues that Quigley and Curry had both apparent and actual authority from the Nation to make representations, including the alleged misrepresentations. Doc. 273 at 28-29. The Court finds that a question of material fact precludes summary judgment on this basis.[3]

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the

---

[3] It appears clear from Nation's Constitution and the relevant resolution of the Nation's Council that Quigley and Curry lacked actual authority to bind the Nation to an agreement. *See* Doc. 256-4 at 5; Doc. 256-5. The Director contends, however, that Quigley and Curry had actual authority to make representations on behalf of the Nation, noting that authority to bind is different from authority to make representations. *See Auvil v. Grafton Homes, Inc.*, 92 F.3d 226, 229-30 (4th Cir. 1996). The Court concludes that further briefing on this alleged distinction and further evidence on the precise authorizations given to Quigley and Curry are needed to resolve this actual authority contention. The Court cannot resolve this issue by summary judgment.

principal's manifestations."  Restatement (Third) of Agency § 2.03.  The Nation makes two arguments as to why Quigley and Curry had no apparent authority as a matter of law: (1) apparent authority does not apply to sovereigns, and (2) the Nation made no representations to the State that would permit a finding of apparent authority.  Doc. 253 at 30-31; Doc. 283 at 20-21.

### A.    Applying Apparent Authority to a Sovereign.

The Restatement (Third) of Agency recognizes that "[t]he doctrine of apparent authority generally does not apply to sovereigns and entities that have been created by sovereigns to achieve governmental ends."  Restatement (Third) of Agency § 2.03 cmt. g. The Restatement also recognizes, however, that "a sovereign or entity can be estopped to deny the agent's lack of authority[.]"  *Id.*  Although awkwardly worded, the clear import of this comment is that a sovereign, in some circumstances, can be estopped from disavowing the apparent authority of its agent.

The Reporter's Notes to comment g state that "[s]everal courts appear to permit the use of estoppel when an agent lacked actual authority[.]"  *Id.*  These include cases where "the state has made an affirmative misrepresentation" or where estoppel is needed "to prevent manifest injustice."  *See e.g.*, *Smith v. Neville*, 539 N.W.2d 679 (S.D. 1995) (estopping the South Dakota Department of Transportation from denying that the State received notice of a plaintiff's injury resulting from a crash with a state employee after the plaintiff had substantially complied with the State's claims adjuster's instruction for providing notice, that instruction was misleading, and plaintiff reasonably believed the State had received notice); *Branca v. Board of Educ.*, 657 N.Y.S.2d 445 (N.Y. 1997) ("a governmental agency may be subject to estoppel if it is shown that a manifest injustice resulted from actions taken by the agency in its proprietary or contractual capacity . . . [and] where misconduct of the agency has induced justifiable reliance by a party who then changes position to his or her detriment.")

A 2015 decision of the Alaska Supreme Court provides an apt illustration.  In *Municipality of Anchorage v. Stenseth*, 361 P.3d 898 (Alaska 2015), the City of

Anchorage brought a claim against a former employee, Stenseth, for fraud in obtaining certain benefits from the City.  The parties agreed to mediate the dispute, and the City sent an attorney to the mediation.  Following the mediation, the City's attorney, with approval from a City claims administrator, made an offer to settle the matter for a payment from Stenseth of $30,000 and a release by the City of all claims.  Stenseth accepted the offer.  The City later sought to disavow the settlement, arguing that the attorney and claims manager were not authorized to enter into the settlement contract.  The Supreme Court of Alaska rejected the City's argument, holding that even if the attorney and claims manager "exceeded their actual authority during the settlement negotiations," the City "could be estopped to deny their lack of authority if Stenseth proved the elements of estoppel against the government."  *Id*. at 909 & n.32.  The court specifically cited comment g to § 2.03 of the Restatement.  *Id.*  The court found that Stenseth had sufficiently met the elements of estoppel, that "estoppel serves the interest of justice," and that the City was bound by the settlement.  *Id.* at 909.

Here, the Court finds a material issue of fact as to whether the Nation can be estopped from denying Quigley and Curry's apparent authority.  Like the City in *Stenseth*, which created apparent authority by sending an attorney to negotiate a settlement contract on its behalf, the Nation potentially conveyed apparent authority when it sent Quigley and Curry to negotiate the Compact.

**B.    Reasonable Belief Based on Manifestations by the Nation.**

The Nation also argues that it made no manifestations to the State that Quigley and Curry could bind the Nation.  Doc. 283 at 20.  "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable *and is traceable to a manifestation of the principal*."  Restatement (Third) of Agency § 2.03 cmt. c (emphasis added).  The Restatement recognizes, however, that a principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations[.]"  *Id.*  "It is usually a question for the trier of fact whether a

reasonable person in the position of a third party would believe that an agent had the authority or the right to do a particular act." *Id.* at cmt. d.

It is undisputed that Quigley and Curry were key members of the Nation's Compact negotiating team, delegated with the task of representing the Nation at negotiations and "implementing the decisions that were made [by the tribal leaders]." *See* Doc. 273 at 28-29; Doc. 283 at 13; *see also* Doc. 274-3 at 18 (Quigley's deposition as the Nation's 30(b)(6) witness). And like the City in *Stenseth*, which created apparent authority by sending its attorney to settlement negotiations, the Nation may have created apparent authority when it sent Quigley and Curry to the Compact negotiations.

A genuine issue of material fact exists as to whether the Nation took actions that could give rise to apparent authority and whether the State could have reasonably believed Quigley and Curry had authority to make representations. The Court will deny summary judgment on this issue.

**IV.    Preemption.**

Because the Court cannot grant summary judgment on the Director's counterclaims, it cannot grant summary judgment on the Nation's preemption claim. That claim is premised on the Nation's assertion that the Compact is valid and governs the parties' relationship with respect to the WVR, the Compact does not authorize the Director to withhold certifications at the WVR, and the Director's withholding of such certifications is therefore outside the Compact and preempted by the Indian Gaming Regulatory Act. The first step of this argument fails if the Compact is subject to rescission based on fraud and misrepresentation, an issue that must be decided at trial.

**V.    Spoliation.**

The Nation asks the Court to sanction the Director because an Assistant Attorney General ("AAG") assigned to provide counsel to the Director and ADG discarded notes he took during two or three meetings in May or June of 2015. The meetings were held with representatives of the Gila River Indian Community ("Gila River") and Salt River Pima-Maricopa Indian Community ("Salt River"), both of which operate casinos in the

Phoenix area and have a commercial interest in preventing the Nation from opening the WVR.  The AAG testified that he attended the meetings on behalf of ADG and took notes to assist him in later briefing the Director.  The AAG further testified that he discarded the notes after briefing the Director, as was his normal practice.  The Nation argues that discarding the notes constituted spoliation of relevant evidence and asks the Court, as a sanction, to strike the Director's unclean hands and bad faith defenses to the Nation's preemption claim and to draw an adverse inference about the effect of the 2015 meetings on the Director's subsequent actions with respect to the WVR.

"The failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences."  *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) (quotation marks and citation omitted).  Spoliation is the destruction or material alteration of evidence, or the failure to otherwise preserve evidence, for another's use in litigation.  *Id.*  A party seeking sanctions for spoliation must prove:  (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought discovery of the evidence.  *Id.*; *see also Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 520-21 (D. Md. 2010).

A related issue – prejudice resulting from loss of the evidence – is relevant when addressing a claim for sanctions.  Some courts have presumed prejudice when culpability and relevancy have been established.  *See, e.g.*, *Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010).  Other cases require a showing of actual prejudice, noting that such a showing "is an important check on spoliation allegations and sanctions motions."  *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 616-17 (S.D. Tex. 2010).

### A.     Duty to Preserve.

A duty to preserve evidence arises when a party knows or should know that the

evidence is relevant to pending or anticipated litigation. *Surowiec*, 790 F. Supp. 2d at 1005. Stated differently, the duty to preserve is triggered "not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *Morford v. Wal-Mart Stores, Inc.*, No. 2:09-cv-02251-RLH-PAL, 2011 WL 635220, at *3 (D. Nev. Feb. 11, 2011); *Surowiec*, 790 F. Supp. 2d at 1005.

The Court concludes that a duty to preserve existed when the AAG made notes during the meetings in 2015. The State of Arizona had already been involved in litigation with the Nation over the WVR, as had Gila River and Salt River. The purpose of the meetings was to discuss ways to block the WVR. The parties actually discussed the possibility that a tortious interference claim could be brought if ADG declined to certify employees and vendors at the WVR. In addition, the Director has asserted work product protection for documents created during this same time period (Doc. 251 at 9-10; Doc. 251-2), the Nation had threatened suit if ADG declined to issue the certifications (Doc. 251-17), and the Director's privilege log asserts that a series of emails in April 2015 was prepared "in anticipation of litigation regarding draft letter to Tohono O'odham Nation" (Doc. 251-2 at 3-5). There can be little doubt that ADG and its counsel anticipated litigation with the Nation when the meetings were held.

The Director argues that the AAG could not have known that the notes were relevant to any such potential litigation, but the Court does not agree. The AAG was meeting with competitors of the Nation and the WVR to discuss strategies for blocking the WVR. The parties discussed the possibility that at least some of these strategies could result in litigation. Plainly, notes about strategies that could result in litigation are likely to be relevant in that litigation.

The Court concludes that ADG and its counsel had a duty to preserve evidence in 2015, and that destruction of the notes violated that duty.

### B.    Culpability, Relevancy, and Prejudice.

The Court cannot reach a final conclusion on whether the notes were destroyed

with a culpable state of mind, how relevant the notes were to issues in this case, or the degree of prejudice suffered by the Nation, if any.  Culpability will turn in part on the state of mind of the AAG, something the Court can evaluate accurately only through hearing his live testimony.  Relevancy and prejudice will also be more accurately assessed in the context of trial, when the Court has a more complete understanding of the significance of the 2015 meetings on the Director's unclean hands and bad faith defenses. Indeed, the Director requests an evidentiary hearing on these issues.  Doc. 271 at 18.

As a result, the Court will deny the Nation's motion for sanctions without prejudice to the Nation raising this as an issue at trial.  Because this will be a bench rather than a jury trial, the Court need not resolve these matters through an evidentiary hearing before trial.

**IT IS ORDERED:**

1.      The Nation's motion for summary judgment (Doc. 253) is **denied**.

2.      The Nation's motion for spoliation sanctions (Doc. 251) is **denied without prejudice**.

3.      The Court will hold a telephone conference with the parties on **January 18, 2017**, at **10:00 a.m.**, to address the following issues:

      a.      The expected length of the trial; [4]

      b.      Dates for the trial in the months of April through August, 2017;

      c.      Whether the parties intend to file motions in limine or *Daubert* motions (recognizing that such motions generally are not necessary in a bench trial);

      d.      The date for submitting a proposed final pretrial order;

      e.      Whether and how the trial should consider the issue of whether the Compact, if valid, authorizes the Director's actions.

4.      The parties should submit a joint memorandum with their thoughts on these

---

[4] The Court will set a time limit for each side in the trial, and will hold the parties to these limits.  The Court anticipates that this case can be tried in 8-10 trial days of 5.5 hours each, but will be interested in the parties' estimates.

issues by **January 13, 2017**.

Dated this 19th day of December, 2016.

David G. Campbell
United States District Judge